# EXHIBIT 1

# COMMONWEALTH OF VIRGINIA



## SUMMONS – CIVIL ACTION
RULE 3:5; VA. CODE § 8.01-2

Case No. CL23000869-00

LOUDOUN ...................................................................................... Circuit Court

18 E MARKET ST/PO BOX 550, LEESBURG 20178-0550
<div align="center">ADDRESS</div>

TO:

NAT'L TRUST HIST. PRESERV. US, PAUL EDMONDSON, PRES. AND CEO

600 14TH STREET, NW

SUITE 500

WASHINGTON, DC 20005-

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the clerk's office of this court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment or decree against such party either by default or after hearing evidence.

Appearance in person is not required by this summons.

Done in the name of the Commonwealth of Virginia.

FEBRUARY 3, 2023        CLEMENS, GARY M                                    Clerk
<div align="center">DATE</div>

by  /S/ WALSH, ANGELA
<div align="center">DEPUTY CLERK</div>

Instructions:

Hearing Official: ...................................................................

FORM CC-1400 MASTER 10/13

# COMMONWEALTH OF VIRGINIA



## SUMMONS – CIVIL ACTION
RULE 3:5; VA. CODE § 8.01-2

Case No. CL23000869-00

LOUDOUN ............................................................................ Circuit Court

18 E MARKET ST/PO BOX 550, LEESBURG 20178-0550
<div style="text-align:center">ADDRESS</div>

TO:

CLEMENS, JAY C

20 FARMHILL CT.

HILLSBOROUGH, CA 94010-

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the clerk's office of this court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment or decree against such party either by default or after hearing evidence.

Appearance in person is not required by this summons.

Done in the name of the Commonwealth of Virginia.

FEBRUARY 3, 2023
<div style="text-align:center">DATE</div>

CLEMENS, GARY M
Clerk

by /S/ WALSH, ANGELA
<div style="text-align:center">DEPUTY CLERK</div>

Instructions:

Hearing Official: ....................................................................

# COMMONWEALTH OF VIRGINIA



## SUMMONS – CIVIL ACTION
RULE 3:5; VA. CODE § 8.01-2

Case No. CL23000869-00

LOUDOUN ............................................................................................. Circuit Court

18 E MARKET ST/PO BOX 550, LEESBURG 20178-0550
<div align="center">ADDRESS</div>

TO:

NELSON, MARTHA

110 RIVERSIDE DRIVE

APT. 15B

NEW YORK, NY 10024-3715

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the clerk's office of this court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment or decree against such party either by default or after hearing evidence.

Appearance in person is not required by this summons.

Done in the name of the Commonwealth of Virginia.

FEBRUARY 3, 2023          CLEMENS, GARY M                                            Clerk
<div align="center">DATE</div>

by   /S/ WALSH, ANGELA
<div align="right">DEPUTY CLERK</div>

Instructions:

Hearing Official: ..............................................................................

# COMMONWEALTH OF VIRGINIA



## SUMMONS – CIVIL ACTION
RULE 3:5; VA. CODE § 8.01-2

Case No. CL23000869-00

LOUDOUN .................................................................................................... Circuit Court

18 E MARKET ST/PO BOX 550, LEESBURG 20178-0550
<div style="text-align:center">ADDRESS</div>

TO:

TUDOR, PHOEBE

1405 SOUTH BLVD.

HOUSTON, TX 77006-6333

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the clerk's office of this court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment or decree against such party either by default or after hearing evidence.

Appearance in person is not required by this summons.

Done in the name of the Commonwealth of Virginia.

FEBRUARY 3, 2023 ........................    CLEMENS, GARY M _____ Clerk
<div style="margin-left:4em">DATE</div>

         by   /S/ WALSH, ANGELA _____
<div style="margin-left:18em">DEPUTY CLERK</div>

Instructions:

Hearing Official: ............................................................................

# COMMONWEALTH OF VIRGINIA



## SUMMONS – CIVIL ACTION
RULE 3:5; VA. CODE § 8.01-2

Case No. CL23000869-00

LOUDOUN ................................................................................................................. Circuit Court

18 E MARKET ST/PO BOX 550, LEESBURG 20178-0550
.......................................................... ADDRESS ..........................................................

TO:

BATES, WILLIAM J

57 MARLIN DRIVE, W.

PITTSBURGH, PA 15216-1538

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the clerk's office of this court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment or decree against such party either by default or after hearing evidence.

Appearance in person is not required by this summons.

Done in the name of the Commonwealth of Virginia.

FEBRUARY 3, 2023 ............................  CLEMENS, GARY M .................................................... Clerk
DATE

by  /S/ WALSH, ANGELA ....................................................................
DEPUTY CLERK

Instructions:

Hearing Official: ...........................................................................................

FORM CC-1400 MASTER 10/13

# COMMONWEALTH OF VIRGINIA



## SUMMONS – CIVIL ACTION
RULE 3:5; VA. CODE § 8.01-2

Case No. CL23000869-00

LOUDOUN ............................................................... Circuit Court

18 E MARKET ST/PO BOX 550, LEESBURG 20178-0550
<div align="center">ADDRESS</div>

TO:

BROWN, CHRISTINA LEE

6501 LONGVIEW LANE

LOUISVILLE, KY 40222-6107

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the clerk's office of this court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment or decree against such party either by default or after hearing evidence.

Appearance in person is not required by this summons.

Done in the name of the Commonwealth of Virginia.

FEBRUARY 3, 2023                    CLEMENS, GARY M                                    Clerk
<div align="center">DATE</div>

by /S/ WALSH, ANGELA
<div align="center">DEPUTY CLERK</div>

Instructions:

Hearing Official: ..................................................................

# COMMONWEALTH OF VIRGINIA



## SUMMONS — CIVIL ACTION
RULE 3:5; VA. CODE § 8.01-2

Case No. CL23000869-00

LOUDOUN ......................................................................... Circuit Court

18 E MARKET ST/PO BOX 550, LEESBURG 20178-0550
ADDRESS

TO:

CAHILL, ELIZABETH KIRKLAND

2 LADSON STREET

UNIT A

CHARLESTON, SC 29401-2757

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the clerk's office of this court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment or decree against such party either by default or after hearing evidence.

Appearance in person is not required by this summons.

Done in the name of the Commonwealth of Virginia.

FEBRUARY 3, 2023           CLEMENS, GARY M                                    Clerk
DATE

by   /S/ WALSH, ANGELA
DEPUTY CLERK

Instructions:

Hearing Official: ................................................................

# COMMONWEALTH OF VIRGINIA



## SUMMONS – CIVIL ACTION
RULE 3:5; VA. CODE § 8.01-2

Case No. CL23000869-00

LOUDOUN ............................................................................................ Circuit Court

18 E MARKET ST/PO BOX 550, LEESBURG 20178-0550
ADDRESS

TO:

DIXON, SAMUEL

114 W KING STREET

EDENTON, NC 27932-1852

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the clerk's office of this court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment or decree against such party either by default or after hearing evidence.

Appearance in person is not required by this summons.

Done in the name of the Commonwealth of Virginia.

FEBRUARY 3, 2023 .................................     CLEMENS, GARY M _____ Clerk
DATE

by   /S/ WALSH, ANGELA _____
DEPUTY CLERK

Instructions:

Hearing Official: ..........................................................................

FORM CC-1400 MASTER 10/13

# COMMONWEALTH OF VIRGINIA



## SUMMONS – CIVIL ACTION
RULE 3:5; VA. CODE § 8.01-2

Case No. CL23000869-00

LOUDOUN ................................................................ Circuit Court

18 E MARKET ST/PO BOX 550, LEESBURG 20178-0550

ADDRESS

TO:

DWIN, DAMIEN

90 E END AVENUE

APT. 22A

NEW YORK, NY 10028-8006

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the clerk's office of this court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment or decree against such party either by default or after hearing evidence.

Appearance in person is not required by this summons.

Done in the name of the Commonwealth of Virginia.

FEBRUARY 3, 2023          CLEMENS, GARY M                                        Clerk

DATE

by   /S/ WALSH, ANGELA

DEPUTY CLERK

Instructions:

Hearing Official: ................................................................

# COMMONWEALTH OF VIRGINIA



## SUMMONS – CIVIL ACTION
RULE 3:5; VA. CODE § 8.01-2

Case No. CL23000869-00

LOUDOUN ........................................................................................................... Circuit Court

18 E MARKET ST/PO BOX 550, LEESBURG 20178-0550
<div align="center">ADDRESS</div>

TO:

FRIST, TRACY

2031 OLD NATCHEZ TRCE

FRANKLIN, TN 27069-1902

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the clerk's office of this court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment or decree against such party either by default or after hearing evidence.

Appearance in person is not required by this summons.

Done in the name of the Commonwealth of Virginia.

FEBRUARY 3, 2023 ..................    CLEMENS, GARY M _____ Clerk
<div align="center">DATE</div>

by   /S/ WALSH, ANGELA _____
<div align="center">DEPUTY CLERK</div>

Instructions:

Hearing Official: .................................................................

# COMMONWEALTH OF VIRGINIA



## SUMMONS – CIVIL ACTION

RULE 3:5; VA. CODE § 8.01-2

Case No. CL23000869-00

LOUDOUN ................................................................ Circuit Court

18 E MARKET ST/PO BOX 550, LEESBURG 20178-0550
ADDRESS

TO:

GOVER, KEVIN

3304 ARUNDEL AVENUE

ALEXANDRIA, VA 22306-1416

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the clerk's office of this court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment or decree against such party either by default or after hearing evidence.

Appearance in person is not required by this summons.

Done in the name of the Commonwealth of Virginia.

FEBRUARY 3, 2023 ................................ CLEMENS, GARY M _____ Clerk
DATE

by   /S/ WALSH, ANGELA _____
DEPUTY CLERK

Instructions:

Hearing Official: ...........................................................

FORM CC-1400 MASTER 10/13

# COMMONWEALTH OF VIRGINIA



## SUMMONS – CIVIL ACTION
RULE 3:5; VA. CODE § 8.01-2

Case No. CL23000869-00

LOUDOUN ............................................................................................................ Circuit Court

18 E MARKET ST/PO BOX 550, LEESBURG 20178-0550
<div align="center">ADDRESS</div>

TO:

GRIEGO, LINDA

171 CALLE VENTOSO, W

SANTA FE, NM 87506-7730

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the clerk's office of this court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment or decree against such party either by default or after hearing evidence.

Appearance in person is not required by this summons.

Done in the name of the Commonwealth of Virginia.

FEBRUARY 3, 2023          CLEMENS, GARY M                                    Clerk
<div>DATE</div>

by   /S/ WALSH, ANGELA
<div>DEPUTY CLERK</div>

Instructions:

Hearing Official: ........................................................................................

# COMMONWEALTH OF VIRGINIA



## SUMMONS – CIVIL ACTION
RULE 3:5; VA. CODE § 8.01-2

Case No. CL23000869-00

LOUDOUN ................................................................................ Circuit Court

18 E MARKET ST/PO BOX 550, LEESBURG 20178-0550 ..............................
ADDRESS

TO:

HOAGLAND, ALISON K ............................................

777 C STREET, SE ....................................................

APT. 311 ....................................................................

WASHINGTON, DC 20003-4432 ..............................

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the clerk's office of this court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment or decree against such party either by default or after hearing evidence.

Appearance in person is not required by this summons.

Done in the name of the Commonwealth of Virginia.

FEBRUARY 3, 2023 ...........................    CLEMENS, GARY M ........................................................ Clerk
DATE

by   /S/ WALSH, ANGELA ......................................................
DEPUTY CLERK

Instructions:

Hearing Official: ....................................................................

# COMMONWEALTH OF VIRGINIA



## SUMMONS – CIVIL ACTION
RULE 3:5; VA. CODE § 8.01-2

Case No. CL23000869-00

LOUDOUN ................................................................................................ Circuit Court

18 E MARKET ST/PO BOX 550, LEESBURG 20178-0550

ADDRESS

TO:

KEITH, SHELLEY HOON

118 FORBES ROAD

MILTON, MA 02186-4211

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the clerk's office of this court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment or decree against such party either by default or after hearing evidence.

Appearance in person is not required by this summons.

Done in the name of the Commonwealth of Virginia.

FEBRUARY 3, 2023                CLEMENS, GARY M                                                    Clerk

DATE

by   /S/ WALSH, ANGELA

DEPUTY CLERK

Instructions:

Hearing Official: ................................................................................

# COMMONWEALTH OF VIRGINIA



## SUMMONS – CIVIL ACTION
RULE 3:5; VA. CODE § 8.01-2

Case No. CL23000869-00

LOUDOUN ........................................................................................ Circuit Court

18 E MARKET ST/PO BOX 550, LEESBURG 20178-0550
ADDRESS

TO:

LYON, CH RANDOLPH

1102 ELM TREE ROAD

LAKE FOREST, IL 60045-1433

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the clerk's office of this court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment or decree against such party either by default or after hearing evidence.

Appearance in person is not required by this summons.

Done in the name of the Commonwealth of Virginia.

FEBRUARY 3, 2023      CLEMENS, GARY M             Clerk
DATE

by    /S/ WALSH, ANGELA
DEPUTY CLERK

Instructions:

Hearing Official: ....................................................................

FORM CC-1400 MASTER 10/13

# COMMONWEALTH OF VIRGINIA



## SUMMONS – CIVIL ACTION
RULE 3:5; VA. CODE § 8.01-2

Case No. CL23000869-00

LOUDOUN .......................................................................................... Circuit Court

18 E MARKET ST/PO BOX 550, LEESBURG 20178-0550
.................................................................................. ADDRESS

TO:

SKYLER, JENNIFER

88 LEXINGTON AVENUE

APT. 706

NEW YORK, NY 10016-8943

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the clerk's office of this court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment or decree against such party either by default or after hearing evidence.

Appearance in person is not required by this summons.

Done in the name of the Commonwealth of Virginia.

FEBRUARY 3, 2023 .......................... CLEMENS, GARY M _____ Clerk
DATE

by ___/S/ WALSH, ANGELA_____
DEPUTY CLERK

Instructions:

Hearing Official: ...............................................................................

FORM CC-1400 MASTER 10/13

# COMMONWEALTH OF VIRGINIA



## SUMMONS – CIVIL ACTION

RULE 3:5; VA. CODE § 8.01-2

Case No. CL23000869-00

LOUDOUN ................................................... Circuit Court

18 E MARKET ST/PO BOX 550, LEESBURG 20178-0550
ADDRESS

TO:

TANKERSLEY, G JACKSON; JR

1530 BLAKE STREET

SUITE 200

DENVER, CO 80202-1336

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the clerk's office of this court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment or decree against such party either by default or after hearing evidence.

Appearance in person is not required by this summons.

Done in the name of the Commonwealth of Virginia.

FEBRUARY 3, 2023
DATE

CLEMENS, GARY M     Clerk

by /S/ WALSH, ANGELA
DEPUTY CLERK

Instructions:

Hearing Official: ...........................................................................

FORM CC-1400 MASTER 10/13

# COMMONWEALTH OF VIRGINIA



## SUMMONS – CIVIL ACTION
RULE 3:5; VA. CODE § 8.01-2

Case No. CL23000869-00

LOUDOUN .......................................................................................................... Circuit Court

18 E MARKET ST/PO BOX 550, LEESBURG 20178-0550 ........................................
ADDRESS

TO:

VILA, ROBERT JOSEPH .......................................................

690 ISLAND DRIVE .......................................................

.......................................................

PALM BEACH, FL 33480-4745 .......................................................

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the clerk's office of this court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment or decree against such party either by default or after hearing evidence.

Appearance in person is not required by this summons.

Done in the name of the Commonwealth of Virginia.

FEBRUARY 3, 2023 ............................    CLEMENS, GARY M _____ Clerk
DATE

by  /S/ WALSH, ANGELA _____
DEPUTY CLERK

Instructions:

Hearing Official: ...............................................................................

**VIRGINIA**

## IN THE CIRCUIT COURT OF LOUDOUN COUNTY

OATLANDS, INC.,         )
                           )
      Plaintiff,        )
                           )
v.                        )     Civil Case No: _____
                           )
NATIONAL TRUST FOR HISTORIC  )     JURY TRIAL DEMANDED
PRESERVATION IN THE UNITED STATES, )
600 14th Street, NW Suite 500     )
Washington, DC 20005        )
                           )
      Serve:  Paul Edmondson   )
             President and CEO   )
             600 14th Street, NW Suite 500 )
             Washington, DC 20005   )
                           )
JAY C. CLEMENS, TRUSTEE     )
                           )
      Serve:  Jay C. Clemens    )
             20 Farmhill Ct.     )
             Hillsborough, CA 94010  )
                           )
MARTHA NELSON, TRUSTEE    )
                           )
      Serve:  Martha Nelson    )
             110 Riverside Drive, Apt. 15B )
             New York, NY 10024-3715 )
                           )
PHOEBE TUDOR, TRUSTEE     )
                           )
      Serve:  Phoebe Tudor     )
             1405 South Blvd.    )
             Houston, TX 77006-6333  )
                           )
WILLIAM J. BATES, TRUSTEE   )
                           )
      Serve:  William J. Bates   )
              57 Marlin Drive, W.   )
             Pittsburgh, PA 15216-1538 )
                           )
                           )
                           )

CHRISTINA LEE BROWN, TRUSTEE                    )
                                               )
     Serve:  Christina Lee Brown               )
             6501 Longview Lane                )
             Louisville, KY 40222-6107         )
                                               )
ELIZABETH KIRKLAND CAHILL, TRUSTEE             )
                                               )
     Serve:  Elizabeth Kirkland Cahill         )
             2 Ladson Street, Unit A           )
             Charleston, SC 29401-2757         )
                                               )
SAMUEL DIXON, TRUSTEE                          )
                                               )
     Serve:  Samuel Dixon                      )
             114 W King Street                 )
             Edenton, NC 27932-1852            )
                                               )
DAMIEN DWIN, TRUSTEE                           )
                                               )
     Serve:  Damien Dwin                       )
             90 E End Avenue, Apt. 22A         )
             New York, NY 10028-8006           )
                                               )
TRACY FRIST, TRUSTEE                           )
                                               )
     Serve:  Tracy Frist                       )
             2031 Old Natchez Trce.            )
             Franklin, TN 27069-1902           )
                                               )
KEVIN GOVER, TRUSTEE                           )
                                               )
     Serve:  Kevin Gover                       )
             3304 Arundel Avenue               )
             Alexandria, VA 22306-1416         )
                                               )
LINDA GRIEGO, TRUSTEE                          )
                                               )
     Serve:  Linda Griego                      )
             171 Calle Ventoso, W              )
             Santa Fe, NM 87506-7730           )
                                               )
                                               )
                                               )
                                               )
                                               )

ALISON K. HOAGLAND, TRUSTEE                    )
                                               )
    Serve:  Alison K. Hoagland          )
           777 C Street, SE, Apt. 311     )
           Washington, DC 20003-4432      )
                                               )
SHELLEY HOON KEITH, TRUSTEE                    )
                                               )
    Serve:  Shelley Hoon Keith          )
           118 Forbes Road                )
           Milton, MA 02186-4211          )
                                               )
C.H. RANDOLPH LYON, TRUSTEE                    )
                                               )
    Serve:  C.H. Randolph Lyon          )
           1102 Elm Tree Road             )
           Lake Forest, IL 60045-1433     )
                                               )
JENNIFER SKYLER, TRUSTEE                       )
                                               )
    Serve:  Jennifer Skyler             )
           88 Lexington Avenue, Apt. 706  )
           New York, NY 10016-8943        )
                                               )
G. JACKSON TANKERSLEY, JR., TRUSTEE           )
                                               )
    Serve:  G. Jackson Tankersley, Jr.  )
           1530 Blake Street, Suite 200   )
           Denver, CO 80202-1336          )
                                               )
ROBERT JOSEPH VILA, TRUSTEE                    )
                                               )
    Serve:  Robert Joseph Vila          )
           690 Island Drive               )
           Palm Beach, FL 33480-4745      )
                                               )
        Defendants.                        )

## **COMPLAINT**

COMES NOW PLAINTIFF, OATLANDS, INC., by counsel, and prays that this Court award a

judgment in its favor and against the Defendants, the National Trust for Historic Preservation in

the United States (the "National Trust") and the members of the National Trust's Board of Trustees in their capacity as trustees. In support, Plaintiff alleges as follows:

## INTRODUCTION

Plaintiff, Oatlands, Inc. ("Oatlands") is a 501(c)(3) charitable organization responsible for maintaining and managing the Oatlands Historic House & Gardens and surrounding real estate ("Oatlands Historic House"). The Oatlands Historic House is a significant historical site located in Loudoun County, Virginia. The property is listed on the National Register of Historic Places as a National Historic Landmark. Construction on the main federal mansion began in 1804 and the building is recognized as one of the finest federal-period country estate houses in the nation.

Oatlands has maintained the Oatlands Historic House since July 15, 1984, though it does not currently own the real estate. Oatlands operates under a 30-year lease for $10/year and cares for the property. The Defendant, the National Trust, is the current owner of the property and manages an approximately $9 million endowment that was established primarily through private donors to care for the historic property.

The relationship between the parties is governed by Co-Stewardship Agreements. The current Co-Stewardship Agreements were amended in April 2019 to account for the transfer of a parcel of land worth over $1 million from Oatlands to the National Trust with the secured debt on the parcel paid out of the endowment funds. To compensate for this transfer from Oatlands to the National Trust and the loss of the endowment funds, Oatlands and the National Trust jointly agreed to work together to place a conservation easement on the property, which the parties' estimated would generate approximately $2 million to replenish the lost endowment funds. However, the National Trust defaulted on this obligation and has refused to pursue obtaining the conservation easement under any structure proposed by Oatlands.

These actions have resulted in a permanent reduction in the size of the endowment and the funds available to maintain and preserve the Oatlands Historic House and gardens. In addition, the National Trust has arbitrarily and in violation of the Co-Stewardship Agreements reduced the annual draw payment provided to Oatlands. The National Trust has also vetoed repair proposals and undermined the independent fundraising conducted by Oatlands.

The combination of the National Trust's actions has had a material adverse effect on Oatlands and the Oatlands Historic House. The lack of funding from the National Trust has strangled the resources available to Oatlands. Oatlands has been forced to deplete its reserves in order to attempt to provide necessary maintenance to the property, which has pushed Oatlands to the brink of insolvency. The Oatlands Historic House has suffered deterioration, including water damage, mold infestation, and unrepaired damage to its roof and balustrades. These conditions threaten the health and safety of Oatlands' personnel and guests to the property.

The lack of funds and available maintenance risks the loss of a nationally important site that is a part of American historical and cultural heritage. Oatlands has filed this suit to force the National Trust and its trustees to fulfill its obligations under the Co-Stewardship Agreements and ensure the Oatlands Historic House & Gardens are preserved for future generations.

<center>PARTIES</center>

1.      The Plaintiff, Oatlands, Inc. is a private 501(c)(3) charity dedicated to the maintenance and preservation of the Oatlands Historic House and Gardens located in Leesburg, Virginia, which is a National Historic Landmark listed on the National Register of Historic Places. Oatlands, Inc. is a Virginia Nonstock Corporation with its principal place of business located at 20850 Oatlands Plantation Ln, Leesburg, VA, 20175.

2.      Defendant, the National Trust for Historic Preservation in the United States ("National Trust") is a private non-profit corporation. The National Trust currently manages about $300 million in endowment funds, largely from private donations, in addition to its other assets. The National Trust was created by federal charter in 1949, which is codified at Sections 312101–32106 of Title 54 of the United States Code. The National Trust has authority to enter into contracts with local agencies, corporations, associations, or individuals and other parties pursuant to 54 U.S.C. § 312105(h). The National Trust may sue and be sued in its corporate name pursuant to 54 U.S.C. § 312105(c). Pursuant to 54 U.S.C. § 312103, the National Trust is deemed for purposes of venue in civil actions, to be a resident of the District of Columbia. Its principal office is located in the District of Columbia at 600 14th Street, NW Suite 500 Washington, DC 20005. The National Trust has an interest in, uses, or possesses real property in the Commonwealth of Virginia, including the Oatlands Historic House, the real property at issue in this case.

3.      Defendant, Jay C. Clemens, is a general trustee on the board of trustees ("Board of Trustees") of the National Trust. Mr. Clemens is sued in his official capacity as a trustee. Upon information and belief Mr. Clemens may be served at 20 Farmhill Ct., Hillsborough, CA 94010, which is an address at which he resides or regularly conducts business.

4.      Defendant, Martha Nelson, is a general trustee on the Board of Trustees of the National Trust. Ms. Nelson is sued in her official capacity as a trustee. Upon information and belief Ms. Nelson may be served at 110 Riverside Drive, Apt. 15B, New York, NY 10024, which is an address at which she resides or regularly conducts business.

5.      Defendant, Phoebe Tudor, is a general trustee on the Board of Trustees of the National Trust. Ms. Tudor is sued in her official capacity as a trustee. Upon information and belief

- 6 -

Ms. Tudor may be served at 1405 South Blvd., Houston, TX 77006, which is an address at which she resides or regularly conducts business.

6.      Defendant, William J. Bates, is a general trustee on the Board of Trustees of the National Trust. Mr. Bates is sued in his official capacity as a trustee. Upon information and belief Mr. Bates may be served at 57 Marlin Drive, W., Pittsburgh, PA 15216, which is an address at which he resides or regularly conducts business.

7.      Defendant, Christina Lee Brown, is a general trustee on the Board of Trustees of the National Trust. Ms. Brown is sued in her official capacity as a trustee. Upon information and belief Ms. Brown may be served at 6501 Longview Lane, Louisville, KY 40222, which is an address at which she resides or regularly conducts business.

8.      Defendant, Elizabeth Kirkland Cahill, is a general trustee on the Board of Trustees of the National Trust. Ms. Cahill is sued in her official capacity as a trustee. Upon information and belief Ms. Cahill may be served at 2 Ladson Street, Unit A, Charleston, SC 29401, which is an address at which she resides or regularly conducts business.

9.      Defendant, Samuel Dixon, is a general trustee on the Board of Trustees of the National Trust. Mr. Dixon is sued in his official capacity as a trustee. Upon information and belief Mr. Dixon may be served at 114 W King Street, Edenton, NC 27932, which is an address at which he resides or regularly conducts business.

10.     Defendant, Damien Dwin, is a general trustee on the Board of Trustees of the National Trust. Mr. Dwin is sued in his official capacity as a trustee. Upon information and belief Mr. Dwin may be served at 90 E End Avenue, Apt. 22A, New York, NY 10028, which is an address at which he resides or regularly conducts business.

11.     Defendant, Tracy Frist, is a general trustee on the Board of Trustees of the National Trust. Ms. Frist is sued in her official capacity as a trustee. Upon information and belief Ms. Frist may be served at 2031 Old Natchez Trce., Franklin, TN 27069, which is an address at which she resides or regularly conducts business.

12.     Defendant, Kevin Gover, is a general trustee on the Board of Trustees of the National Trust. Mr. Gover is sued in his official capacity as a trustee. Upon information and belief Mr. Gover may be served at 3304 Arundel Avenue, Alexandria, VA 22306, which is an address at which he resides or regularly conducts business.

13.     Defendant, Linda Griego, is a general trustee on the Board of Trustees of the National Trust. Ms. Griego is sued in her official capacity as a trustee. Upon information and belief Ms. Griego may be served at 171 Calle Ventoso, W, Santa Fe, NM 87506, which is an address at which she resides or regularly conducts business.

14.     Defendant, Alison K. Hoagland, is a general trustee on the Board of Trustees of the National Trust. Ms. Hoagland is sued in her official capacity as a trustee. Upon information and belief Ms. Hoagland may be served at 777 C Street, SE, Apt. 311, Washington, DC 20003, which is an address at which she resides or regularly conducts business.

15.     Defendant, Shelley Hoon Keith, is a general trustee on the Board of Trustees of the National Trust. Ms. Keith is sued in her official capacity as a trustee. Upon information and belief Ms. Keith may be served at 118 Forbes Road, Milton, MA 02186, which is an address at which she resides or regularly conducts business.

16.     Defendant, C.H. Randolph Lyon, is a general trustee on the Board of Trustees of the National Trust. Mr. Lyon is sued in his official capacity as a trustee. Upon information and

belief Mr. Lyon may be served at 1102 Elm Tree Road, Lake Forest, IL 60045, which is an address at which he resides or regularly conducts business.

17.     Defendant, Jennifer Skyler, is a general trustee on the Board of Trustees of the National Trust. Ms. Skyler is sued in her official capacity as a trustee. Upon information and belief Ms. Skyler may be served at 88 Lexington Avenue, Apt. 706, New York, NY 10016, which is an address at which she resides or regularly conducts business.

18.     Defendant, G. Jackson Tankersley, Jr., is a general trustee on the Board of Trustees of the National Trust. Mr. Tankersley is sued in his official capacity as a trustee. Upon information and belief Mr. Tankersley may be served at 1530 Blake Street, Suite 200, Denver, CO 80202, which is an address at which he resides or regularly conducts business.

19.     Defendant, Robert Joseph Vila., is a general trustee on the Board of Trustees of the National Trust. Mr. Vila is sued in his official capacity as a trustee. Upon information and belief Mr. Vila may be served at 690 Island Drive, Palm Beach, FL 33480, which is an address at which he resides or regularly conducts business.

<div align="center"><strong>JURISDICTION AND VENUE</strong></div>

20.     This is a breach of contract suit. The contract was made in Virginia, governed by Virginia Law, and the real property giving rise to this lawsuit is located in the County of Loudoun, Virginia.

21.     This Court has jurisdiction over this dispute pursuant to Va. Code § 8.01-328.1(A)(1), (2), (6). Among other basis for jurisdiction, the National Trust transacted business in the Commonwealth of Virginia, entered into a contract to be performed in this Commonwealth, and has an interest in using or possessing real property in this Commonwealth. In addition, this Court has jurisdiction pursuant to Va. Code § 64.2-710(A) because this dispute relates to the

administration of a trust governed by Virginia Law and this Court's jurisdiction is being invoked by Oatlands—a beneficiary and interested person with respect to administration of the trust.

22.     Venue is appropriate in Loudoun County pursuant to Va. Code § 8.01-261(1)(a)(1)– (2) and Va. Code § 8.01-262(3), (4), (5), (9), and (10).

<div align="center"><b>FACTUAL BACKGROUND</b></div>

23.     The Oatlands Historic House is located at 20850 Oatlands Plantation Lane in Leesburg, Virginia 20175.

24.     The historic core of the Oatlands properties consists of 396 acres with a Greek Revival mansion, whose construction began in 1804, with formal terraced gardens including a balustrade, front gate, reflecting pool, original plants from George Carter (the "Gardens"), several outbuildings and ancillary structures.

25.     The Oatlands Historic House was transferred to the National Trust by Margaret Eustis Finley in January 1965. The transfer was accompanied by $500,000.00 in securities that Ms. Finley instructed were to be used as an endowment for the preservation and maintenance of the historic property with "a condition of the gift that only the income derived from the endowment fund be used for the [preservation and maintenance] purposes." The National Trust accepted the property and the funds. The National Trust through its then-Chairman, Gordon Gray, included a stamp on the Finley Letter to indicate the National Trust agreed their acceptance was subject to the conditions of Ms. Finley's letter. A copy of the letter conveying this gift and the National Trust's acceptance is attached as **Exhibit 1**.

26.     By separate letter, the National Trust confirmed the gift and agreed that the house and grounds were conveyed "in pristine condition," which would "dictate our standard of operation for years to come." A copy of the letter is attached as **Exhibit 2**. The National Trust represented

that the endowment income from the funds provided would be used to maintain the Oatlands Historic House and "should always provide ideal care."

27.     Unfortunately, the National Trust has failed to live up to its promise to Ms. Finley and has failed to make the funds available to maintain the commitment to maintain the house and grounds in pristine condition despite having ample funding in the endowment to do so.

28.     The National Trust also failed to maintain the promises made to Valeria H. Symington.

29.     Ms. Symington in her will and trust provided a gift of $1.25 million (the "Symington Fund") on or about August 17, 2004 to the National Trust "to be used exclusively for Oatlands, 20850 Oatlands Lane, Leesburg, Virginia 20175." A true copy of a letter including the provisions in Ms. Symington's Trust regarding these funds is attached as **Exhibit 3**.

30.     By a board resolution dated October 3, 2004, the National Trust through its board of trustees accepted the gift from Ms. Symington. A true copy of this board resolution is attached as **Exhibit 4**.

31.     The Symington Fund together with the endowment provided by Ms. Finley and all other board-designated funds established for the benefit of the Oatlands House and related real estate collectively constitute the "National Trust Oatlands Endowment."

32.     Unfortunately, the National Trust has misused the Symington Fund and not made monies available "for the benefit of Oatlands 20850 Oatlands Lane" as Ms. Symington intended.

33.     The National Trust has used the Symington Fund for purposes other than caring for, maintaining, and preserving the historic mansion located at 20850 Oatlands Lane.

34.     In addition, Ms. Symington intended her gift to be used by Oatlands with the Oatlands Board having local control of the bequest. But the National Trust did not honor her intention and maintained control of the vast majority of the funds.

35.     The National Trust's actions prevented the use of the funds to provide necessary repairs and maintenance for the benefit of historic mansion and has limited the availability of monetary resources to care for the property to the detriment of Oatlands.

<u>The National Trust Agrees to a Co-Stewardship Agreement with Oatlands.</u>

36.     Oatlands is a 501(c)(3) charitable organization dedicated to managing and maintaining the Oatlands Historic House and Gardens through a draw provided by the National Trust, with the National Trust holding legal title to the real estate and managing the National Trust Oatlands Endowment for the property.

37.     Since July 15, 1984, Oatlands managed and operated the historic core through a successful co-stewardship with the National Trust, under a Co-Stewardship Agreement, which was amended and restated pursuant to agreements effective as of August 1, 2017.

38.     In April 2014, Oatlands separately acquired an additional parcel of land, located at 40040 Little Oatlands Lane, called the Oatlands Hamlet Property in order to protect the viewsheds from the mansion and the historic core and to generate income to support its maintenance of the larger historic site.

39.     However, in April 2019 the Oatlands Hamlet Property was conveyed to the National Trust for no consideration (the "Oatlands Hamlet Transaction"). The National Trust withdrew approximately $1,352,653 from the Symington Fund to pay the secured debt on the property located at 40040 Little Oatlands Lane. In connection with this transaction, the National

Trust and Oatlands agreed to secure a conservation easement on the Oatlands property, which would replenish the National Trust Oatlands Endowment and provide funding for the entire property.

40. Without securing a conservation easement to benefit and protect the entire Oatlands Historic House and adjoining real estate, the use of the Symington Fund to pay the secured debt on the property located at 40040 Little Oatlands Lane is outside the authorization provided by Ms. Symington for the use of her funds because the money would not "be used exclusively for Oatlands, 20850 Oatlands Lane, Leesburg, Virginia 20175." *See* Exhibit 3.

41. To memorialize their agreement with respect to the Oatlands Hamlet Transaction and to provide for the capital and operational needs of Oatlands and the Oatlands Historic House, Oatlands and the National Trust executed further amended documents in April 2019 to incorporate the mutual promises related to the Oatlands Hamlet Transaction and the ongoing relationship between the parties.

42. The Co-Stewardship Agreements executed on April 15, 2019 govern the current relationship between the National Trust and Oatlands. The Co-Stewardship Agreements consist of three separate documents: a "Cooperative Agreement," a "Collections Loan Agreement," and a "Lease Agreement." Copies of these documents are attached as **Exhibits 5**, **6**, and **7**.

43. Among the requirements of the Co-Stewardship Agreement are two main financial terms that are presently at dispute between the parties: the parties' mutual agreement to use their best efforts to secure the placement of a conservation easement to enhance the endowment and the resulting draw (the "Conservation Easement"), and the requirement by the National Trust to pay a draw from the National Trust Oatlands Endowment to Oatlands (the "Endowment Draw").

44. However, the National Trust has failed to perform its obligations under the Co-Stewardship Agreements, which has significantly constrained the financial resources available to Oatlands.

## The National Trust Fails to Fulfill Its Commitment to Obtain a Conservation Easement.

45. The Co-Stewardship Agreements require the parties to use their best efforts to secure the placement of the Conservation Easement on the Historic Core using the Virginia Land Preservation Tax Credit Program. Specifically, the parties agreed:

> **Transfer of Real Property Interests.** Neither Party will give, sell, or in any way transfer any real property interest with respect to the Property, including any easement, without the written consent of the other Party; PROVIDED, HOWEVER, the Parties agree to use their best efforts to secure the placement of a mutually-acceptable conservation easement on the Historic Core using the Virginia Land Preservation Tax Credit [P]rogram, with any net funds received to be held by the National Trust in a board-designated endowment for the Property, subject to approval of the terms by the National Trust Board and the Oatlands Board.

Exhibit 5, Cooperative Agreement, ¶13

46. The agreements further provided that the funds created by the board-designated endowment would be a part of the National Trust Oatlands Endowment and augment the quarterly Endowment Draw provided to Oatlands. *See* Exhibit 5, Cooperative Agreement, ¶6(i).

47. Had the Conservation Easement been timely obtained the National Trust Oatlands Endowment would have been increased by at least $2 million.

48. The increase in the National Trust Oatlands Endowment directly affects the Endowment Draw paid to Oatlands and would have resulted in hundreds of thousands of additional dollars received by Oatlands every year for the foreseeable future.

- 14 -

49. However, despite the requirement by the parties to use their best efforts to secure the placement of a conservation easement using the Virginia Land Preservation Tax Credit Program, the National Trust has refused to work with Oatlands to secure the easement.

50. The National Trust has represented that it would be willing to approach a private donor to provide the funds that would be generated by the easement. However, so far, the National Trust has not presented Oatlands with a commitment from any donor to contribute at least $2 million to Oatlands Endowment Fund under the Virginia Land Preservation Tax Credit Program or to otherwise resolve the National Trust's obligations with respect to the Conservation Easement and Oatlands does not believe such a donor exists.

51. Oatlands has suggested multiple options that would be acceptable to Oatlands to enable the parties to obtain the Conservation Easement. However, the National Trust has rejected each of these proposals.

52. The National Trust has claimed that its own existing easements on other properties are a barrier to obtain the Conservation Easement on the Oatlands Historic House and related real estate and has claimed that the parties in executing the Co-Stewardship Agreements and transferring the Oatlands Hamlet Property were operating under a mutual mistake with respect to the Conservation Easement.

53. However, the National Trust has the ability to secure the Conservation Easement either by divesting itself of any incompatible easements, or as Oatlands recommends, creating an LLC that is wholly controlled by the National Trust to hold the property and be able to qualify for the Virginia Land Preservation Tax Credit Program.

54. The National Trust has refused to take these steps in breach of the Co-Stewardship Agreements.

- 15 -

55. The National Trust has also refused Oatlands alternative demand to rescind the transfer of the Oatlands Hamlet Parcel, essentially taking the view that the National Trust can repudiate its obligations under the contract and provide Oatlands with no monetary consideration in exchange for the transfer of a parcel of land worth well over $1 million.

56. The National Trust's use of the Symington Funds to facilitate the acquisition by the National Trust of a valuable piece of real estate for no consideration and free of any secured debt benefited the National Trust's own interests at the expense of Ms. Symington's instruction that her money "be used exclusively for Oatlands, 20850 Oatlands Lane, Leesburg, Virginia 20175." *See* Exhibit 3.

57. The loss of the Oatlands Hamlet Parcel has exacerbated the financial strain on Oatlands in two major ways.

58. First, the Endowment Draw received by Oatlands has been significantly reduced. This reduction is because approximately $1.3 million of the funds in the endowment provided by Ms. Symington were used to pay secured debt on the Oatlands Hamlet Parcel. The annual Endowment Draw received by Oatlands is based on a percentage of the balance of the National Trust Oatlands Endowment, which includes the Symington Fund. Oatlands and the National Trust anticipated these endowment funds would be replenished from the proceeds from the Conservation Easement. But this has not occurred, resulting in fewer funds received by Oatlands each year in its Endowment Draw. Second, Oatlands is unable to obtain a loan, financing, or sell the parcel located at 40040 Little Oatlands Lane in order to meet its funding needs because the National Trust now holds title to the parcel.

59. While Oatlands believes the National Trust should simply fulfill its obligations, obtain the Conservation Easement, and pay the appropriate Endowment Draw, the National Trust

has also refused Oatlands' alternative demand to return the Oatlands Hamlet Parcel and rescind the transfer if the National Trust is unable or unwilling to follow through on its commitment and obtain the Conservation Easement. However, the National Trust has, without explanation, refused to do so.

<u>The National Trust Fails to Provide Oatlands a Full Endowment Draw.</u>

60.     The National Trust has also wrongfully and arbitrarily reduced the Endowment Draw paid to Oatlands, which has starved Oatlands of the funding necessary to maintain the Oatlands Historic House and pay its operational expenses.

61.     Under the Co-Stewardship Agreements, the National Trust maintains multiple board designated funds that are collectively defined under the agreements as the "National Trust Oatlands Endowment." Exhibit 5, Cooperative Agreement, ¶6(A).

62.     The Endowment Draw is a contractual responsibility of National Trust under the Co-Stewardship Agreements, with the Co-Stewardship Agreements providing:

> ***Quarterly Payments.*** Each fiscal year during the Term of this Agreement, the National Trust will pay to Oatlands, in four (4) equal quarterly installments during the first week of each quarter (July 1, October 1, January 1, April 1), the annual withdrawal from the Oatlands Fund #50016 and any other board-design[a]ted endowments established for the benefit of the Property (such as the board-designated endowment created with proceeds from the conservation easement pursuant to Paragraph 13), as applicable, permitted in accordance with the payout authorized by the National Trust Board, with administrative costs applied on the same basis as for other National Trust endowments (the "Endowment Draws").

Exhibit 5, Cooperative Agreement, ¶6(B)(i).

63.     At the time the Co-Stewardship Agreements were signed the "payout authorized by the National Trust Board" was 5% of the balance of the National Trust Oatlands Endowment.

64. But after the signing of the Co-Stewardship Agreements, the National Trust has instead been paying Endowment Draw payments to Oatlands as low as 3.5% of the National Trust Oatlands Endowment.

65. This has resulted in hundreds of thousands of dollars in lost Endowment Draw payments to Oatlands, directly reducing the money available for Oatlands' business operations and necessary maintenance to preserve the historic property.

66. At the time the parties were considering the Oatlands Hamlet Transaction and amending the Co-Stewardship Agreements, the parties obtained an estimate regarding the expected net proceeds from obtaining the Conservation Easement.

67. Those estimates were jointly provided to the National Trust and Oatlands on February 19, 2020 by David Moyes. Mr. Moyes estimated that the Conservation Easement would generate, in a worse-case scenario, at least $1,924,500.00 of proceeds after considering the estimated value of the property and anticipated expenses. A copy of these estimates is attached as **Exhibit 8**.

68. Oatlands calculates that if the National Trust fulfilled its obligations under the Co-Stewardship Agreements, the balance of the National Trust Oatlands Endowment would be approximately $2.5 million larger and Oatlands would have received approximately $500,000 in additional funds from Endowment Draws, as estimated in **Exhibit 9**.

69. As a result, Oatlands' total damages from the National Trust's breach of the Co-Stewardship Agreements are approximately $3 million. This includes at least $2.5 million to be added to the Oatlands' Endowment to compensate for lost proceeds from the Conservation Easement, plus investment returns on those proceeds, and at least $500,000 in additional

- 18 -

Endowment Draw receipts that would have been provided had Oatlands received an appropriate draw from its endowment.

<u>The National Trust Enacts a Spending Policy that is Inconsistent with the Co-Stewardship Agreement and that the Trust Has Arbitrarily Applied to the Detriment of Oatlands.</u>

70. On June 19, 2020, after the Co-Stewardship Agreements were adopted, the National Trust unilaterally enacted a spending policy ("Spending Policy") that lessened the draw payment to Oatlands.

71. The Spending Policy results in a different calculation of the Endowment Draw primarily because it (a) applies a reduction in the spending rate for fiscal years 2020-2024; (b) applies the spending rate to the average endowment fund balance over three-years; (c) and applies a 2% cap and floor on year-over-year increases to the Endowment Draw (defined in the Spending Policy as a "cap-and-collar").

72. The spending rate reduction, averaging, and cap-and-collar restrictions are not present in the Co-Stewardship Agreements executed by the National Trust and Oatlands. Oatlands did not agree in writing to the Spending Policy or any change in the methodology used to calculate its Endowment Draw. The Co-Stewardship Agreements specifically provide that any modification of the Cooperative Agreement (which would include changing the terms of the Endowment Draw) had to be in writing.

73. In addition, the Co-Stewardship Agreements contained an integration clause where the parties specified the documents that were included in their contract, providing:

> **Other Documents; Entire Agreement**. The Co-Stewardship Agreements (i.e. this Agreement, the Lease, and the Loan Agreement) constitute the complete understanding and agreement between the Parties, superseding any and all prior oral or written agreements and understandings (including the Cooperative Agreement, Lease, and Loan Agreement dated July 15, 1984), and will be read in conjunction with each other, and no modification, waiver or amendment of any provision thereof will be valid unless made in

writing and signed by the duly authorized representative of both Parties hereto.

Exhibit 5, Cooperative Agreement, ¶15(H).

74. The Spending Policy is not listed among the documents the parties included in their agreement.

75. The National Trust did not consult with Oatlands before reducing the Endowment Draw provided to Oatlands.

76. This failure to consult was a breach of the Co-Stewardship Agreements, which requires the parties to consult with each other on decisions to be made and actions to be taken with respect to the property. Exhibit 5, Cooperative Agreement, ¶3(B)(iv), ¶15(H).

77. The National Trust and its Board of Trustees did not make any individualized assessments regarding the effect of this reduction in endowment draw funding would have on Oatlands or the care of the Oatlands Historic House and Gardens.

78. The failure to conduct a reasonable inquiry into the effect of the change in the Endowment Draw on Oatlands and the historic property violated the fiduciary duty of care and duty of prudent administration as a trustee owed by the National Trust and each member of its Board of Trustees.

79. The parol evidence rule bars consideration of the Spending Policy in interpreting the Co-Stewardship Agreements, including the provisions regarding the payment of the Endowment Draw.

80. Oatlands contends that the National Trust was not free to unilaterally change the spending rate from the rate in place when the Co-Stewardship Agreements were executed. But even if the National Trust could change the spending rate, the draw received by Oatlands is inconsistent with, and far less than, the amount Oatlands should be receiving if its draw was

determined by multiplying the National Trust's Board approved spending rate by the balance of the Oatlands Endowment.

81.     The National Trust receives Consolidated Financial Statements and an Independent Auditor report for the end of its fiscal years, which end on June 30th of each year. The 2017-2018 financial statements report that the National Trust's authorized spending rate for restricted and unrestricted endowment funds was 5% for 2017 and 2018. According to the financial statements, the National Trust's authorized spending rate for 2019 was 5%, for 2020 was 4.95%; and 4.90% for 2021. Excerpts of these statements are attached as **Exhibits 10, 11**, and **12**.

82.     However, for fiscal year 2019, the balance of the National Trust Oatlands Endowment at the end of the prior year was $6,614,449.49. The National Trust made four quarterly draw payments to Oatlands of $79,066.00 (totaling $316,264). The payment of $316,264.00 was 4.78% of the $6,614,449.49 endowment balance and fell short of the 5% spending rate reported on the National Trust's financial statements.

83.     For fiscal year 2020, the balance of the National Trust Oatlands Endowment at the end of the prior year was $7,439,716.15. The National Trust made four quarterly draw payments to Oatlands of $80,985.50 (totaling $323,942.00). The payment of $323,942.00 was 4.35% of the $7,439,716.15 endowment balance and fell short of the 4.95% spending rate reported on the National Trust's financial statements.

84.     For fiscal year 2021, the balance of the National Trust Oatlands Endowment at the end of the prior year was $8,168,904.14. The National Trust made four quarterly draw payments to Oatlands of $83,339.75 (totaling $333,359.00). The payment of $333,359.00 was 4.08% of the $8,168,904.14 endowment balance and fell short of the 4.90% spending rate reported on the National Trust's financial statements.

85.     For fiscal year 2022, the balance of the National Trust Oatlands Endowment at the end of the prior year was $9,535,405.07. The National Trust has informed Oatlands it will make four quarterly draw payments to Oatlands of $85,006.50 (totaling $340,026.00). The payment of $340,026.00 is 3.57% of the $9,535,405.07 endowment balance and fell short of the 4.85% spending rate that the National Trust has reportedly authorized.[1]

86.     The reduction of the Endowment Draw from the historical 5% draw under the 2019 and prior Co-Stewardship Agreements to 3.57% in 2022 was an unexpected drop in funding support by the National Trust for Oatlands that materially damaged Oatlands' business operations.

87.     The payment being provided to Oatlands by the National Trust is inconsistent with the representations contained in the National Trust's audited financial statements.

88.     The National Trust knew that this reduction in the Endowment Fund payment would harm Oatlands but took no steps to mitigate this reduction in funding.

89.     In fact, the National Trust arbitrarily applied the Spending Policy, ignoring provisions designed to protect Oatlands.

90.     For example, the Spending Policy purports to apply a 2% cap and floor on year-over-year increases to the Endowment Draw. The National Trust has purported to rely on this cap-and-collar provision to reduce the Endowment Draw provided to Oatlands, resulting in a draw substantially less than the National Trust purports to provide in its public statements.

91.     But the Trust has not provided the 2% floor to protect Oatlands when the National Trust Oatlands Endowment fund balance was unexpectedly reduced by the inability to obtain the Conservation Easement in connection with the Oatlands Hamlet Transaction.

---

[1] Fiscal year 2022 has not completed and financial statements are not yet available.

92.     For the fiscal year prior to the Oatlands Hamlet Transaction, the National Trust made four quarterly draw payments to Oatlands of $103,714.00 (totaling $414,856.00).

93.     After the Oatlands Hamlet Transaction, the Oatlands Endowment was reduced. However, rather than apply the 2% floor to the full endowment draw to limit the disruption in Oatlands' operations, the National Trust calculated the Endowment Draw for the year to total $316,264. This was a 23.77% year-over-year reduction and resulted in about $100,000 less funding for Oatlands for that year.

94.     Had the 2% floor been correctly applied, the Endowment Draw for 2019 would have been $406,558.88 for the year (rather than $316,264.00). In addition, the draw for each year from 2019 would have also been larger. In total, this would have resulted in hundreds of thousands of dollars of additional funding provided to Oatlands.

### The National Trust's Actions Threaten Irreparable Damage to the Historic Property and Have Harmed Oatlands.

95.     The lack of support from the National Trust and the inability to replenish the National Trust Oatlands Endowment from the proceeds of the Conservation Easement have pushed Oatlands to the brink of insolvency.

96.     The lack of funding from the National Trust makes it impossible to maintain the Oatlands Historic House in the "pristine condition" that the National Trust committed itself to and represented would be sufficient to "always provide ideal care." *See* Exhibit 2.

97.     Oatlands is currently drawing down its reserves at the rate of $150,000 - $200,000 per year, after investing approximately $750,000.00 of its separate capital on maintenance and restoration projects that were not funded by the National Trust.

98.     The loss of reserves have forced Oatlands to significantly reduce its staffing from 15 full-time employees to 2. The staffing reductions have placed a significant strain on the

resources available to care for the historic properties, which makes it impossible to maintain the house and grounds in "pristine condition" or provide "ideal care."

99. The historic property at Oatlands is experiencing damage due to water infiltration, mold, and roof issues. Repairing these issues is beyond the financial resources available to Oatlands.

100. The roof of the property is in need of repair. This has resulted in water damage and moisture infiltration that have damaged the historic walls as well as the ceiling and flooring in the basement of the mansion.

101. The Co-Stewardship Agreements allow the National Trust to effectively veto repairs or changes to the property that are proposed by Oatlands. The National Trust has used this power arbitrarily, denying repair proposals by Oatlands, which has resulted in significant harm to the Oatlands Historic House.

102. Oatlands submitted a proposal to the National Trust from a donor identified by Oatlands for funds to assist in replacing the mansion roof. However, the National Trust denied this proposal because, at the time, the National Trust required the replacement roof to be done in copper.

103. This requirement by the National Trust increased the cost of the roof repair project beyond what Oatlands was able to perform and the National Trust did not make alternative funding available from the Oatlands Endowment to make these repairs.

104. The National Trust's decision to not allow necessary repairs has consequences that may have permanent deleterious effects on the Oatlands Historic House. The delay in repairing the roof has resulted in water damage and mold accumulation that affects the property. This has caused damage to the property. True and accurate photographs illustrating this water damage are below:

  

105. The conditions represented by these photographs fall short of maintaining the historic house and grounds in "pristine condition" as the National Trust committed itself to do in its October 1965 letter. Exhibit 2.

106. The risk of a collapse of all or a portion of the roof at Oatlands as well as mold accumulation presents a health and safety hazard to Oatlands' staff and visitors to the historic property.

107. Oatlands has raised to the National Trust the health and safety issue related to the roof and requested that the National Trust's President meet with Oatlands to discuss a special draw to provide for the repair of the roof. However, the National Trust has refused to even facilitate the meeting requested by Oatlands to discuss the issue.

108. The National Trust's decision to not facilitate the repair to the roof of the historic mansion and other buildings has negatively affected the yearly financial resources of Oatlands. Currently, Oatlands is spending approximately $30,000.00 on plaster and siding repairs due to the issues with the roof, which could be avoided if the roof were properly repaired.

109.    The balustrades at the Oatlands Historic House also require repairs that are beyond the resources of Oatlands to provide absent support from the National Trust.

110.    A balustrade is an upright support of a vertical square or lathe-turned form found in stairways, parapets, and other architectural features.

111.    At Oatlands, the balustrades form a railing structure in outdoor areas of the historic property.

112.    The balustrades have suffered significant deterioration that risk the loss of these historic features and also present a tripping and falling hazard to Oatlands' staff and its guests. A true and accurate photograph providing an example of the deterioration is below:



113.    Oatlands obtained a proposal from a private donor to pay for the replacement balustrades. However, the National Trust at the time denied the proposal because it insisted the balustrades could only be repaired by using 100-year-old wood. This demand significantly

increased the cost of the repairs beyond what Oatlands could afford, and the National Trust refused Oatlands requests to make any additional funds available.

114.    Oatlands estimates that it will cost about $2.5 million to make all of the necessary repairs required for the property, including nearly $1.5 million in necessary repairs for mold remediation, the mansion roof replacements, and the balustrades. These amounts exceed the funds available to Oatlands.

115.    Oatlands has raised to the National Trust the safety issues related to the unrepaired balustrades and requested that the National Trust's President meet with Oatlands to discuss a special draw to provide for this repair. However, the National Trust has refused to even facilitate the meeting requested by Oatlands to discuss the issue.

116.    Through these actions the National Trust has violated its commitment to maintain the Oatlands Historic House in "pristine condition" and "always provide ideal care" for the property.

### The National Trust has Retained the Oatlands Hamlet Parcel Despite the Requirement to Return Assets Entrusted to it By Oatlands.

117.    The Co-Stewardship Agreements contemplate that Oatlands has the ability to transfer assets to the National Trust to be managed by that entity. Title would be held by the National Trust but subject to a return to Oatlands at Oatlands' request.

118.    The Co-Stewardship Agreements provide:

**Alternative Investment Management Options.** In the Event that the Oatlands Board considers changing investment strategies for any funds held by Oatlands for the benefit of the Property, the National Trust agrees to provide Oatlands with the option, under the same terms offered to other National Trust co-stewardship organizations to invest such funds as a part of the National Trust's endowment. Such funds would be transferred to the ownership of the National Trust pursuant to an Endowment Transfer Agreement, subject to return of the funds thus transferred at the request of Oatlands. Funds thus transferred will be co-mingled with other endowment

- 27 -

funds held by the National Trust but will be accounted for in a sperate administrative account and designated for the benefit of the Property. Any decision to transfer funds to the National Trust shall be at the sole discretion of Oatlands, subject to the terms stated in the Endowment Transfer Agreement.

Exhibit 5, Cooperative Agreement, ¶6(D).

119.    As part of the Oatlands Hamlet Transaction, the National Trust withdrew $1,352,653 from the Oatlands National Endowment (specifically, the Symington Fund) to pay secured debt on the property. Oatlands then transferred the Oatlands Hamlet Parcel to the National Trust for no consideration.

120.    The transfer of the real estate to the National Trust is indistinguishable from the transfer of the monetary value of the parcel or trust funds used to retire the related debt.

121.    Oatlands is entitled to exercise its option under the Cooperative Agreement to require the National Trust to return the Oatlands Hamlet Parcel at the request of Oatlands.

122.    Oatlands has exercised its right and demanded return of the Oatlands Hamlet Parcel but the National Trust has refused to return the real estate.

123.    The National Trust's refusal to return the property is a breach of the Co-Stewardship Agreements.

124.    In addition, the retention of this property by the National Trust is a breach of the fiduciary duties owed by the National Trust and its Board of Trustees.

125.    The National Trust and its Board of Trustees are fiduciaries in a trust relationship with Oatlands and the Oatlands Historic House.

126.    As a result, the transaction is subject to review for entire fairness and is voidable as a matter of law by Oatlands. Retention of the Oatlands Hamlet Parcel by the National Trust at

Oatlands' expense is inconsistent with the trust relationship between the National Trust and Oatlands.[2]

127.    The transfer of the Oatlands Hamlet Parcel from Oatlands to the National Trust is a transaction between a trustee and a party in a trust relationship.

128.    The National Trust has an obligation to act with entire fairness with respect to transactions between itself and Oatlands/the Oatlands Historic House.[3]

129.    In the absence of a right to demand the return of the Oatlands Hamlet Parcel to Oatlands, the transfer of the Oatlands Hamlet Parcel to the National Trust for no consideration was not a transaction that meets the entire fairness standard and resulted in the National Trust obtaining an advantage against Oatlands beyond the normal commercial advantage applicable in arm's length real estate transactions.

### The Co-Stewardship Agreements Require the Parties to Seriously Consider Each Others' Views but the National Trust has Repeatedly Ignored the Issues Raised by Oatlands

130.    Oatlands has made multiple requests to the National Trust, asking that the Trust provide a special draw from the National Trust Oatlands Endowment to address critical repairs and funding for the site, including repairs to the mansion roof and balustrades. To facilitate its request, Oatlands sought an in-person meeting with the National Trust's President, Paul Edmondson, to discuss the request for a special draw to make these repairs.

131.    These repairs are necessary to provide ideal care to the property.

---

[2] *Swineford v. Virginia Tr. Co.*, 154 Va. 751, 759–60 (1930) ("Nothing in the law of fiduciary trusts is better settled than that the trustee shall not be allowed to advantage himself in dealings with the trust estate.").

[3] *See* Va. Code § 64.2-764(D) (providing interested transactions involving non-trust property are voidable where "the trustee obtains an advantage beyond the normal commercial advantage from such transaction").

132.    However, the National Trust has arbitrarily, and in violation of its fiduciary duties to Oatlands and the Oatlands Historic House, refused to even agree to a meeting with Oatlands to discuss these issues.

133.    Failing to consider the option of a special endowment draw in light of the critical needs facing the property violates the fiduciary duties of care and prudent administration owed by the National Trust and its Board of Trustees to Oatlands and the Oatlands Historic House.

134.    The National Trust's refusal to engage in discussions with Oatlands on these issues is also a breach of the Co-Stewardship Agreements.

135.    The Co-Stewardship Agreements impose requirements on Oatlands and the National Trust to engage in collaboration and mutual cooperation with respect to the Oatlands Historic House and seriously consider each other's views with respect to the maintenance of the historic property. However, the National Trust has failed to do so.

136.    Paragraph 3(b)(iv) of the Cooperative Agreement provides:

*Collaboration.* The Parties will continue to collaborate and consult in the maintenance, management, preservation, and operation of the Property with Oatlands informing the National Trust of significant developments relating to the Property and the National Trust informing Oatlands of significant developments relating to its historic sites and the field of historic site stewardship generally. Each Party will give serious consideration to the advice and recommendations of the other Party.

137.    Despite this obligation, the National Trust has not consulted with or given serious consideration to the advice and recommendation of Oatlands, including the need for necessary repairs, the need for additional funding, and facilitating meetings between Oatlands and National Trust personnel to discuss issues affecting the historic property.

138.    Similarly, Paragraph 15(H) of the Cooperative Agreement provides:

**Mutual Cooperation/Reasonableness.** The Parties agree to cooperate with each other in connection with the decisions to be made, and actions to be taken, under this Agreement. The Parties further agree that they will act in

a reasonable manner in the fulfillment of their rights and obligations under this Agreement.

139. The National Trust has not engaged in good faith cooperation, nor has it fulfilled its obligation to cooperate with Oatlands regarding decisions made and actions taken under the Co-Stewardship Agreements, including the payment of the Endowment Draw and the use of the Oatlands Endowment to make essential repairs to the property.

140. The National Trust has failed to act in a reasonable manner under this Agreement.

141. The National Trust has failed to maintain the Oatlands Historic House and grounds in pristine condition and to provide ideal care for the property as the National Trust committed to do. *See* Exhibit 2.

142. The National Trust's actions have resulted in monetary damages to Oatlands, including the cost of attorney's fees in filing this action to require the National Trust to fulfill its duties under the Co-Stewardship Agreements and its fiduciary duties with respect to Oatlands and the historic property.

143. Absent relief provided by the Court, the Oatlands Historic House and Oatlands will suffer irreparable damage.

## COUNT I
### ACTION TO COMPEL SPECIFIC PERFORMANCE
### REGARDING OBTAINING THE CONSERVATION EASEMENT

144. The Plaintiff incorporates the allegations set forth in paragraphs 1 through 143.

145. Virginia Law recognizes that parties who contract to utilize their best efforts to complete obligations do so and can be compelled to specifically perform that obligation, including undertaking the costs and burdens necessary to fulfill those obligations.[4]

---

[4] *Cangiano v. LSH Bldg. Co.*, 271 Va. 171, 180 (2006) (ordering specific performance of contract requiring a party to use best effort to obtain required easements and requiring defaulting party to pursue purchase of additional land to complete the requirement); *Wheeler*

146. The National Trust has failed to make devoted and painstaking application to obtain the Conservation Easement.

147. These devoted efforts and applications include divesting itself of easements or holdings that make the National Trust ineligible to qualify for the Virginia Land Preservation Tax Credit program or exploring alternate transaction structures that would permit qualifying for the program.

148. This Court has authority to specifically order the National Trust to perform such efforts.[5]

149. Without an order compelling specific performance, the National Trust will not fulfill its contractual obligation to obtain the Conservation Easement.

WHEREFORE, in consideration of the foregoing, Oatlands prays that this Court enter Judgment in its favor, and compel the National Trust to specifically perform the obligation in the Co-Stewardship Agreement to use its best efforts to obtain the Conservation Easement on the property, including but not limited to (1) compelling the National Trust to divest itself of any contrary easements or properties in order to allow the Nation Trust to qualify for the Virginia Land Preservation Tax Credit program; (2) compelling the National Trust to place the property in a limited liability company under the control of the National Trust in order to qualify for the Virginia Land Preservation Tax Credit program; (3) undertake any other actions that may be necessary to enable the placement of a conservation easement on the property; and/or (4) enter an award for

---

v. *Wheeler*, No. 1392-20-1, 2021 WL 3354359, at *4 (Va. Ct. App. Aug. 3, 2021) (finding that "best efforts" requires a party to make "devoted and painstaking application to accomplish an undertaking.").

[5] *Cangiano*, 271 Va. 171 at 181.

costs and attorney's fees incurred by Oatlands in gaining an order compelling the National Trust's compliance with the Co-Stewardship Agreements.

## COUNT II
### IN THE ALTERNATIVE DAMAGES FOR BREACH OF CONTRACT
### REGARDING FAILURE TO OBTAIN THE CONSERVATION EASEMENT

150. The Plaintiff incorporates the allegations set forth in paragraphs 1 through 149.

151. In the alternative that the National Trust is not ordered to specifically perform the obligation to obtain the Conservation Easement, Oatlands is entitled to an award of money damages for breach of contract related to the loss of the endowment funds that would have been generated from the Conservation Easement due to the National Trust's failure to perform.

152. The April 2019 Co-Stewardship Agreements, including the Cooperative Agreement were binding contracts entered between the National Trust and Oatlands.

153. The requirement to obtain the Conservation Easement was a material term to the contract which has been breached as a result of the National Trust's failure to perform.

154. The National Trust's breach of contract has caused material financial losses to Oatlands by failing to obtain funds for the National Trust Oatlands Endowment of approximately $2.5 million.

155. A monetary award for damages should be entered in favor of Oatlands and against the National Trust in that amount with the funds added to a board-designated endowment fund to care for the Oatlands Historic House and be included in the calculation for the Oatlands Endowment Draw.

WHEREFORE, in consideration of the foregoing, Oatlands asks this Court to enter a judgment in its favor and against the National Trust in the amount of at least $2.5 million for breach of contract, the sum of which to be used to create a board-designated endowment fund for the care

of the Oatlands Property with the balance included in the calculation of the annual Endowment Draw payable to Oatlands along with an award for costs and attorney's fees.

### COUNT III
### IN THE ALTERNATIVE ACTION FOR RECISSION
### OF THE TRANSFER OF THE OATLANDS HAMLET PARCEL

156. The Plaintiff incorporates the allegations set forth in paragraphs 1 through 155.

157. Oatlands believes the National Trust should perform its contractual obligations to obtain a Conservation Easement as contemplated by the Co-Stewardship Agreements.

158. However, to the extent obtaining the easement is impossible, the transfer of the Oatlands Hamlet Parcel to the National Trust should be rescinded.

159. The transfer of the Oatlands Hamlet Parcel from Oatlands to the National Trust for no consideration was premised upon the mutual agreement of the parties that the Conservation Easement would be obtained by the National Trust.

160. The requirement that the Conservation Easement be obtained to compensate for the transfer of the property and the reduction in the National Trust Oatlands Endowment was a requirement that was essential to the substance of the transfer of the Oatlands Hamlet Parcel.

161. To the extent the parties are unable—or in the case of the National Trust unwilling—to obtain the Conservation Easement, at a minimum the transfer of the Oatlands Hamlet Parcel should be rescinded.

162. Rescission is an equitable remedy designed to restore the parties to the position they would have been in where a contract should be abrogated or annulled on a legally sufficient ground.[6]

---

[6] 17A Am. Jur. 2d Contracts § 535; *See also Miller v. Reynolds*, 216 Va. 852 (1976) (rescinding real estate contract where real estate conveyance was premised on the land being suitable for the construction of a home and septic system but the septic tank could not be installed).

163. Recission is an appropriate remedy where a contract is void as a result of mutual or unilateral mistake or where appropriate to prevent unjust enrichment of one party at the expense of the other, and the parties can be returned to the status quo ante without prejudice.[7]

164. The receipt of the Oatlands Hamlet Parcel for no consideration by the National Trust unjustly enriches the National Trust at the expense of Oatlands. The failure to provide a Conservation Easement to replenish the Oatlands Endowment materially harms Oatlands.

165. The National Trust would not experience any prejudice from the return of the parcel.

166. In addition, Oatlands has a contractual right under the Co-Stewardship Agreements to demand the return of Oatlands assets entrusted to the National Trust for management.

167. Oatlands has made a written demand for return of the Oatlands Hamlet Parcel, which the National Trust has unreasonably refused.

WHEREFORE, in consideration of the foregoing, Oatlands asks that a judgment be entered in its favor and against the National Trust rescinding the transfer of the Oatlands Hamlet Parcel and entering an order compelling the National Trust to convey the parcel back to Oatlands along with an award for costs and attorney's fees.

## COUNT IV
### DAMAGES FOR BREACH OF CONTRACT
### FOR FAILURE TO PAY THE ENDOWMENT DRAW

168. The Plaintiff incorporates the allegations set forth in paragraphs 1 through 167.

---

[7] 17A Am. Jur. 2d Contracts § 538.

169.    The Co-Stewardship Agreements imposed an obligation on the National Trust to pay an annual Endowment Draw to Oatlands in accordance with the formula set forth in Paragraph 6(B)(i) of the Cooperative Agreement.

170.    The National Trust has breached the Co-Stewardship Agreements by failing to pay the Endowment Draw to Oatlands in the amount required by the Co-Stewardship Agreements.

171.    The National Trust has failed to pay approximately $500,000 in Endowment Draw payments to Oatlands which would have been paid had the National Trust fulfilled its obligations under the Co-Stewardship Agreements.

172.    Those funds would have been utilized by Oatlands to fund its necessary business operations, including the care and maintenance of the historic property.

WHEREFORE, in consideration of the foregoing, Oatlands asks this Court to enter a judgment in its favor and against the National Trust in the amount of at least $500,000 for breach of contract related to the payment of the Endowment Draw with that sum to be paid to Oatlands for Oatlands operational expenses along with an award for costs and attorney's fees.

## COUNT V
### DECLARATORY JUDGEMENT
### FOR FAILURE TO PAY THE ENDOWMENT DRAW

173.    The Plaintiff incorporates the allegations set forth in paragraphs 1 through 172.

174.    Pursuant to Va. Code § 8.01-184, this Court may issue a declaratory judgment and to make binding adjudications of right, including in controversies involving the interpretation of contracts and other instruments of writing.

175.    Oatlands and the National Trust have a judiciable disagreement regarding the requirements and obligations with respect to the payments under the Endowment Draw.

176.     Oatlands requests a determination of the amount and interpretation of the Endowment Draw and the status and application of the National Trust's purported Spending Policy, which Oatlands contends is barred by the parol evidence rule and is implemented arbitrarily by the National Trust.

WHEREFORE, in consideration of the foregoing, Oatlands asks that this Court enter a declaratory judgment interpreting the endowment draw requirement under the Co-Stewardship Agreement, entering declaratory relief that the National Trust may not unilaterally change that requirement pursuant to a spending policy, and enjoin the National Trust from relying on the Spending Policy in determining the Oatlands Endowment.

## COUNT VI
### DAMAGES FOR BREACH OF TRUST

177.     The Plaintiff incorporates the allegations set forth in paragraphs 1 through 176.

178.     The National Trust and its Board of Trustees hold the Oatlands Historic House and the National Trust Oatlands Endowment funds in trust as fiduciaries in accordance with the donations made by Margaret Eustis Finley and Valerie H. Symington and the conditions placed on those gifts. Exhibits 1, 3.

179.     The National Trust committed itself to maintain the Oatlands Historic House in "pristine condition," and as trustees, the National Trust and its Board of Trustees owe fiduciary duties with respect to Oatlands and the historic property. *See* Exhibit 2. The National Trust and its Board of Trustees were also required to use the funds provided by Ms. Symington exclusively for Oatlands, 20850 Oatlands Lane, as she directed. Exhibit 3.

180.     The National Trust has failed its commitment to maintain the property in "pristine condition" despite having the available endowment funds to do so and has used the Symington Funds in a manner outside the purposes designated in Ms. Symington's donation.

181.    Oatlands as caretaker of the Oatlands Historic House has standing to raise issues with respect to the condition of the property. Oatlands is also a beneficiary of the trust under applicable Virginia Law.

182.    Oatlands is a "beneficiary" of this trust under Section 64.2-701 of the Virginia Code because Oatlands is an identified charitable organization that will or may receive distributions under the terms of the trust as established by the donors, or as determined or amended by the National Trust including through the Co-Stewardship Agreements. Oatlands also has a vested interest in the care and maintenance of the Oatlands Historic House.

183.    The National Trust and each member of its Board of Trustees owes certain fiduciary duties under Virginia Law as trustees. These include the duty to administer and invest, a duty of care, a duty to prudently administer the trust, the duty of loyalty, and the duty to control and protect trust property.

184.    However, the National Trust and each of the members of its Board of Trustees has breached these duties by their actions.

185.    These include, but are not limited to: (1) breaching their duty of care and their duty of prudent administration by allowing the property to fall into disrepair by failing to provide Oatlands with sufficient funds to maintain the property and arbitrarily denying necessary repairs when proposed by Oatlands; (2) violating the terms of the trust by failing to maintain the property in "pristine condition" and/or using the Symington Funds for purposes other than exclusively for the real property located at 20850 Oatlands Lane; (3) violating their duty of care, prudent administration, and duty to protect trust property by failing to adequately inform themselves and take the steps a reasonably prudent person would take to understand the conditions and alternatives with respect to the property, including by denying Oatlands' repeated requests for a meeting with

the President of the National Trust to discuss a special endowment draw to make critical repairs to the mansion roof and balustrades; (4) violating their duty of loyalty by accepting the transfer of a parcel of land worth over $1 million for no consideration from Oatlands, a beneficiary of the trust; (5) mismanaging endowment funds and using income generated by the fund for purposes other than caring for the Oatlands Historic House.

186.     Pursuant to Va. Code § 64.2-792, Oatlands and the Oatlands Historic House are entitled to an order providing remedies in their favor and against the National Trust and the members of the Board of Trustees in the form of, among others, an order from this Court compelling (1) the National Trust to perform its duties under the Co-Stewardship Agreement, including making an appropriate Endowment Draw and either obtaining the Conservation Easement or contributing $1.96 million from the National Trust's general funds to the Oatlands Endowment to remedy the failure to obtain the Conservation Easement; (2) entering a declaratory judgment that the National Trust and each member of its Board of Trustees has breached their fiduciary duties under the trust and enjoining the National Trust and its trustees from further breaches; (3) compelling the National Trust and its Board of Trustees to redress their breaches of trust by paying money, restoring property, or other means; and (4) entering an award of damages in favor of Oatlands and against the National Trust and its Board of Trustees.

187.     The measure of damages is provided pursuant to Virginia Code § 64.2-793, which permits a beneficiary to seek damages for breach of trust in the greater of the amount required to restore the value of trust property and distributions to what they would have been had the breach not occurred or the profit made by the trustee for the breach of the trust.

188.     Here, Oatlands is entitled to an award of $2.5 million to be added to its endowment fund on account of the Conservation Easement; an additional award of approximately $500,000 to

be paid to Oatlands for its operation on account of underpaid Endowment Draws. Alternatively, Oatlands is entitled to receive an award of $1.23 million against the National Trust and its trustees on account of the value of the Oatlands Hamlet Parcel—or the entry of an order compelling the National Trust to execute a quit claim deed conveying the parcel back to Oatlands—as well as an additional award of $2.5 million (for a total of $3.73 million) to make necessary repairs to restore the Oatlands Historic House to pristine condition as required by the trust.

189.     Oatlands is also entitled to an award for its attorney's fees in bringing this action to remedy these breaches of trust. Pursuant to Va. Code § 64.2-795 this Court may award "costs and expenses, including reasonable attorney fees" to be paid by another party or from the trust that is the subject of the controversy as justice and equity may require.

WHEREFORE, in consideration of the foregoing, Oatlands asks this Court to enter a judgment in its favor and against the National Trust and each member of its Board of Trustees, award monetary damages for breach of trust in the amount up to $3.73 million, appropriate injunctive relief, and require the National Trust and each member of the Board of Trustees to pay Oatlands' costs and expenses for bringing this action, including Oatlands' reasonable attorney's fees.

## COUNT VII
### ACTION FOR REMOVAL OF THE NATIONAL TRUST AS TRUSTEE FOR SERIOUS BREACH OF TRUST

190.     The Plaintiff incorporates the allegations set forth in paragraphs 1 through 189.

191.     Virginia Code 64.2-792(5) allows the Court to "[a]ppoint a special fiduciary to take possession of the trust property and administer the trust" and Va. Code § 64.2-792(7) allows for the removal of the trustee of a trust under certain circumstances, which are set forth in Va. Code § 64.2-759.

192.     Virginia Code § 64.2-759(B) allows a beneficiary or co-trustee of a trust to petition to remove a trustee, among other reasons, if "[t]he trustee has committed a serious breach of trust."

193.     Removal of a trustee or the appointment of a special fiduciary are serious matters but here these remedies are appropriate because the National Trust and its trustees have committed a serious breach of trust.

194.     A breach of the duty of loyalty and engaging in a self-interested transaction that resulted in the acquisition of parcels of real property worth in excess of a million for no consideration constitutes a serious breach of trust.

195.     Here, the National Trust and the members of its Board of Trustees committed a serious breach of trust in acquiring title to the Oatlands Hamlet Parcel for no consideration and continuing to maintain ownership of this parcel despite Oatlands' demand that the parcel be returned.

196.     The National Trust and its Board of Trustees have also failed to provide an appropriate endowment draw to support Oatlands' operations, provide funds for necessary maintenance to care for the historic property, or consent to necessary repairs being made to the property as proposed by Oatlands, including the repair of the mansion roof and balustrades.

197.     The National Trust and its Board of Trustees have allowed significant deterioration to occur to the Oatlands Historic House despite having the resources able to preserve the historic property, which is directly contrary to the purpose of the endowments and the National Trust's obligation in accepting the endowment funds to maintain the historic property in "pristine condition" and to use the funds they received "exclusively" to preserve and maintain the historic house. *See* Exhibits 1, 3.

198.    By denying resources to Oatlands, the National Trust is using its economic power as the primary source of funding for Oatlands to starve Oatlands of the resources to care for and maintain the property in order for the National Trust to escape its contractual obligations, including its obligation to obtain the Conservation Easement and to make an appropriate Endowment Draw.

199.    These actions are a serious breach of trust that constitute cause for the removal of the National Trust and its Board as trustees and the appointment of a special fiduciary to take control of and administer the "50016 - Oatlands General Endowment Fund," the "50141 - Symington Fund" and any other board designated funds that collectively with the General Endowment and Symington Fund constitute the National Trust Oatlands Endowment.

WHEREFORE, in consideration of the foregoing, Oatlands asks that this Court enter an order finding that the National Trust and each member of its Board of Trustees has committed a serious breach of trust, removing the National Trust and the members of its Board of Trustees as trustees, and appointing a special fiduciary to take possession of and administer the Oatlands Endowment for the benefit of Oatlands and the Oatlands Historic House, and requiring the National Trust and the members of its Board of Trustees to pay Oatlands' costs and expenses for bringing this action, including Oatlands' reasonable attorney's fees.

## DEMAND FOR A JURY TRIAL

200.    The Plaintiff incorporates the allegations set forth in paragraphs 1 through 199.

201.    Oatlands demands a jury trial on all issues related to the allegations in this complaint that may be tried by a jury.

WHEREFORE, in consideration of the foregoing, Oatlands ask that this Court enter judgment in its favor and against the National Trust and each member of its Board of Trustees and award monetary damages in favor of Oatlands in the amount of approximately $3 million—consisting of

at least $2.5 million to be added to the Oatlands' Endowment and $500,000 to be paid as an Endowment Draw for property maintenance, repairs, and Oatlands' operations plus additional costs and attorney's fees. In the alternative, Oatlands asks that this Court order recission of the transfer of the Oatlands Hamlet Parcel. In addition, Oatlands asks that this Court declare that the National Trust and each member of its Board of Trustees has engaged in a breach of trust, award damages for the breach of trust in an amount up to $3,730,000, remove the National Trust and the members of its Board of Trustees as trustees, and appoint a special fiduciary to take possession of and administer the Oatlands Endowment for the benefit of Oatlands and the Oatlands Historic House.

Respectfully Submitted,

OATLANDS, INC.
By counsel

_Bradley Jones_

Bradley D. Jones, Esq.
Virginia State Bar No. 85095
Lauren Farrar, Esq.
Virginia State Bar No. 96965
Counsel for Plaintiff
ODIN, FELDMAN & PITTLEMAN, P.C.
1775 Wiehle Avenue, Suite 400
Reston, VA. 20190
Tel:     (703) 218-2176 (Mr. Jones)
         (703) 218-2145 (Ms. Farrar)
Fax:    (703) 218-2160
Email: Brad.Jones@opflaw.com
         Lauren.Farrar@ofplaw.com


DATE: February 2, 2023

#5481484v1 092013/000001

Uploaded: 2023FEB02 12:52 Filed By:Bar# 96965 LFARRAR Reference: EF-116617
E-Filed: 2023FEB02 LOUDOUN CC ANGELA.WALSH at 2023FEB03 15:51 CL23000869-00

EXHIBIT 1

Washington, D. C.
January 4, 1965

National Trust for Historic Preservation
in the United States
Transportation Building
Washington, D. C. 20006

Dear Sirs:

I am delivering to you today securities of the value
of $500,000. Such securities shall be selected from the
enclosed list by your representative and American Security
and Trust Company acting for me using today's market values.
This $500,000 gift is to constitute an endowment fund for the
maintenance and preservation of property known as "Oatlands"
near Leesburg, Virginia, which was conveyed to you by my
husband, myself and my sister, Anne Eustis Emmet, by deed
dated December 22, 1965. It is a condition of this gift that
only the income derived from the endowment fund thus created
in to be used for the above-stated purposes.

The actual details of the transfer of the securities
will have to be worked out between your representative and
American Security and Trust Company.

It is my hope, but it is not a condition of this
gift, that American Security and Trust Company be made the
custodian of this fund.

Very truly yours,

Margaret Eustis Finley

This fund has been accepted under
the conditions set forth above.

NATIONAL TRUST FOR HISTORIC PRESERVATION
IN THE UNITED STATES

by _____Gordon Gray_____
Chairman

| Prepared by | Index No. |
|---|---|
| Date | X / // |

Uploaded: 2023FEB02 12:52 Filed By:Bar# 96965 LFARRAR Reference: EF-116617
E-Filed: 2023FEB02 LOUDOUN CC ANGELA.WALSH at 2023FEB03 15:51 CL23000869-00

EXHIBIT 2

October 25, 1965

Mrs. David E. Finley
1534 - 28th Street, NW
Washington, D. C. 20007

Dear Margie:

It gives me a great deal of pleasure to write confirming what I and
other Trustees have said, that is how deeply we appreciate the gift
of Oatlands and 261 acres of land by you and your sister Mrs. Eustis
Emmet to the National Trust for Historic Preservation as a memorial to
your father and mother, William Corcoran Eustis and Edith Morton Eustis.

Your determination to place the house and grounds in pristine condition
reflects a sense of pride that will be contagious and dictate our standard
of operation for years to come. We are equally grateful for your gener-
osity in endowing the property with a fund of $500,000, the income from
which should always provide ideal care.

As you know, the Board was enthusiastic in voting to accept Oatlands
as a National Trust property and there were general expressions of con-
currence with the thought that Oatlands should be an active and useful
house in the various programs of the Trust. There was even some dis-
cussion of the Trustees coming to Oatlands as a group sometime in the
near future, probably during the course of our January board meeting which
will likely be held here in Washington.

As you may know, I plan to leave at once for Europe where I will be
involved in a study tour which will bring forth recommendations for
improved preservation activities in this country. Immediately upon my
return, I will be in touch with you to see if there are matters concerning

Oatlands which need my attention. In the meantime, we have instructed Ed Burling to be available for any consultation that might be needed from him as General Counsel for the Trust.

Again, let me tell you how thoroughly grateful we are for your generosity.

Sincerely,

Gordon Gray
Chairman

EXHIBIT 3

Law Office of
**KENNETH F. PARKS, PLC**
Attorney at Law

17 Royal Street, SE
Leesburg, Virginia 20175

Telephone (703) 777-3788
Facsimile (703) 777-4075

8 June 2011

Ms. Chris McNeal
Oatlands Historic House and Gardens
20850 Oatlands Plantation Lane
Leesburg, Virginia 20175

Re: Valeria H. Symington Trust

Dear Ms McNeal:

Please find enclosed a copy of the brief provisions in Mrs. Symington's Trust regarding the funds to be used exclusively for the benefit of Oatlands.

If you have any questions, please do not hesitate to call or write me.

Very truly yours,

Kenneth F. Parks

cc: Kathleen O. Pearson, Executrix
    Henry Harris, Trustee
    Marilyn P. Rust, Trustee

e.    My Trustees shall distribute Share E 12.5% to the National Trust for Historic Preservation, Washington, D.C. to be used exclusively for Oatlands, 20850 Oatlands Lane, Leesburg, Virginia 20175.

11

Uploaded: 2023FEB02 12:52 Filed By:Bar# 96965 LFARRAR Reference: EF-116617
E-Filed: 2023FEB02 LOUDOUN CC ANGELA.WALSH at 2023FEB03 15:51 CL23000869-00

EXHIBIT 4



**NATIONAL TRUST**
HISTORIC PRESERVATION®

## National Trust for Historic Preservation
## Board of Trustees

### RESOLUTION TO DESIGNATE PROCEEDS FROM
### THE VALERIA H. SYMINGTON TRUST
### FOR OATLANDS

**WHEREAS** the National Trust received a gift of $1.25 million from the Valeria H. Symington Trust on August 17, 2004 "to be used exclusively for Oatlands;" and

**WHEREAS** in consultation with representatives of the board of Oatlands, Inc., it is recommended that $950,000 be designated by the Board of Trustees of the National Trust as endowment for Oatlands, and that $300,000 be used by Oatlands, Inc. to retire debt and to establish a pool of operating cash;

**RESOLVED** that the Board of Trustees designates $950,000 of the gift from the Valeria H. Symington Trust as endowment for Oatlands, and that $300,000 be used to retire existing debt and to establish a pool of operating cash for Oatlands, Inc.

*I certify that the foregoing resolution was approved by the Board of Trustees of the National Trust for Historic Preservation on October 3, 2004*

Paul W. Edmondson
Corporate Secretary

Uploaded: 2023FEB02 12:52 Filed By:Bar# 96965 LFARRAR Reference: EF-116617
E-Filed: 2023FEB02 LOUDOUN CC ANGELA.WALSH at 2023FEB03 15:51 CL23000869-00

# EXHIBIT 5

## AMENDED AND RESTATED COOPERATIVE AGREEMENT

**THIS AMENDED AND RESTATED COOPERATIVE AGREEMENT** (this "Agreement"), effective as of the 15th day of April, 2019 (the "Amendment Date"), is made by and between the **NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES** (the "National Trust"), a charitable, educational, nonprofit corporation created by Congress, with principal offices at The Watergate Office Building, 2600 Virginia Avenue NW, Suite 1100, Washington, DC 20037, and **OATLANDS, INC.** ("Oatlands"), a Virginia non-stock, nonprofit corporation with principal offices at 20850 Oatlands Plantation Lane, Leesburg, VA 20175.

This Agreement amends and restates the Cooperative Agreement entered into between the National Trust and Oatlands (collectively, "the Parties") effective as of August 1, 2017 (the "Effective Date") (the "Original Agreement"), which specified the mutual agreements related to the renewal, restatement, and extension of the co-stewardship arrangement at Oatlands Historic House and Gardens, a National Trust Historic Site located at 20850 Oatlands Plantation Lane, Leesburg, Virginia 20175 (the "Historic Core"), to incorporate an adjacent fifty-four (54) acre parcel known as "Oatlands Hamlet," located at 40040 Little Oatlands Lane, Leesburg, Virginia 20175 (the "Oatlands Hamlet Property"), which was acquired by Oatlands on April 23, 2014 and was conveyed to the National Trust in April 2019 (collectively, the "Property"). In consideration of the mutual promises stated below, the the Parties agree as follows:

1. **Background & Purpose**.

    **A.** The Property, a significant historic site in Loudoun County, Virginia, includes three hundred ninety-six (396) acres owned by the National Trust, with a Greek Revival main house (c. 1804) constructed for George Carter (the "Mansion"); formal terraced gardens including a balustrade, front gate, reflecting pool, and many original plants from George Carter (the "Gardens"); several outbuildings and ancillary structures; and buildings and structures on the Oatlands Hamlet Property, including a two-story painted stone main house (c. 1800s) (which incorporates an early slave dwelling associated with the Property historically) with a 20th century addition (the "Hamlet House"), a two-story stone house (early 1800s) (the "Stone House"), a one-story wood-sided house (c. 1950s) (the "Wood Tenant House"), a garage (19th century), a pool, and other ancillary buildings and structures (a map of the Property is attached as **Exhibit A**).

    **B.** In 1965, the National Trust became the owner of the Historic Core through a gift from Anne Eustis Emmet and Margaret Eustis Finley. A year later, in 1966, the Historic Core opened to the public. Since then, Oatlands has managed and operated the Historic Core as a successful co-stewardship National Trust Historic Site, and has done so for the last thirty-three (33) years pursuant to a Cooperative Agreement, Loan Agreement and Lease with the National Trust, all dated July 15, 1984, as amended. In April 2014, Oatlands separately acquired the Oatlands Hamlet Property to protect the viewsheds from the Mansion and of the Historic Core and to generate income, and has administered and interpreted that property to produce income and as part of the larger historic site. The Oatlands Hamlet Property was conveyed to the National Trust in April 2019. As the 1984 Cooperative Agreement recognized, and as remains true now, the endowment funds held by the National Trust and identified herein are inadequate to provide for the financial needs of the Property. Oatlands has accordingly undertaken and continues herein to use its best efforts to raise funds that, together with endowment and other funds provided by the National Trust, are adequate

to provide for the capital and operational needs of the Property. It is that cooperation between the National Trust and Oatlands that continues to be the primary subject of this Agreement.

**C.** The purpose of this Agreement, and the other Co-Stewardship Agreements, is to renew, restate, and extend the co-stewardship relationship for the Property to reflect current practices and the common interests of the Parties relating to the operation of the Property as a National Trust Historic Site, and to align the relationship with the National Trust's current practices in its management of its portfolio of National Trust Historic Sites.

**2.** **Term.** This Agreement will be effective as of the Effective Date stated above and will remain and continue in full force and effect unless and until: (a) the Lease is terminated in accordance with its terms, whereupon this Agreement will also simultaneously terminate; or (b) this Agreement is modified or terminated by mutual agreement of the Parties by an instrument in writing executed with the same formalities as this Agreement (the "Term").

### 3. General Management of the Property as a National Trust Historic Site.

**A.** **Consistency with the National Trust's Historic Sites Vision.** It is acknowledged by both Parties that the current management of the Property is consistent with the National Trust's vision for its portfolio of historic sites, as set forth in the document entitled "Reimagining Historic Sites: A Vision for the Future of National Trust Historic Sites," attached hereto as **Exhibit B** (the "Historic Sites Vision Statement"). The Parties agree to work together to ensure that the Property continues to reflect the key elements of the Historic Sites Vision Statement, which are as follows:

   **i.** National Trust Historic Sites exemplify places of national significance or where the work has national impact;

   **ii.** National Trust Historic Sites employ local governance models that ensure strong oversight and connections with the local community;

   **iii.** National Trust Historic Sites have a financially sustainable business model that aims at promoting self-sufficiency, and which recognizes that sustainability of the physical assets (buildings, grounds, and collections, including funding for cyclical maintenance) is a critical part of financial self-sufficiency;

   **iv.** The operations of National Trust Historic Sites align with the National Trust's statutory mission of providing for the preservation of historic sites and facilitating public participation in the preservation of historic places. Each National Trust Historic Site should also reflect the National Trust values of collaboration, diversity, innovation, integrity, and making a difference; and

   **v.** The entire portfolio of National Trust Historic Sites models a variety of uses and preservation techniques that promote financial sustainability in support of preservation, engagement, and interpretation goals.

**B.** **Site Management Principles.** The Parties agree that the Property will continue to be managed in accordance with the following principles, which may be

amended from time to time by the mutual written agreement of the Parties (collectively, the "Site Management Principles"):

    **i.**     *Integrated Preservation Approach.* An exceptional element of the Property is the careful positioning of the Mansion as it relates to the Gardens and landscaping, which significantly contribute to the historic setting and character of the Property. The Mansion, historic buildings and structures and their relationship with the Gardens and landscape of the Property will continue to be preserved as a complete, interrelated unit.

    **ii.**     *Site Stewardship.* The Property will continue to be cooperatively stewarded as a historic site and museum that offers a variety of educational programs, expands outreach through in-person and online tools, and exhibits a range of 21st century best practices in collections curation, cultural landscape management, multidisciplinary research, education, community engagement, and stewardship. The Parties also agree that the Oatlands Hamlet Property, like portions of the Historic Core, will continue to be used for events and activities that produce income to sustain the Property and its continued operation and management by Oatlands. Any change to the use or zoning of the Property will require the mutual approval of the Parties. Neither Party will seek a change of zoning of the Property without the written consent of the other, and the Parties will endeavor to agree on a common position with respect to any change in zoning proposed by the other. The Parties agree that the following standards are applicable to the stewardship of the Property:

        **1.**     The United States Secretary of the Interior's Standards for the Treatment of Historic Properties (the "Secretary's Standards"), as may be amended from time to time; and

        **2.**     The National Trust's Best Practices for the Care of Structures and Landscapes at National Trust Historic Sites, and the National Trust's Collections Management Policy and accompanying Standard Operating Procedures, as each may be amended from time to time.

    **iii.**     *Interpretation and Public Engagement.* The Property will continue to be interpreted for the public benefit in a manner that makes it meaningful and accessible to multiple and broad audiences including local, national, and international communities, and other interested parties, and, when developed, in accordance with the Interpretative Plan (as hereinafter defined).

    **iv.**     *Collaboration.* The Parties will continue to collaborate and consult in the maintenance, management, preservation, and operation of the Property, with Oatlands informing the National Trust of significant developments relating to the Property and the National Trust informing Oatlands of significant developments relating to its historic sites and the field of historic site stewardship generally. Each Party will give serious consideration to the advice and recommendations of the other Party.

    **v.**     *Sustainable Construction.* New construction proposed for the Property will be compatible with the cultural and natural resources on the

Property and will be financially sustainable. New construction will also be environmentally sustainable to the extent reasonably feasible.

**vi.** *New Approaches to Preservation.* The Parties will continue to work collaboratively to develop new approaches to preservation, consistent with the leadership roles of the National Trust and Oatlands in the field of historic site stewardship.

**vii.** *Other Professional Standards.* The Parties will collaborate to ensure that the Property is managed in accordance with other applicable professional standards relating to the management of historic sites, including without limitation, standards for archaeology, anthropology, history, historic preservation, collections management, education, operations, governance, and ethics and fundraising, as they may be mutually identified by Oatlands and the National Trust from time to time.

**C.    Plans.**

**i.** *In General.* The Parties agree that the Property will be managed in a manner that is consistent with Oatlands' existing plans and practices for the Property, including the following existing and new plans to be developed (each a "Plan" and collectively, the "Plans"):

**1.** Existing Plans. The Strategic Plan dated 2015; and

**2.** New Plans. A Cyclical Maintainance Schedule will be developed within twelve (12) months after the Effective Date; an Interpretative Plan, and a Scope of Collections and Collections Plan will be developed within twenty-four (24) months after the Effective Date; an Asset Management Plan will be developed within thirty (30) months after the Effective Date; and a Site Master Plan and a Cultural Landscape Plan will be developed within thirty-six (36) months after the Effective Date. The National Trust agrees to provide Oatlands with a template for the Asset Management Plan and to work collaboratively with Oatlands to develop that plan.

Each Plan will be reviewed and updated as necessary by Oatlands at its discretion but not less than every ten (10) years after a Plan is adopted by Oatlands; except that the Cyclical Maintenance Schedule will be updated annually and the Strategic Plan will be updated at least every five (5) years.

**ii.** *Revisions and Development of New Plans.* Oatlands will consult with the National Trust on the development of new Plans and any revisions to the Plans, as follows:

**1.** Oatlands will initiate consultation by providing written notice to the representative of the National Trust (as defined in Paragraph 15(A)), and Oatlands will invite the National Trust to participate in meetings and review draft documents. Oatlands will give serious consideration to any recommendations of the National Trust with respect to all new Plans and material revisions to Plans to insure that all points of view are considered before adoption by the Oatlands Board of Directors (the "Oatlands Board"). If the Parties mutually agree that a new Plan or

material revisions to a Plan are consistent with the Site Management Principles set forth in Paragraph 3(B) above, Oatlands will be free to adopt and implement the new Plan or revisions to a Plan.

    **2.** If, after good faith discussion, there is disagreement between the Parties concerning whether a new Plan or material revisions to a Plan are consistent with the Site Management Principles, the dispute will be resolved pursuant to the dispute resolution process set forth in Paragraph 12.

    **3.** A copy of the new Plan or revised Plan will be sent to the National Trust when adopted by the Oatlands Board.

**4.**   **Preservation of the Property's Physical Assets.** The Parties recognize that the Mansion, the Gardens, the Hamlet House, the Stone House, and the other historic buildings and structures, and the connections between the buildings and landscapes, are the primary architectural artifacts at the Property and are of preeminent historical and cultural importance. Oatlands, primarily through the work of its staff, will continue to be responsible for the maintenance and preservation of the physical assets of the Property, which are owned by the National Trust, as provided herein. Consequently, the Parties agree that those assets shall continue to be preserved in cooperation as follows:

    **A.**   **Buildings and Landscape.** Due to the good stewardship of Oatlands, its staff, and volunteers, the Property has been very well-maintained over the years. Oatlands agrees to continue to maintain and preserve the physical assets of the Property in a state that is at least as good as exists as of the Effective Date of this Agreement, except as provided in Paragraph 6(c) of the Lease (with regard to Damage or Destruction). With regard to particular areas, buildings, structures, and features, the Parties agree as follows:

       **i.**   *Material Changes to the Property.* To assist the National Trust in fulfilling its fiduciary responsibility to preserve the historic character of the Property, Oatlands will consult with the National Trust pursuant to the approval process set forth below in Paragraph 5 with respect to the preparation of proposed plans that would materially change the Property, including material changes resulting from alteration, improvement, restoration, repair, preservation, new construction, landscape modifications, or any other physical changes to the Property. Oatlands will not proceed to contract for the performance of or otherwise carry out any such work including, but not limited to, proposed material changes in the physical fabric of the Property (including but not limited to: the Mansion, the Hamlet House, the Stone House, and other buildings, structures, walls, stairs, walkways and paths, gates, balustrade, reflecting pools) or any part of the Property whether intended to assure proper upkeep, maintenance, repair, alteration, improvement, restoration, preservation or otherwise, without the prior written approval of the National Trust. In light of the National Trust's underlying fiduciary responsibility to ensure the preservation of the Property, the National Trust's approval of any such material change under this Paragraph 4(A)(i) may be withheld or conditioned in its sole discretion, and the determination by the National Trust shall not be subject to the dispute resolution provision in Paragraph 12. Provided, however, Oatlands may conduct routine maintenance in accordance with the approved Cyclical Maintenance Schedule without the

requirement to consult with and/or seek the approval of the National Trust. Changes to the Property that are included in approved Plans will be considered conceptually approved by the National Trust, and only the details and specifications of the proposed change will need to be approved by the National Trust under Paragraph 5.

    **ii.**     ***Landscape and Landscape Features***. The Gardens and landscaping at the Property significantly contribute to the historic setting and character of the Property. Oatlands will continue to maintain the landscaping in at least as good appearance as exists as of the Effective Date of this Agreement, with similar plantings, vegetation, layout, design, and natural screening. The right to cut, remove, and clear grass, invasive species or other vegetation and to perform routine maintenance, landscaping, horticultural activities and upkeep of the landscape in accordance with the Landscape Plan does not require prior approval from the National Trust, except as otherwise provided herein. The Parties also recognize that changes in environmental conditions may impact Oatlands' ability to maintain landscaping in the same character or configuration as has existed historically, and agree to cooperate to identify alternative horticultural approaches to maintain an appropriate garden character reflecting evolving environmental conditions.

    **iii.**     ***Viewsheds***. The viewsheds of and from the Mansion and the Gardens significantly contribute to the historic setting and character of the Property. In order to protect those viewsheds, the Parties agree that no new building or structure visible from the Mansion or Gardens will be erected on the Property unless mutually approved in writing by both Parties.

    **iv.**     ***Prioritization & Timing of Capital Projects and Cyclical Maintenance***. The Parties agree to collaborate and consult with each other on the prioritization and timing of the implementation of capital projects and cyclical maintenance for the Property to ensure that critical preservation, infrastructure, and life safety needs at the Property continue to be addressed.

    **B.**     **Collections Conservation and Management**. Oatlands will inventory, maintain, preserve, and administer the NTHP Oatlands Objects Collection (as defined in the Loan Agreement) in accordance with the Loan Agreement and the Scope of Collections and Collections Plan.

## 5.   Approval Process for Material Changes to the Property.

    **A.**     **Notice.** If Oatlands initiates a project that requires approval by the National Trust pursuant to Paragraph 4(A)(i). above, Oatlands will provide written notice to the representative of the National Trust (as defined in Paragraph 15(A)), including a description of the proposed project, a schedule, proposed meeting dates, and such other information as may be reasonably requested by the National Trust. Within thirty (30) calendar days of receiving the notice, the National Trust will provide a written acknowledgment to Oatlands specifying the name of the primary National Trust staff person who will serve as the contact for the National Trust during the approval process, and the degree to which the National Trust would like to participate (i.e. attend meetings, consult on an as needed basis, etc.). The National Trust may change the contact person or the level of its involvement at any time during the approval process. In most

6

cases, it will be appropriate for the National Trust and Oatlands to have an initial scoping meeting to discuss the project.

**B.    Meetings and Materials.** Oatlands will invite the designated National Trust staff person to participate in substantive meetings relating to the project by providing written notice not less than seven (7) calendar days in advance. Oatlands will provide the National Trust with copies of all materials and minutes or notes, as applicable, for each meeting in advance or within a reasonable time after each meeting. The National Trust may, at any time, choose to participate in meetings or provide comments and advice to Oatlands.

**C.    Review of Project.** Oatlands will provide drafts of drawings, conceptual plans, schematic designs, construction documents and specifications, and other documents related to a project to the National Trust with a reasonable opportunity to review the documents. In light of the National Trust's underlying fiduciary responsibility to ensure the preservation of the Property, the National Trust may approve the project or may withhold or condition its approval in its sole discretion, and its determination shall not be subject to the dispute resolution provision in Paragraph 12. If a project is disapproved, the National Trust will provide Oatlands with written suggestions for modification or a written explanation for the National Trust's disapproval.

**D.    Final Plan.** A copy of the final documents relating to a project (i.e. final construction documents, etc.), once approved by the National Trust, will be provided to the National Trust.

## 6.    Financial Self-Sufficiency

**A.    Financially Sustainable Business Model.** Oatlands will continue to use its best efforts to operate a financially sustainable business model for the Property that aims at achieving self-sufficiency, taking into account both funds provided by or through the National Trust and those raised by Oatlands.

**B.    The National Trust's Endowment for the Property.** The National Trust owns and maintains a permanent endowment for the maintenance and preservation of the Property (identified as "Oatlands Fund #50016"). There is also a separate fund that was created by a gift to the National Trust "to be used exclusively for Oatlands, 20850 Oatlands Lane, Leesburg, Virginia 20175," which is currently board-designated as endowment (identified as "Oatlands-Symington Fund #50141"), and there may be other board-designated endowments established for the benefit of the Property (such as a board-designated endowment created with proceeds from the conservation easement pursuant to Paragraph 13) (collectively, these funds are hereinafter referred to as the "National Trust Oatlands Endowment"). As of the Amendment Date, the Parties agree that the Oatlands-Symington Fund #50141 will be used as follows: (1) approximately $1,300,000 to retire mortgage debt on the Oatlands Hamlet Property, (2) $500,000 (or the remaining funds as of April 30, 2019 if a lesser amount) to establish the Maintenance Fund (as hereinafter defined), and (3) any remaining balance as of April 30, 2019, up to $100,000, will be transferred to Oatlands in recognition of investments made in the Oatlands Hamlet Property. As part of the National Trust endowment funds, the National Trust Oatlands Endowment will continue to be invested and managed by the National Trust in accordance with the policies established by the National Trust Board of Trustees

(the "National Trust Board"), in its sole discretion but in accordance with all applicable legal requirements that may affect such management and discretion.

    **i.**     *Quarterly Payments.* Each fiscal year during the Term of this Agreement, the National Trust will pay to Oatlands, in four (4) equal quarterly installments during the first week of each quarter (July 1, October 1, January 1, April 1), the annual withdrawal from the Oatlands Fund #50016 and any other board-designted endowments established for the benefit of the Property (such as the board-designated endowment created with proceeds from the conservation easement pursuant to Paragraph 13), as applicable, permitted in accordance with the payout authorized by the National Trust Board, with administrative costs applied on the same basis as for other National Trust endowments (the "Endowment Draws").

    **ii.**     *Guidelines for Use of Endowment Draws.* The Parties agree that the preservation of the Property as a site of historic and cultural significance requires the prudent application of Endowment Draws and of income generated from operations to (a) maintain the physical assets of the Property and (b) sustain the ability of Oatlands as an operating entity to raise funds from programs, events, leases or rentals, and contributions. Oatlands shall have reasonable managerial discretion to use the Endowment Draws in support of both operational and capital needs of the Property, but priority shall be given to fulfilling the core stewardship obligations set forth in the Co-Stewardship Agreements. In applying Endowment Draws, Oatlands will accord high priority to the funding of major repairs, emergencies and the Maintenance Fund (as hereinafter defined) for the Property.

    **iii.**     *Endowment Reporting.* For fiscal year 2018 and each year thereafter during the Term, the National Trust will provide Oatlands with: (1) quarterly performance reports of all additions and subtractions to the National Trust Oatlands Endowment within sixty (60) days after the end of each quarter, including all deposits, returns, income, losses and withdrawals; (2) a fiscal year-end report based on its independent accountant's audit of the National Trust's endowment within one hundred and eighty (180) days after the fiscal year end; and (3) other reports as may be provided to other co-stewardship National Trust Historic Sites.

    **iv.**     *Investments Information.* The Oatlands Board may request up to four (4) calls annually with the National Trust staff person in charge of investments to discuss strategy, investments and performance of the National Trust Oatlands Endowment. In addition, the National Trust will host an annual meeting, conference call or webinar for National Trust Historic Sites' boards and management with the National Trust Investments Committee chair and a representative from its current investment advisor.

    **C.**     **Maintenance Fund.** Within six (6) months of the completion of the Asset Management Plan, Oatlands agrees to establish and maintain one of the following administrative accounts or endowments to fund capital repairs and cyclical maintenance of the Property (the "Maintenance Fund"): (1) a board-designated maintenance endowment held by Oatlands; (2) a capital reserve account held by Oatlands; or (3) a maintenance endowment held by the National Trust under the terms stated below in

Paragraph 6(D). The initial amount of the Maintenance Fund will be based upon the annual cyclical maintenance expenses stated in the Asset Management Plan and will be mutually agreed to by the Parties.

      **i.**     As of the Amendment Date, the Parties agree to designate $500,000 (or the remaining funds as of April 30, 2019 if a lesser amount) of the Oatlands-Symington Fund #50141 as the Maintenance Fund, which shall continue to be owned and maintained by the National Trust pursuant to Paragraph 6(B). Earnings and income will accumulate in the Maintenance Fund, and Oatlands may apply to the National Trust for funding from the Oatlands-Symington Fund #50141 to fund capital repairs and cyclical maintenance, and any such application shall be funded by the mutual agreement of the Parties.

      **ii.**     The Parties will regularly assess the amount of the Maintenance Fund and the designation of the Oatlands-Symington Fund #50141 as the Maintenance Fund at the Periodic Reviews (as hereinafter defined) and may modify such amount based on the mutual written agreement of the Parties.

    **D.**    **Alternative Investment Management Options.** In the event that the Oatlands Board considers changing investment strategies for any funds held by Oatlands for the benefit of the Property, the National Trust agrees to provide Oatlands with the option, under the same terms offered to other National Trust co-stewardship organizations, to invest such funds as a part of the National Trust's endowment. Such funds would be transferred to the ownership of the National Trust pursuant to an Endowment Transfer Agreement, subject to return of the funds thus transferred at the request of Oatlands. Funds thus transferred will be co-mingled with other endowment funds held by the National Trust but will be accounted for in a separate administrative account and designated for the benefit of the Property. Any decision to transfer funds to the National Trust shall be at the sole discretion of Oatlands, subject to the terms stated in the Endowment Transfer Agreement.

    **E.**    **Oatlands Reporting and Examining.** Oatlands agrees to provide to the National Trust: (1) an annual audit within one hundred and eighty (180) days after the fiscal year end; and (2) an annual budget within thirty (30) days following approval by the Oatlands Board. The National Trust and its duly authorized representatives will have access to and the right to examine any books, documents, papers and records of Oatlands relating to the Property for the purpose of audit or making excerpts and transcripts at reasonable times and with reasonable prior notice. Oatlands agrees to maintain auditable records for no fewer than three (3) years.

    **F.**    **National Trust Grants.** Oatlands will continue to be eligible to apply for and receive grant funds from the National Trust including, but not limited to, the Historic Sites Fund, the Landscape Fund, the Collections Fund, and the Interpretation and Education Fund, upon the same terms and conditions as other co-stewardship National Trust Historic Sites. Currently, the Historic Sites Fund, an endowed fund of the National Trust that provides funding for projects at National Trust Historic Sites, is used primarily as a source to address prioritized capital projects, life safety and infrastructure needs, and cyclical maintenance. The National Trust Board may establish other criteria for the use of the Historic Sites Fund, at its sole discretion.

## 7. Fundraising and Development

**A. Gifts for the Benefit of the Property.** Gifts to the National Trust that are restricted to the endowment for the Property will be placed in the National Trust Oatlands Endowment, and the National Trust will notify Oatlands of such endowment gifts within seven (7) business days of receipt. The National Trust will provide notice to Oatlands of all other gifts received for the benefit of the Property within seven (7) business days of receipt and will transfer or re-grant such gifts to Oatlands within thirty (30) business days of receipt, consistent with (or as permitted by) the terms of the gift.

**B. Coordination of Solicitations.** Either party may contact the other party to discuss prospective donors throughout the Term of this Agreement, and the Parties agree to use reasonable efforts to coordinate solicitations to avoid conflicts and duplicative solicitations.

## 8. Public Access & Membership

**A. Visitation.** The public will continue to be engaged at the Property (through tours, special events, use of the grounds, etc.) during reasonable hours at least one hundred and fifty (150) days per year, unless unable due to natural disasters or other Acts of God, for which reasonable visitation privilege fees may be charged, except as otherwise provided herein. Oatlands will develop and implement safety procedures and precautions for visitors, including but not limited to, providing visitors with safety information about the Property, warning visitors about any known dangers, and erecting warning signs on the Property, as applicable.

**B. National Trust Visitation Privileges.** The National Trust's trustees, officers, employees, and members will continue to have the privilege of visiting the Property during public visitation hours upon presentation of appropriate identification, at a discounted rate of admission, except for events or programs for which a special fee is charged. Oatlands will continue to provide other discounts consistent with discounts offered at other co-stewardship National Trust Historic Sites.

**C. National Trust and Membership Initiatives.** National Trust membership brochures will continue to be available and promoted at the Property. Oatlands agrees to participate in other initiatives established by the National Trust to solicit visitors to the Property to become National Trust members, and to participate in other National Trust initiatives that are consistent with the mission of Oatlands and that are financially feasible to Oatlands.

**D. *Preservation* Magazine.** Oatlands may purchase copies of *Preservation* magazine on the same terms and conditions as offered to other co-stewardship National Trust Historic Sites.

**E. Events.** The National Trust may use the Property for up to three (3) events per year as mutually agreed to by the Parties, with no charge for site rental or use. The National Trust will adhere to Oatlands' site use regulations and will pay for the costs and expenses of its events.

**F. Information Sharing.** Oatlands agrees to provide the following information to the National Trust on a quarterly basis: material changes to board and

committee member lists, attendance figures, and changes in staff and board members contact information. In addition, the Parties may, from time to time, request the use of e-mail addresses and/or other personal identifiable information from the other party, which may be provided at the discretion of each party.

## 9. Marketing and Publicity.

   **A.** **Signs and Promotional and Interpretive Materials**. Consistent with current practices, Oatlands will:

   **i.** Maintain, at its own expense, a mutually acceptable sign or signs at the entrance of the Property clearly and prominently identifying the Property as a National Trust Historic Site, displaying the National Trust's current logo and Oatlands' logos, and consistent with sign regulations applicable to National Trust Historic Sites.

   **ii.** Acknowledge or include standard language prominently identifying the Property as a National Trust Historic Site and include the National Trust's current logo (in accordance with National Trust's Identity Guidelines: Applying the Historic Site Logo (March 2013) as may be amended from time to time) in all other principal signage, printed literature, and promotional and interpretive materials for the Property, including online and computerized materials; and

   **iii.** Prominently publicize the co-stewardship relationship with the National Trust by making one of the following statements in all publicity materials related to the Property: (1) "Oatlands, a historic site of the National Trust for Historic Preservation," (2) "A site of the National Trust for Historic Preservation," or (3) "a National Trust for Historic Preservation historic site." The Parties agree to develop standard language describing their relationship for each party to use for publicity purposes, and any other language used must be approved by the other party prior to release.

   **B.** **License and Use of Registered Trademarks and Logos.**

   **i.** To the extent the National Trust has the right to convey, the National Trust grants to Oatlands an exclusive, royalty-free, revocable license for the Term of this Agreement to use, reproduce, and sublicense the registered trademark for the Property, "Oatlands", which is a held by the National Trust, for the general corporate purposes of Oatlands.

   **ii.** Except as specified in Paragraph 9(B)(i), both Parties agree not to use the name, logo or registered trademarks of the other party without receiving the prior written approval for such use, unless otherwise specified herein.

   **C.** **National Trust Promotions.** The National Trust will promote the Property as a National Trust Historic Site in publications, websites, mailings, and other promotional materials and, where appropriate, will display Oatlands' logo, without charge to Oatlands or at rates and upon the same terms and conditions applicable to other co-stewardship National Trust Historic Sites. The National Trust will offer to Oatlands discounted rates for advertising or promotions in any National Trust media publications in which National Trust Historic Sites are encouraged or permitted to place

advertisements or other promotions, upon the same terms and conditions as other co-stewardship National Trust Historic Sites.

     **D.**    **Media Contacts.** Oatlands agrees to include standard information about the National Trust and the Property and an appropriate acknowledgement of the Property being a National Trust Historic Site in its press releases and other contacts with the media relating to the Property. The National Trust will provide standard information to Oatlands for use in press releases, which may be modified from time to time.

     **E.**    **Crisis Communications Plan.** The Parties agree to continue to utilize and comply with the National Trust's Crisis Communications Plan (March 2014), as it may be amended from time to time.

     **F.**    **Websites.** A website page for the Property that includes information on the history of the Property and a link to the National Trust's website and its current logo will continue to be maintained and regularly updated. The National Trust agrees to provide a link from the National Trust's website to Oatlands' website.

     **G.**    **Licensing.** The National Trust may, in its sole discretion, license and reproduce objects, historic structures, and historic landscape features in the NTHP Oatlands Collection (as defined in the Loan Agreement) as specified in the Loan Agreement. Oatlands may not license the name or logo of the National Trust, nor any object owned by the National Trust, without the prior written consent of the National Trust. Any proceeds from licensing conducted by Oatlands will be received and used by Oatlands for the benefit of the Property. In the event Oatlands initiates a licensing program and a conflict arises between the licensing programs, the Parties agree to meet to resolve the conflict

     **H.**    **Brand-Alignment Marketing Plan.** Within twelve (12) months from the Effective Date, Oatlands and the National Trust will jointly develop a brand-alignment marketing plan, which plan shall be updated not less than once every three (3) years.

    **10.**    **Ongoing Coordination and Cooperation.** In order to maintain and strengthen a close collaborative relationship, the National Trust and Oatlands agree as follows:

     **A.**    **National Trust Site Directors Meetings.** Oatlands agrees that the Oatlands' Executive Director will continue to attend the regularly scheduled meetings of the National Trust Site Directors and the National Trust annual meetings, one of which is usually held during the annual National Preservation Conference, at Oatlands' own cost and expense. Other Oatlands staff members may also continue to participate in meetings of other disciplines hosted by the National Trust, at Oatlands' cost and discretion.

     **B.**    **National Trust Technical Expertise.** Oatlands, at its discretion, may seek the technical expertise of personnel of the National Trust on matters including but not limited to architecture, preservation, contracts, legal technical assistance, interpretation, collections management, archeology, accounting, marketing, member relations, and publications. The National Trust agrees to assist Oatlands without charge on these subjects when requested, within the scope of the National Trust's authority and available resources, and on the same terms and conditions as other co-stewardship National Trust Historic Sites.

C.    **Periodic Review of Co-Stewardship Relationship**.  The Parties agree to meet to review the relationship contemplated under the Co-Stewardship Agreements not less than every five (5) years to provide an opportunity to discuss how the relationship is working, with the possibility of amending or modifying the Co-Stewardship Agreements by mutual written agreement of the Parties (the "Periodic Reviews").  The Periodic Reviews will be led by the National Trust's Vice President for Historic Sites and Oatlands' Executive Director, or their designees.  Both Parties may invite other staff or Board members to participate in the Periodic Reviews.  The Parties agree that the first Periodic Review will occur on or about the fifth (5th) anniversary of the Effective Date with subsequent Periodic Reviews occurring every five (5) years thereafter.

**11.    Governance**.  The Parties agree that the long-term success of the Property is dependent upon an effective Oatlands Board with strong connections to the local community. To that end, the Parties agree as follows:

A.    **Recommendations.**  Oatlands may seek recommendations from the National Trust for nominees to the Oatlands Board who have skills and/or experience in stewardship of National Trust Historic Sites. Oatlands may accept or reject such recommendations in its sole discretion.

B.    **National Trust Representation.** The Oatlands Board recognizes the long-standing partnership with the National Trust and appreciates the transparency and communications required for Oatlands staff and volunteers to manage the National Trust's assets.  To facilitate this, both parties agree that a National Trust representative designated by the President of the National Trust will be appointed to serve as an Ex-Officio voting member of the Oatlands Board.  The representative of the National Trust will be a member of the National Trust's Executive Team or Senior Staff Leadership Team, the Vice President for Historic Sites, a National Trust Trustee, or another individual as mutually agreed to by the Parties.

C.    **Principal Officer (Executive Director)**.  Oatlands agrees that at all times it will employ a principal officer (i.e. Executive Director) who will have day-to-day responsibility for carrying out Oatlands' responsibility for the management of the Property. Oatlands will seek and use reasonable efforts to obtain the advice of the National Trust concerning the qualifications required of any candidates for the position prior to the appointment of such official.

D.    **Bylaws.**  The Oatlands Board agrees to review and update Oatlands' bylaws, as needed, not less than every five (5) years.  The Oatlands Board will provide the National Trust with an opportunity to review and comment on the draft bylaw changes before they are presented to the Oatlands Board for final approval.  The Oatlands Board agrees to give serious consideration to the advice and recommendations of the National Trust.

E.    **Policies and Procedures**.  The Oatlands Board will promulgate appropriate board, staff, and operational policies and procedures that will include provisions addressing acceptance of gifts, conflict of interest, retention of records and retention and disposition policy, whistleblowers, and other employee and volunteer standards and policies as determined appropriate by the Oatlands Board.  Oatlands will

also develop an emergency response plan and provide staff and volunteer trainings related to life and safety matters.

  **F.**  **General Governance Principles.** The Parties will each make reasonable efforts to follow the "Best Practices for Nonprofit Governance," adapted from the Independent Sector's *Principles for Good Governance and Ethical Practice* (2015 ed.), as summarized in **Exhibit C**.

  **12.** **Dispute Resolution**. The Parties mutually acknowledge that problems may arise that need to be addressed by the Parties, and the Parties, therefore, agree that they will act in good faith and use reasonable efforts to promptly resolve any problems that arise by mutual agreement. In the event that a dispute between the Parties cannot be resolved by negotiation, the Parties agree to submit the problem to a management committee for resolution. The "Management Committee" shall mean a committee made up of a senior executive from each of the Parties for the purpose of resolving problems under this section and generally overseeing the relationship between the Parties contemplated by this Agreement. For ten (10) calendar days following submission of any dispute to the Management Committee, the Management Committee shall have the exclusive right to resolve such problem. In the event that the Management Committee is unable to resolve the dispute during that period, the matter shall be referred to a "Dispute Resolution Panel," consisting of a representative chosen by each Party (whose expenses shall be paid by the respective Party) and a third representative chosen by the Party representatives (whose expenses shall be shared by the Parties). For thirty (30) calendar days following the submission of any dispute to the Dispute Resolution Panel, the Dispute Resolution Panel shall have the exclusive right to resolve such problem. The Dispute Resolution Panel may extend the exclusive review period up to an additional thirty (30) days. Should the Dispute Resolution Panel fail to resolve the dispute within the review period, either Party may seek judicial review of the dispute. The Parties agree to be bound by the decision of the Dispute Resolution Panel, unless the Parties mutually agree on alternative plans or either Party abandons its objections. This dispute resolution process shall not be applicable to any determination reserved to the sole discretion of either Party or, at the election of either party, to any dispute arising from or relating to the use of principal or income of the Oatlands-Symington Fund #50141.

  **13.** **Transfer of Real Property Interests**. Neither Party will give, sell, or in any way transfer any real property interest with respect to the Property, including any easement, without the written consent of the other Party; PROVIDED, HOWEVER, the Parties agree to use their best efforts to secure the placement of a mutually-acceptable conservation easement on the Historic Core using the Virginia Land Preservation Tax Credit program, with any net funds received to be held by the National Trust in a board-designated endowment for the Property, subject to approval of the terms by the National Trust Board and the Oatlands Board.

  **14.** **Compliance with Other Agreements**. The Parties will comply with the applicable terms of: (a) the restrictions in the Deed from Margaret E. Finley and David E. Finley, and Anne Eustis Emmet dated December 22, 1965; (b) the restrictions in the Deed of Gift from B. Powell Harrison dated December 26, 1980; (c) the Deed of Easement held by the Virginia Outdoors Foundation dated September 30, 2003 relating to the Long Meadow parcel; (d) the Deed of Easement held by the Virginia Outdoors Foundation dated May 16, 1968 relating to the Mountain Gap School parcel; and (e) any and all easements, rights of way, and other restrictions on the Property.

**A New Historic Sites Vision:  Clarity Brings Alignment**

*National Trust Sites are places of national significance or impact where a variety of ownership, stewardship, business, use, and engagement practices flourish to advance the National Trust mission and model the many options for preservation*



The new vision for National Trust Sites calls for alignment and clarity around five key elements of the National Trust/Historic Site relationship.  Each is important, but it is when all five are in play that National Trust Historic Sites reach a transformative level of impact in the context of the work of this 21st century historic preservation organization.

### Significance and Impact Nationally

In alignment with our Congressional charter, the new vision calls for National Trust sites that exemplify places of national significance or where the work has national impact.

As a nationally-facing organization with limited resources, the Trust focuses on places where our contributions are essential to success on nationwide issues.  The vision calls for national significance and/or impact.  Significance speaks to what has happened; impact speaks to our work in the future.

Two-thirds of the current portfolio is easily identified as nationally significant, given those sites' designation as a National Historic Landmark, National Monument, units of the National Park System, and/or nationally significant National Register Property.

In terms of the national impact of current work, one can look to these five examples:

- The forward-facing efforts of the Robert H. Smith Center for the Constitution at Montpelier,
- The national leadership issues under study at the David M. Rubenstein National Center for White House History at Decatur House,
- The Lower East Side Tenement Museum's emphasis on immigration issues in the 21st century,
- The current work on human trafficking taking place at President Lincoln's Cottage, and
- The Glass House's service as a canvas for inspiration and experimentation honoring the legacy of Philip Johnson and David Whitney.

For National Trust sites that have not traditionally focused on the national impact of their programs and outreach, we will work with staff and volunteer leadership to identify the opportunities to expand the reach and influence of both their mission and daily activities.

### Locally Governed

The new vision affirms the belief that local governance models ensure strong oversight and connections with the local community. The concept of local governance is not based on zip code, but is tied to the concept of local community for the site – which may be local, national, and/or international in nature. Sites with this model tend to demonstrate a strong connection to their history, to their stories, and to their communities and their needs today.

With this affirmation, the National Trust will work on a site-by-site basis with current and new partners to transition to appropriate local governance, management, interpretation, and ownership models that demonstrate the various pathways for preservation. Board building will be a key undertaking. Models for local governance could include co-stewardship with a nonprofit organization, affiliate status with a nonprofit or governmental organization, and private owner lease/management, among others.

Two sites – President Lincoln's Cottage and Drayton Hall – have self-selected to pilot the transition to new versions of local governance. The Trust is working with their staff and advisory councils to develop a governance agreement in alignment with the vision for historic sites.

For other sites currently in a stewardship arrangement, where the National Trust both owns and manages the property, we will begin individual conversations with those directors and boards to discuss readiness to move towards local governance in the context of a ten-year implementation plan. The Trust – using materials piloted for President Lincoln's Cottage and intended for testing and refinement in the years ahead – will provide staff and councils with an increasingly sophisticated set of tools to help determine local governance readiness and impact.

### Financial Self-Sufficiency

The new vision also calls for sites to have a financially sustainable business model that ensures self-sufficiency. The National Trust and the sites are expected to understand their business and move to change unsustainable models based on common but out-dated assumptions. Long-term financial self-sufficiency is understood as a key to responsible stewardship.

Sustainability of the physical assets (buildings, grounds, collections) – including funding for cyclical maintenance – is a critical part of financial self-sufficiency. Capitalization costs of facilities must be understood and accounted for in both short-term and long-range financial planning. Endowments are often an important element in financial self-sufficiency, but in healthy organizations should not be used

for more than 20% of the annual operating budget. They can also be important elements to support cyclical maintenance budgeting.

In implementing this new vision, the National Trust will work closely with site leadership to identify and develop recurring revenue streams to cover robust operations, programs, and cyclical maintenance needs. New and non-traditional models for historic site revenue, such as those under consideration in the shared use concept for Cooper-Molera Adobe, will be identified and supported as appropriate.

### Alignment with the Trust Mission

With the development of a new vision, the National Trust assumes the continuation of a portfolio of historic sites where the alignment between sites and the National Trust charter and values is easily articulated and recognized. Just as this vision describes the National Trust relationship to its historic sites, individual sites should articulate how they align with the Trust mission as defined in our charter: to provide for the preservation of historic sites and to facilitate public participation in the preservation of historic places. Trust sites – each in their own ways – should reflect the Trust values of collaboration, diversity, innovation, integrity, and making a difference.

Each site will articulate this alignment in different ways. Examples may include mission statements, strategic plans, programmatic collaboration, links on web sites, inclusion in guide training, joint branding, and presentations as part of visitor tours, among a host of other options. As each site moves to implement the elements of this vision, National Trust staff will work with the site staff and volunteer leadership to craft an appropriate alignment strategy.

### Exploration and Adaptation of New Models of Preservation

Finally, the new vision calls for a variety of uses and preservation techniques to be modeled across the portfolio of sites. Adaptable plans for use of the site ensure long-term preservation and sustainability.

The Trust will work with current and new partners to consider and ultimately adopt new models for sites use that ensure financial sustainability in support of preservation, engagement, and interpretation goals. It is expected that many sites will model more than one use. Concurrently, Trust staff and financial assets will be focused more than ever on preservation of the physical fabric.

The five examples below are illustrative of the range of uses and preservation models that are either already in place in our portfolio or are contemplated in the near future:

- Several of our historic sites – such as Drayton Hall – will retain a primary focus as museums. Like this Charleston site, these museums will offer a variety of cutting-edge educational programs, engage in preservation issues outside the site, expand outreach through online tools, and exhibit a range of 21st century best practices in collections curation, education, and stewardship

- Decatur House in Washington, DC, has moved under the leadership of our co-stewardship partner – the White House Historical Association – from a traditional house museum to an educational and cultural center through the David M. Rubenstein National Center for White House History at Decatur House. The center provides ongoing educational programs for students, teachers, scholars, and the general public on the history of the White House and the President's Neighborhood and has ambitious plans for growth.

- Brucemore – the National Trust site in Cedar Rapids, Iowa, administered by Brucemore, Inc. – has a long history as a center for community cultural activity and outreach, including major music and theatre festivals, an Independence Week Balloon Glow, and musical salons.

- The National Trust is working with California State Parks and local stakeholders at Cooper-Molera Adobe in Monterey to re-envision what is now a traditional house museum open by appointment only into a vibrant shared use interpretive/commercial site. This shared use approach can help provide the resources to tell a more layered and rich story of the Cooper and Molera families while helping reinvigorate the local Main Street historic district.

- Also in Monterey is the only existing example of a National Trust historic site that has been conveyed to private ownership. Casa Amesti is now owned by a private club which has maintained it to preservation standards included in a permanent covenant. The site also has requirements for public access at certain times of the year. This move to private ownership was seen as a way to ensure continued use of an important historic site which was not well suited as a museum, maintain some public benefit, and ensure financial sustainability.



Sites adopt a variety of models to ensure sustainability

## Implementation

Senior management – in growing consultation with senior management of the sites – has begun work on a ten-year transition plan that is over-arching *and* site-by-site focused, addressing questions around

- Roles (What roles will the Trust and sites play in the future of each site?)

- National/local balance (What is the connection between a national site and a local steward/partner?)

- Capacity (How do we know when a site is ready for the next step? The Trust?

- Self-sufficiency (What ensures financial support, sustainability, and self-sufficiency?)

- Stewardship (How do we ensure care of the physical assets?)

***FY11-FY13***

The Trust took steps in each of these elements over the past three years, by defining an overarching vision, beginning the first exploration of options for revised or new relationships (e.g., Frank Lloyd Wright Home and Studio, Cooper-Molera Adobe) and beginning work on new local governance relationships with two stewardship sites that had self-selected to move forward to transition (i.e., Drayton Hall and President Lincoln's Cottage).

Three sites (Cooper-Molera Adobe, Woodlawn, and Lyndhurst) began re-visioning work using the Trust's new National Treasures campaign model, while institution of new financial tracking systems, initial work on a CRM system, and identification of training needs were among the first steps taken toward self-sufficiency. Finally, the identification of critical priorities and the undertaking of a multi-year approach to address them were the first steps toward an appropriate level of preservation stewardship.

***Piloting the Vision: FY12 – FY15***

Five sites are well into the work to pilot this vision. Drayton Hall and President Lincoln's cottage – current stewardship sites – self-selected to begin the move to new local governance models under the larger umbrella of the new vision for sites.

At the same time, the Trust began National Treasure campaigns at Cooper-Molera, Woodlawn, and Lyndhurst, bringing the full resources of the organization to help determine their future. Each has its own challenges and opportunities, and each is on a very different path towards realizing the five-part vision of a 21° century National Trust Historic Site.

***Longer Term Implementation***

As transitions are made at these five sites, the Trust will work with senior leadership across the portfolio to assess impacts, recalibrate the plan as needed, help build stronger local boards, and move forward with transitions at additional sites. Next steps:

- Initial conversations with stewardship sites over the coming months will be set to identify the specific work for transition. The conversations will take place with site directors and councils in 2014, to begin the long-term implementation planning.

- Conversations with existing co-stewardship and affiliate sites in 2014 will focus on elements of the vision at the site where strengthening is needed for success. While each conversation will be different, the initial focus on roles, national/local balance, capacity, self-sufficiency, and stewardship will guide these discussions. It is also our goal to include cyclical maintenance provisions in each site budget in the FY15 – 18 timeframe.

The spring site directors' meeting and the fall gathering at the National Preservation Conference in Savannah will serve as opportunities for cross-portfolio updates and conversation on progress and work to be accomplished.

The headquarters infrastructure to support this new vision will need to be shaped over the next three years. New support systems and new ways of working will be required for successful implementation.



With a sustained focus on implementing this new vision for sites – building upon three years of analysis and preparation – the goal is to reach the stage where the flywheel effect accelerates this work, as success encourages more sites to move towards full embrace of a vision where:

*National Trust Sites are places of national significance or impact where a variety of ownership, stewardship, business, use, and engagement practices flourish to advance the National Trust mission and model the many options for preservation*

### National Trust Stewardship Sites (2013)
- Chesterwood, Stockbridge, MA
- Drayton Hall, Charleston, SC
- Farnsworth House, Plano, IL
- Gaylord Building, Lockport, IL
- Lyndhurst, Tarrytown, NY
- Philip Johnson's Glass House, New Canaan, CT
- President Lincoln's Cottage, Washington, DC
- Shadows-on-the-Teche, New Iberia, LA
- Villa Finale, San Antonio, TX
- Woodlawn and Frank Lloyd Wright's Pope-Leighey House, Alexandria, VA
- Woodrow Wilson House, Washington, DC

### National Trust Co-Stewardship Sites (2013)
- Belle Grove, Middletown, VA
- Brucemore, Cedar Rapids, IA
- Cliveden, Philadelphia, PA
- Cooper-Molera Adobe, Monterey, CA
- Decatur House, Washington, DC
- Filoli, Woodside, CA
- James Madison's Montpelier, Orange, VA
- Kykuit, Tarrytown, NY
- Oatlands, Leesburg, VA

### National Trust Affiliate Sites (2013)
- Acoma Sky City, Acoma, NM
- Hotel de Paris, Georgetown, CO
- Lower East Side Tenement Museum, New York, NY
- Museum of African American History, Boston and Nantucket, MA
- The Touro Synagogue, Newport, RI

## EXHIBIT C

## "Best Practices for Nonprofit Governance"

# PRINCIPLES
## FOR GOOD GOVERNANCE AND ETHICAL PRACTICE

◉ INDEPENDENT SECTOR

Independent Sector's *Principles for Good Governance and Ethical Practice* is the foremost guide for sound and successful practice by charities and foundations in the U.S., providing clarity about legal compliance and public disclosure, effective governance, strong financial oversight, and responsible fundraising. The 2015 edition provides considerable new value, reflecting changes in law as well as new circumstances in which the charitable sector functions, and new relationships within and between sectors. The following 33 Principles reflect the scope of the guide, while rationales and actionable steps for implementation can be found in the full guide, available at PrinciplesForGood.com.

### LEGAL COMPLIANCE AND PUBLIC DISCLOSURE

1. A charitable organization must comply with all applicable federal laws and regulations, as well as applicable laws and regulations of the states and the local jurisdictions in which it is formed or operates. If the organization conducts programs outside the United States, it must also abide by applicable international laws, regulations and conventions.

2. A charitable organization should formally adopt a written code of ethics with which all of its directors or trustees, staff, and volunteers are familiar and to which they adhere.

3. A charitable organization should adopt and implement policies and procedures to ensure that all conflicts of interest (real and potential), or the appearance thereof, within the organization and the governing board are appropriately managed through disclosure, recusal, or other means.

4. A charitable organization should establish and implement policies and procedures that enable individuals to come forward with information on illegal practices or violations of organizational policies. This "whistleblower" policy should specify that the organization will not retaliate against, and will seek to protect the confidentiality of, individuals who make good-faith reports.

5. A charitable organization should establish and implement policies and procedures to protect and preserve the organization's important data, documents, and business records.

6. A charitable organization's board should ensure that the organization has adequate plans to protect its assets — its property, documents and data, financial and human resources, programmatic content and material, and its integrity and reputation — against damage or loss. The board should review regularly the organization's need for general liability and directors' and officers' liability insurance, as well as take other actions necessary to mitigate risks.

7. A charitable organization should make information about its operations, including its governance, finances, programs, and activities, widely available to the public. Charitable organizations also should consider making information available on the methods they use to evaluate the outcomes of their work and sharing the results of those evaluations.

### EFFECTIVE GOVERNANCE

A charitable organization must have a governing body that is responsible for reviewing and approving the organization's mission and strategic direction, annual budget and key financial transactions, compensation practices and policies, and fiscal and governance policies.

The board of a charitable organization should meet regularly enough to conduct its business and fulfill its duties.

The board of a charitable organization should establish its own size and structure and review these periodically. The board should have enough members to allow for full deliberation and diversity of thinking on governance and other organizational matters. Except for very small organizations, this generally means that the board should have at least five members.

The board of a charitable organization should include members with the diverse background (including, but not limited to, ethnicity, race, and gender perspectives), experience, and organizational and financial skills necessary to advance the organization's mission.

A substantial majority of the board of a public charity, usually meaning at least two-thirds of its members, should be independent. Independent members should not: (1) be compensated by the organization as employees or independent contractors; (2) have their compensation determined by individuals who are compensated by the organization; (3) receive, directly or indirectly, material financial benefits from the organization except as a member of the charitable class served by the organization; or (4) be related to anyone described above (as a spouse, sibling, parent or child), or reside with any person so described.

The board should hire, oversee, and annually evaluate the performance of the chief executive officer of the organization. It should conduct such an evaluation prior to any change in that officer's compensation, unless there is a multi-year contract in force or the change consists solely of routine adjustments for inflation or cost of living.

The board of a charitable organization that has paid staff should ensure that the positions of chief staff officer, board chair, and board treasurer are held by separate individuals. Organizations without paid staff should ensure that the positions of board chair and treasurer are held by separate individuals.

The board should establish an effective, systematic process for educating and communicating with board members to ensure they are aware of their legal and ethical responsibilities, are knowledgeable about the programs and activities of the organization, and can carry out their oversight functions effectively.

Board members should evaluate their performance as a group and as individuals no less frequently than every three years, and should have clear procedures for removing board members who are unable to fulfill their responsibilities.

Governing boards should establish clear policies and procedures setting the length of terms and the number of consecutive terms a board member may serve.

The board should review organizational and governing instruments no less frequently than every five years.

The board should establish and review regularly the organization's mission and goals and should evaluate, no less frequently than every five years, the organization's programs, goals and activities to be sure they advance its mission and make prudent use of its resources.

Board members are generally expected to serve without compensation, other than reimbursement for expenses incurred to fulfill their board-related duties. A charitable organization that provides compensation to its board members should use appropriate comparability data to determine the amount to be paid, document the decision, and provide full disclosure to anyone, upon request, of the amount and rationale for the compensation.

## STRONG FINANCIAL OVERSIGHT

21. A charitable organization must keep complete, current, and accurate financial records and ensure strong financial controls are in place. Its board should receive and review timely reports of the organization's financial activities and should have a qualified, independent financial expert audit or review these statements annually in a manner appropriate to the organization's size and scale of operations.

22. The board of a charitable organization must institute policies and procedures to ensure that the organization (and, if applicable, its subsidiaries) manages and invests its funds responsibly, in accordance with all legal requirements. The full board should review and approve the organization's annual budget and should monitor actual performance against the budget.

23. A charitable organization should not provide loans (or the equivalent, such as loan guarantees, purchasing or transferring ownership of a residence or office, or relieving a debt or lease obligation) to directors, officers, or trustees.

24. A charitable organization should spend a significant amount of its annual budget on programs that pursue its mission while ensuring that the organization has sufficient administrative and fundraising capacity to deliver those programs responsibly and effectively.

25. A charitable organization should establish clear, written policies for paying or reimbursing expenses incurred by anyone conducting business or traveling on behalf of the organization, including the types of expenses that can be paid for or reimbursed and the documentation required. Such policies should require that travel on behalf of the organization is to be undertaken cost-effectively.

26. A charitable organization should neither pay for nor reimburse travel expenditures for spouses, dependents or others who are accompanying someone conducting business for the organization unless they, too, are conducting such business.

## RESPONSIBLE FUNDRAISING

27. Solicitation materials and other communications addressed to donors and the public must clearly identify the organization and be accurate and truthful.

28. Contributions must be used for purposes consistent with the donor's intent, whether as described in the relevant solicitation materials or as specifically directed by the donor.

29. A charitable organization must provide donors with specific acknowledgments of charitable contributions, in accordance with IRS requirements, as well as information to facilitate the donors' compliance with tax law requirements.

30. A charitable organization should adopt clear policies, based on its specific exempt purpose, to determine whether accepting a gift would compromise its ethics, financial circumstances, program focus, or other interests.

31. A charitable organization should provide appropriate training and supervision of the people soliciting funds on its behalf to ensure that they understand their responsibilities and applicable federal, state, and local laws, and do not employ techniques that are coercive, intimidating, or intended to harass potential donors.

32. A charitable organization should not compensate internal or external fundraisers based on a commission or a percentage of the amount raised.

33. A charitable organization should respect the privacy of individual donors and, except where disclosure is required by law, should not sell or otherwise make available the names and contact information of its donors without providing them an opportunity at least once a year to opt out of the use of their names.

## FULL ACCESS TO THE PRINCIPLES



VISIT
PRINCIPLESFORGOOD.COM
FOR ACCESS TO

* The Complete 2015 *Principles for Good Governance and Ethical Practice*
* *Principles* Legal Reference Edition
* Organizational Assessment Tool
* Comprehensive Resource Center

also develop an emergency response plan and provide staff and volunteer trainings related to life and safety matters.

      **F.**     **General Governance Principles.** The Parties will each make reasonable efforts to follow the "Best Practices for Nonprofit Governance," adapted from the Independent Sector's *Principles for Good Governance and Ethical Practice* (2015 ed.), as summarized in **Exhibit C**.

      **12.**     **Dispute Resolution.** The Parties mutually acknowledge that problems may arise that need to be addressed by the Parties, and the Parties, therefore, agree that they will act in good faith and use reasonable efforts to promptly resolve any problems that arise by mutual agreement. In the event that a dispute between the Parties cannot be resolved by negotiation, the Parties agree to submit the problem to a management committee for resolution. The "Management Committee" shall mean a committee made up of a senior executive from each of the Parties for the purpose of resolving problems under this section and generally overseeing the relationship between the Parties contemplated by this Agreement. For ten (10) calendar days following submission of any dispute to the Management Committee, the Management Committee shall have the exclusive right to resolve such problem. In the event that the Management Committee is unable to resolve the dispute during that period, the matter shall be referred to a "Dispute Resolution Panel," consisting of a representative chosen by each Party (whose expenses shall be paid by the respective Party) and a third representative chosen by the Party representatives (whose expenses shall be shared by the Parties). For thirty (30) calendar days following the submission of any dispute to the Dispute Resolution Panel, the Dispute Resolution Panel shall have the exclusive right to resolve such problem. The Dispute Resolution Panel may extend the exclusive review period up to an additional thirty (30) days. Should the Dispute Resolution Panel fail to resolve the dispute within the review period, either Party may seek judicial review of the dispute. The Parties agree to be bound by the decision of the Dispute Resolution Panel, unless the Parties mutually agree on alternative plans or either Party abandons its objections. This dispute resolution process shall not be applicable to any determination reserved to the sole discretion of either Party or, at the election of either party, to any dispute arising from or relating to the use of principal or income of the Oatlands-Symington Fund #50141.

      **13.**     **Transfer of Real Property Interests.** Neither Party will give, sell, or in any way transfer any real property interest with respect to the Property, including any easement, without the written consent of the other Party; PROVIDED, HOWEVER, the Parties agree to use their best efforts to secure the placement of a mutually-acceptable conservation easement on the Historic Core using the Virginia Land Preservation Tax Credit program, with any net funds received to be held by the National Trust in a board-designated endowment for the Property, subject to approval of the terms by the National Trust Board and the Oatlands Board.

      **14.**     **Compliance with Other Agreements.** The Parties will comply with the applicable terms of: (a) the restrictions in the Deed from Margaret E. Finley and David E. Finley, and Anne Eustis Emmet dated December 22, 1965; (b) the restrictions in the Deed of Gift from B. Powell Harrison dated December 26, 1980; (c) the Deed of Easement held by the Virginia Outdoors Foundation dated September 30, 2003 relating to the Long Meadow parcel; (d) the Deed of Easement held by the Virginia Outdoors Foundation dated May 16, 1968 relating to the Mountain Gap School parcel; and (e) any and all easements, rights of way, and other restrictions on the Property.

**15.** **General Provisions**. The Parties agree that the general provisions set forth in this Paragraph 15 shall apply to each of the Co-Stewardship Agreements.

**A.** **Representatives**. For purposes of this Agreement, the representative of the National Trust is the Vice President for Historic Sites, and the representative of Oatlands is the Executive Director. The National Trust Vice President for Historic Sites will be responsible for coordinating consultation with other National Trust employees as necessary and appropriate.

**B.** **Notices**. Notices may be served on either party, at the respective addresses set forth above, or at such other address notice of which is given by either party to the other in accordance herewith, either: (1) by delivery of such notice in writing by either party to the other, or (2) by either party causing to be delivered to the other party a written copy of such notice, or by either party sending to the other party such notice in writing by United States certified or registered mail, postage prepaid, in which event the notice shall be deemed to have been served five (5) days after the time such copy is mailed. Notice may also be given by electronic mail, but will not be deemed received unless and until acknowledged by a reproducible email given by the recipient party. Communications sent to the National Trust should be sent to the Vice President for Historic Sites. Communications sent to Oatlands should be sent to the Executive Director.

**C.** **Amendments**. This Agreement may be amended only by the mutual, written agreement of the Parties.

**D.** **Assignment**. This Agreement may not be assigned by either party without the prior written consent of the other party.

**E.** **Equal Employment Opportunity**. Oatlands and the National Trust are equal opportunity employers. It is Oatlands' and the National Trust's practice to hire qualified individuals, and administer all terms and conditions of employment, without regard to race, color, creed, sex (including pregnancy, childbirth, and related medical conditions), age, marital status, religion, national origin, citizenship status, physical or mental disability, genetic information, sexual orientation, veteran status, or any other classification protected by law.

**F.** **Successors & Assigns**. All covenants, promises, representations and agreements herein contained will be binding upon, apply and inure to the benefit of Oatlands, the National Trust and their respective successors and assigns.

**G.** **Other Documents; Entire Agreement**. The Co-Stewardship Agreements (i.e. this Agreement, the Lease, and the Loan Agreement) constitute the complete understanding and agreement between the Parties, superseding any and all prior oral or written agreements and understandings (including the Cooperative Agreement, Lease, and Loan Agreement dated July 15, 1984), and will be read in conjunction with each other, and no modification, waiver or amendment of any provision thereof will be valid unless made in writing and signed by the duly authorized representative of both Parties hereto.

**H.** **Mutual Cooperation/Reasonableness**. The Parties agree to cooperate with each other in connection with the decisions to be made, and actions to be taken,

under this Agreement. The Parties further agree that they will act in a reasonable manner in the fulfillment of their rights and obligations under this Agreement.

  **I.**   **Authority**. The Parties warrant and represent that each party and their respective signatories has the authority to enter into this Agreement.

  **J.**   **Compliance with Laws**. Oatlands agrees at all times to comply with applicable laws, codes, rules, regulations and other governmental and municipal requirements.

  **K.**   **Governing Law**. This Agreement is made in and will be governed by the laws of the Commonwealth of Virginia.

  **L.**   **Interpretation**. The captions of the paragraphs of this Agreement are for convenience only and will have no bearing whatsoever in the interpretation of the terms, conditions and provisions of this Agreement.

  **M.**   **Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be an original, and all of which shall constitute one and the same instrument with the same effect as if all Parties had signed the same signature page.

[*Signature Page to Follow*]

**IN WITNESS WHEREOF**, the Parties have hereunto set their hands and seals the date and year first written above.

**NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES**

By: _____

Paul W. Edmondson, Interim President & CEO

**OATLANDS, INC.**

By: _____

Eugene Gulland, Chair

# EXHIBIT A

## "Map of Property"



A-Administration
B-Bachelor's Cottage
C-Carter Barn & Courtyard
CC-Corn Crib
CH-Carriage House
CR-Carter's RD
DF-Donkey Field
EF-East Field
EW-East Woods
FR-Field Road
G-Garden
GF-Gap Field
GFE-Gap Field Entrance
GH-Green House
GRE-Gap Road Entrance
GS-Garden Studio
LF-Llama Field
M-Mansion
MGS-Mt. Gap School
& Adjacent Lot

ENTRANCE  Oatlands
Plantation Lane

NFA-North Field A
NFB-North Field B
OD-Oatlands Dumpsite
OF-Old Field
OG-Oak Grove
P-Parking Lot
PF-Pony Field
PS-Pine Slope
SF-South Field
SP1-Smith Preserve Lot 1
SP2-Smith Preserve Lot 2
SP3-Smith Preserve Lot 7
SP4-Smith Preserve Lot 4
SP5-Smith Preserve Lot 5
SP6-Smith Preserve Lot 6
TC-Twentieth Century Barn
TH1-Tenant House 1
TH2-Tenant House 2
TS-Trunk Shed
WH-Well House



## National Trust Ownership
## and Easement Properties

# EXHIBIT B

## "Historic Sites Vision Statement"

**Reimagining Historic Sites:**
**A Vision for the Future of National Trust Historic Sites**
**January 2014**

The National Trust for Historic Preservation was chartered by Congress in 1949 to provide for the preservation of historic sites and to facilitate public participation in the preservation of historic places.

> *An Act to provide for the preservation of historic American sites, buildings, objects, and antiquities of national significance, and for other purposes, and to facilitate public participation in the preservation of sites, buildings, and objects of national significance or interest, there is hereby created a charitable, educational, and nonprofit corporation, to be known as the National Trust for Historic Preservation in the United States, hereafter referred to as the "National Trust." (Congressional Charter, 1949)*

### Setting the Context

In response to this charter, the National Trust has acquired and maintained more than 30 historic sites in its almost 65 years of existence. Each was important in its own way but the sites were generally acquired without an overarching vision that articulated:

- **Why** the site fit into a portfolio of National Trust sites

- **What** would be done to promote larger preservation and engagement goals, and

- **How** we would support the preservation of those sites and engage the public in meaningful ways as part of a growing portfolio, especially in light of changing public funding.

The Trust operated in this fashion into the 1990s, supported by a $7 million annual federal appropriation that was largely devoted to the historic sites. In the 1990s, the goal was set to move all Trust sites to a co-stewardship relationship, where they would be operated by a separate non-profit or governmental partner, yet no clear plan for implementation was adopted. At the same time, the portfolio was expanded with the addition of five "affiliate" sites, which were neither owned nor operated by the National Trust, but existed in a partnership and marketing relationship with the organization.



**1950 2005**
- From Woodlawn to Villa Finale, Trust acquires and owns more than 30 sites
- Donations – sometimes unsolicited – are the primary means of acquisition
- Federal funding of $7M annually (thru 1995) was primarily used to support sites

**1998 2012**
- Trust expands its portfolio with five "Affiliate" sites with partners
- The Trust turns over ownership of two sites – Casa Amesti and Frank Lloyd Wright Home & Studio – to new stewards
- In 2010, Trust begins review of vision & governance models

**2010 2020**
- Trust undertakes $26M+ Critical Priorities plan to bring all sites to appropriate levels of stewardship
- Trust updates technology systems to current levels
- New vision developed
- Work begins on five sites to model new vision.

**Transition in Leadership Leads to Work on a New Vision**

In 2010, under new executive leadership, the National Trust began a comprehensive review of the Trust vision and governance models for its historic sites. At the same time, recent investment by the organization was designed to address our stewardship responsibilities.

- A five-year comprehensive Critical Priorities program, stretching from 2011-2015, was undertaken to assess and address risks at Trust sites related to imminent loss of historic fabric, life safety, and outdated infrastructure.

- The Trust has spent or identified $10.5 million of the estimated $25.397 million total cost. The gap is to be filled by gifts received through the Trust's national fundraising campaign. By the conclusion of FY14, 42% by cost and 50% by number of 138 total projects will be completed; 93% of all projects will have been initiated.

In addition to the Critical Priorities campaign, additional Trust investment at the historic sites includes:

- *Finance & Management*
  - Sites involvement in Constituent Relationship Management (CRM) development to support the Trust's new business/membership/fundraising system
  - Phone system and Point of Sale system upgrades
  - Supervisor training + Leadership development program/emerging professionals network
- *Marketing*
  - Re-branding/logo work at sites
  - Travel media outreach for sites
  - In-kind paint program donations – expanding to stain in 2014
  - Continued help with marketing assistance
- *Development*
  - Sites included in Principal Gifts prospect review to close Critical Priorities gap
- *Legal*
  - Contracting assistance on Critical Priorities
  - Legal and Preservation staff assistance at Treasure sites
  - Ongoing Legal work at sites

Senior management, in close collaboration with the Board of Trustees, began work in 2012 on an innovative vision for National Trust sites that moves away from old assumptions and practices to provide direction to support enduring public value – as well as creating new value for an expanded public. The vision is designed to ensure clarity around the Trust/Site relationship in terms of national significance and impact, local governance, financial self-sufficiency, alignment with the National Trust mission, and exploration and adaptation of new models of preservation. A ten-year implementation plan is envisioned, to provide guidance to senior management and volunteer leadership. In this vision:

- The National Trust *intends to retain ownership* of those sites it currently owns and continue the engagement and integration of these places into the overall Trust strategic vision and work
- *Stewardship of the physical assets* will remain a primary concern of the National Trust
- The National Trust values of *collaboration, innovation, diversity, integrity, and making a difference* are at the heart of this vision

**A New Historic Sites Vision: Clarity Brings Alignment**

*National Trust Sites are places of national significance or impact where a variety of ownership, stewardship, business, use, and engagement practices flourish to advance the National Trust mission and model the many options for preservation*



The new vision for National Trust Sites calls for alignment and clarity around five key elements of the National Trust/Historic Site relationship. Each is important, but it is when all five are in play that National Trust Historic Sites reach a transformative level of impact in the context of the work of this 21st century historic preservation organization.

*Significance and Impact Nationally*

In alignment with our Congressional charter, the new vision calls for National Trust sites that exemplify places of national significance or where the work has national impact.

As a nationally-facing organization with limited resources, the Trust focuses on places where our contributions are essential to success on nationwide issues. The vision calls for national significance and/or impact. Significance speaks to what has happened; impact speaks to our work in the future.

Two-thirds of the current portfolio is easily identified as nationally significant, given those sites' designation as a National Historic Landmark, National Monument, units of the National Park System, and/or nationally significant National Register Property.

In terms of the national impact of current work, one can look to these five examples:

---

- The forward-facing efforts of the Robert H. Smith Center for the Constitution at Montpelier,
- The national leadership issues under study at the David M. Rubenstein National Center for White House History at Decatur House,
- The Lower East Side Tenement Museum's emphasis on immigration issues in the 21st century,
- The current work on human trafficking taking place at President Lincoln's Cottage, and
- The Glass House's service as a canvas for inspiration and experimentation honoring the legacy of Philip Johnson and David Whitney.

For National Trust sites that have not traditionally focused on the national impact of their programs and outreach, we will work with staff and volunteer leadership to identify the opportunities to expand the reach and influence of both their mission and daily activities.

### Locally Governed

The new vision affirms the belief that local governance models ensure strong oversight and connections with the local community. The concept of local governance is not based on zip code, but is tied to the concept of local community for the site – which may be local, national, and/or international in nature. Sites with this model tend to demonstrate a strong connection to their history, to their stories, and to their communities and their needs today.

With this affirmation, the National Trust will work on a site-by-site basis with current and new partners to transition to appropriate local governance, management, interpretation, and ownership models that demonstrate the various pathways for preservation. Board building will be a key undertaking. Models for local governance could include co-stewardship with a nonprofit organization, affiliate status with a nonprofit or governmental organization, and private owner lease/management, among others.

Two sites – President Lincoln's Cottage and Drayton Hall – have self-selected to pilot the transition to new versions of local governance. The Trust is working with their staff and advisory councils to develop a governance agreement in alignment with the vision for historic sites.

For other sites currently in a stewardship arrangement, where the National Trust both owns and manages the property, we will begin individual conversations with those directors and boards to discuss readiness to move towards local governance in the context of a ten-year implementation plan. The Trust – using materials piloted for President Lincoln's Cottage and intended for testing and refinement in the years ahead – will provide staff and councils with an increasingly sophisticated set of tools to help determine local governance readiness and impact.

### Financial Self-Sufficiency

The new vision also calls for sites to have a financially sustainable business model that ensures self-sufficiency. The National Trust and the sites are expected to understand their business and move to change unsustainable models based on common but out-dated assumptions. Long-term financial self-sufficiency is understood as a key to responsible stewardship.

Sustainability of the physical assets (buildings, grounds, collections) – including funding for cyclical maintenance – is a critical part of financial self-sufficiency. Capitalization costs of facilities must be understood and accounted for in both short-term and long-range financial planning. Endowments are often an important element in financial self-sufficiency, but in healthy organizations should not be used

for more than 20% of the annual operating budget. They can also be important elements to support cyclical maintenance budgeting.

In implementing this new vision, the National Trust will work closely with site leadership to identify and develop recurring revenue streams to cover robust operations, programs, and cyclical maintenance needs. New and non-traditional models for historic site revenue, such as those under consideration in the shared use concept for Cooper-Molera Adobe, will be identified and supported as appropriate.

### Alignment with the Trust Mission

With the development of a new vision, the National Trust assumes the continuation of a portfolio of historic sites where the alignment between sites and the National Trust charter and values is easily articulated and recognized. Just as this vision describes the National Trust relationship to its historic sites, individual sites should articulate how they align with the Trust mission as defined in our charter: to provide for the preservation of historic sites and to facilitate public participation in the preservation of historic places. Trust sites – each in their own ways – should reflect the Trust values of collaboration, diversity, innovation, integrity, and making a difference.

Each site will articulate this alignment in different ways. Examples may include mission statements, strategic plans, programmatic collaboration, links on web sites, inclusion in guide training, joint branding, and presentations as part of visitor tours, among a host of other options. As each site moves to implement the elements of this vision, National Trust staff will work with the site staff and volunteer leadership to craft an appropriate alignment strategy.

### Exploration and Adaptation of New Models of Preservation

Finally, the new vision calls for a variety of uses and preservation techniques to be modeled across the portfolio of sites. Adaptable plans for use of the site ensure long-term preservation and sustainability.

The Trust will work with current and new partners to consider and ultimately adopt new models for sites use that ensure financial sustainability in support of preservation, engagement, and interpretation goals. It is expected that many sites will model more than one use. Concurrently, Trust staff and financial assets will be focused more than ever on preservation of the physical fabric.

The five examples below are illustrative of the range of uses and preservation models that are either already in place in our portfolio or are contemplated in the near future:

- Several of our historic sites – such as Drayton Hall – will retain a primary focus as museums. Like this Charleston site, these museums will offer a variety of cutting-edge educational programs, engage in preservation issues outside the site, expand outreach through online tools, and exhibit a range of 21st century best practices in collections curation, education, and stewardship

- Decatur House in Washington, DC, has moved under the leadership of our co-stewardship partner – the White House Historical Association – from a traditional house museum to an educational and cultural center through the David M. Rubenstein National Center for White House History at Decatur House. The center provides ongoing educational programs for students, teachers, scholars, and the general public on the history of the White House and the President's Neighborhood and has ambitious plans for growth.

- Brucemore – the National Trust site in Cedar Rapids, Iowa, administered by Brucemore, Inc. – has a long history as a center for community cultural activity and outreach, including major music and theatre festivals, an Independence Week Balloon Glow, and musical salons.

- The National Trust is working with California State Parks and local stakeholders at Cooper-Molera Adobe in Monterey to re-envision what is now a traditional house museum open by appointment only into a vibrant shared use interpretive/commercial site. This shared use approach can help provide the resources to tell a more layered and rich story of the Cooper and Molera families while helping reinvigorate the local Main Street historic district.

- Also in Monterey is the only existing example of a National Trust historic site that has been conveyed to private ownership. Casa Amesti is now owned by a private club which has maintained it to preservation standards included in a permanent covenant. The site also has requirements for public access at certain times of the year. This move to private ownership was seen as a way to ensure continued use of an important historic site which was not well suited as a museum, maintain some public benefit, and ensure financial sustainability.



21st Century House Museum — Cultural/Educational Center — Community Center — Commercial and Nonprofit Shared Use — Private Ownership with Covenant & Public Access

Sites adopt a variety of models to ensure sustainability

## Implementation

Senior management – in growing consultation with senior management of the sites – has begun work on a ten-year transition plan that is over-arching *and* site-by-site focused, addressing questions around

- Roles (What roles will the Trust and sites play in the future of each site?)

- National/local balance (What is the connection between a national site and a local steward/partner?)

- Capacity (How do we know when a site is ready for the next step? The Trust?)

- Self-sufficiency (What ensures financial support, sustainability, and self-sufficiency?)

- Stewardship (How do we ensure care of the physical assets?)

### FY11-FY13

The Trust took steps in each of these elements over the past three years, by defining an overarching vision, beginning the first exploration of options for revised or new relationships (e.g., Frank Lloyd Wright Home and Studio, Cooper-Molera Adobe) and beginning work on new local governance relationships with two stewardship sites that had self-selected to move forward to transition (i.e., Drayton Hall and President Lincoln's Cottage).

Three sites (Cooper-Molera Adobe, Woodlawn, and Lyndhurst) began re-visioning work using the Trust's new National Treasures campaign model, while institution of new financial tracking systems, initial work on a CRM system, and identification of training needs were among the first steps taken toward self-sufficiency. Finally, the identification of critical priorities and the undertaking of a multi-year approach to address them were the first steps toward an appropriate level of preservation stewardship.

### Piloting the Vision: FY12 – FY15

Five sites are well into the work to pilot this vision. Drayton Hall and President Lincoln's cottage – current stewardship sites – self-selected to begin the move to new local governance models under the larger umbrella of the new vision for sites.

At the same time, the Trust began National Treasure campaigns at Cooper-Molera, Woodlawn, and Lyndhurst, bringing the full resources of the organization to help determine their future. Each has its own challenges and opportunities, and each is on a very different path towards realizing the five-part vision of a 21st century National Trust Historic Site.

### Longer Term Implementation

As transitions are made at these five sites, the Trust will work with senior leadership across the portfolio to assess impacts, recalibrate the plan as needed, help build stronger local boards, and move forward with transitions at additional sites. Next steps:

- Initial conversations with stewardship sites over the coming months will be set to identify the specific work for transition. The conversations will take place with site directors and councils in 2014, to begin the long-term implementation planning.

- Conversations with existing co-stewardship and affiliate sites in 2014 will focus on elements of the vision at the site where strengthening is needed for success. While each conversation will be different, the initial focus on roles, national/local balance, capacity, self-sufficiency, and stewardship will guide these discussions. It is also our goal to include cyclical maintenance provisions in each site budget in the FY15 – 18 timeframe.

The spring site directors' meeting and the fall gathering at the National Preservation Conference in Savannah will serve as opportunities for cross-portfolio updates and conversation on progress and work to be accomplished.

The headquarters infrastructure to support this new vision will need to be shaped over the next three years. New support systems and new ways of working will be required for successful implementation.



With a sustained focus on implementing this new vision for sites – building upon three years of analysis and preparation – the goal is to reach the stage where the flywheel effect accelerates this work, as success encourages more sites to move towards full embrace of a vision where:

*National Trust Sites are places of national significance or impact where a variety of ownership, stewardship, business, use, and engagement practices flourish to advance the National Trust mission and model the many options for preservation*

### National Trust Stewardship Sites (2013)
- Chesterwood, Stockbridge, MA
- Drayton Hall – Charleston, SC
- Farnsworth House, Plano, IL
- Gaylord Building, Lockport, IL
- Lyndhurst, Tarrytown, NY
- Philip Johnson's Glass House, New Canaan, CT
- President Lincoln's Cottage, Washington, DC
- Shadows-on-the-Teche, New Iberia, LA
- Villa Finale, San Antonio, TX
- Woodlawn and Frank Lloyd Wright's Pope-Leighey House, Alexandria, VA
- Woodrow Wilson House, Washington, DC

### National Trust Co-Stewardship Sites (2013)
- Belle Grove, Middletown, VA
- Brucemore, Cedar Rapids, IA
- Cliveden, Philadelphia, PA
- Cooper-Molera Adobe, Monterey, CA
- Decatur House, Washington, DC
- Filoli, Woodside, CA
- James Madison's Montpelier, Orange, VA
- Kykuit, Tarrytown, NY
- Oatlands, Leesburg, VA

### National Trust Affiliate Sites (2013)
- Acoma Sky City, Acoma, NM
- Hotel de Paris, Georgetown, CO
- Lower East Side Tenement Museum, New York, NY
- Museum of African American History, Boston and Nantucket, MA
- The Touro Synagogue, Newport, RI

**EXHIBIT C**

## "Best Practices for Nonprofit Governance"

# PRINCIPLES
## FOR GOOD GOVERNANCE AND ETHICAL PRACTICE


INDEPENDENT SECTOR

Independent Sector's *Principles for Good Governance and Ethical Practice* is the foremost guide for sound and successful practice by charities and foundations in the U.S., providing clarity about legal compliance and public disclosure, effective governance, strong financial oversight, and responsible fundraising. The 2015 edition provides considerable new value, reflecting changes in law as well as new circumstances in which the charitable sector functions, and new relationships within and between sectors. The following 33 Principles reflect the scope of the guide, while rationales and actionable steps for implementation can be found in the full guide, available at PrinciplesForGood.com.

### LEGAL COMPLIANCE AND PUBLIC DISCLOSURE

1. A charitable organization must comply with all applicable federal laws and regulations, as well as applicable laws and regulations of the states and the local jurisdictions in which it is formed or operates. If the organization conducts programs outside the United States, it must also abide by applicable international laws, regulations and conventions.

2. A charitable organization should formally adopt a written code of ethics with which all of its directors or trustees, staff, and volunteers are familiar and to which they adhere.

3. A charitable organization should adopt and implement policies and procedures to ensure that all conflicts of interest (real and potential), or the appearance thereof, within the organization and the governing board are appropriately managed through disclosure, recusal, or other means.

4. A charitable organization should establish and implement policies and procedures that enable individuals to come forward with information on illegal practices or violations of organizational policies. This "whistleblower" policy should specify that the organization will not retaliate against, and will seek to protect the confidentiality of, individuals who make good-faith reports.

5. A charitable organization should establish and implement policies and procedures to protect and preserve the organization's important data, documents, and business records.

6. A charitable organization's board should ensure that the organization has adequate plans to protect its assets — its property, documents and data, financial and human resources, programmatic content and material, and its integrity and reputation — against damage or loss. The board should review regularly the organization's need for general liability and directors' and officers' liability insurance, as well as take other actions necessary to mitigate risks.

7. A charitable organization should make information about its operations, including its governance, finances, programs, and activities, widely available to the public. Charitable organizations also should consider making information available on the methods they use to evaluate the outcomes of their work and sharing the results of those evaluations.

### EFFECTIVE GOVERNANCE

A charitable organization must have a governing body that is responsible for reviewing and approving the organization's mission and strategic direction, annual budget and key financial transactions, compensation practices and policies, and fiscal and governance policies.

The board of a charitable organization should meet regularly enough to conduct its business and fulfill its duties.

The board of a charitable organization should establish its own size and structure and review these periodically. The board should have enough members to allow for full deliberation and diversity of thinking on governance and other organizational matters. Except for very small organizations, this generally means that the board should have at least five members.

The board of a charitable organization should include members with the diverse background (including, but not limited to, ethnicity, race, and gender perspectives), experience, and organizational and financial skills necessary to advance the organization's mission.

A substantial majority of the board of a public charity, usually meaning at least two-thirds of its members, should be independent. Independent members should not: (1) be compensated by the organization as employees or independent contractors, (2) have their compensation determined by individuals who are compensated by the organization; (3) receive, directly or indirectly, material financial benefits from the organization except as a member of the charitable class served by the organization; or (4) be related to anyone described above (as a spouse, sibling, parent or child), or reside with any person so described.

The board should hire, oversee, and annually evaluate the performance of the chief executive officer of the organization. It should conduct such an evaluation prior to any change in that officer's compensation, unless there is a multi-year contract in force or the change consists solely of routine adjustments for inflation or cost of living.

The board of a charitable organization that has paid staff should ensure that the positions of chief staff officer, board chair, and board treasurer are held by separate individuals. Organizations without paid staff should ensure that the positions of board chair and treasurer are held by separate individuals.

PRINCIPLESFORGOOD.COM

The board should establish an effective, systematic process for educating and communicating with board members to ensure they are aware of their legal and ethical responsibilities, are knowledgeable about the programs and activities of the organization, and can carry out their oversight functions effectively.

Board members should evaluate their performance as a group and as individuals no less frequently than every three years, and should have clear procedures for removing board members who are unable to fulfill their responsibilities.

Governing boards should establish clear policies and procedures setting the length of terms and the number of consecutive terms a board member may serve.

The board should review organizational and governing instruments no less frequently than every five years.

The board should establish and review regularly the organization's mission and goals and should evaluate, no less frequently than every five years, the organization's programs, goals, and activities to be sure they advance its mission and make prudent use of its resources.

Board members are generally expected to serve without compensation, other than reimbursement for expenses incurred to fulfill their board-related duties. A charitable organization that provides compensation to its board members should use appropriate comparability data to determine the amount to be paid, document the decision, and provide full disclosure to anyone, upon request, of the amount and rationale for the compensation.

## STRONG FINANCIAL OVERSIGHT

21. A charitable organization must keep complete, current, and accurate financial records and ensure strong financial controls are in place. Its board should receive and review timely reports of the organization's financial activities and should have a qualified, independent financial expert audit or review these statements annually in a manner appropriate to the organization's size and scale of operations.

22. The board of a charitable organization must institute policies and procedures to ensure that the organization (and, if applicable, its subsidiaries) manages and invests its funds responsibly, in accordance with all legal requirements. The full board should review and approve the organization's annual budget and should monitor actual performance against the budget.

23. A charitable organization should not provide loans (or the equivalent, such as loan guarantees, purchasing or transferring ownership of a residence or office, or relieving a debt or lease obligation) to directors, officers, or trustees.

24. A charitable organization should spend a significant amount of its annual budget on programs that pursue its mission while ensuring that the organization has sufficient administrative and fundraising capacity to deliver those programs responsibly and effectively.

25. A charitable organization should establish clear, written policies for paying or reimbursing expenses incurred by anyone conducting business or traveling on behalf of the organization, including the types of expenses that can be paid for or reimbursed and the documentation required. Such policies should require that travel on behalf of the organization is to be undertaken cost-effectively.

26. A charitable organization should neither pay for nor reimburse travel expenditures for spouses, dependents or others who are accompanying someone conducting business for the organization unless they, too, are conducting such business.

## RESPONSIBLE FUNDRAISING

27. Solicitation materials and other communications addressed to donors and the public must clearly identify the organization and be accurate and truthful.

28. Contributions must be used for purposes consistent with the donor's intent, whether as described in the relevant solicitation materials or as specifically directed by the donor.

29. A charitable organization must provide donors with specific acknowledgments of charitable contributions, in accordance with IRS requirements, as well as information to facilitate the donors' compliance with tax law requirements.

30. A charitable organization should adopt clear policies, based on its specific exempt purpose, to determine whether accepting a gift would compromise its ethics, financial circumstances, program focus, or other interests.

31. A charitable organization should provide appropriate training and supervision of the people soliciting funds on its behalf to ensure that they understand their responsibilities and applicable federal, state, and local laws, and do not employ techniques that are coercive, intimidating, or intended to harass potential donors.

32. A charitable organization should not compensate internal or external fundraisers based on a commission or a percentage of the amount raised.

33. A charitable organization should respect the privacy of individual donors and, except where disclosure is required by law, should not sell or otherwise make available the names and contact information of its donors without providing them an opportunity at least once a year to opt out of the use of their names.

## FULL ACCESS TO THE PRINCIPLES



VISIT
PRINCIPLESFORGOOD.COM
FOR ACCESS TO

- The Complete 2015 *Principles for Good Governance and Ethical Practice*
- *Principles* Legal Reference Edition
- Organizational Assessment Tool
- Comprehensive Resource Center

- The forward-facing efforts of the Robert H. Smith Center for the Constitution at Montpelier,
- The national leadership issues under study at the David M. Rubenstein National Center for White House History at Decatur House,
- The Lower East Side Tenement Museum's emphasis on immigration issues in the 21st century,
- The current work on human trafficking taking place at President Lincoln's Cottage, and
- The Glass House's service as a canvas for inspiration and experimentation honoring the legacy of Philip Johnson and David Whitney.

For National Trust sites that have not traditionally focused on the national impact of their programs and outreach, we will work with staff and volunteer leadership to identify the opportunities to expand the reach and influence of both their mission and daily activities.

### Locally Governed

The new vision affirms the belief that local governance models ensure strong oversight and connections with the local community. The concept of local governance is not based on zip code, but is tied to the concept of local community for the site – which may be local, national, and/or international in nature. Sites with this model tend to demonstrate a strong connection to their history, to their stories, and to their communities and their needs today.

With this affirmation, the National Trust will work on a site-by-site basis with current and new partners to transition to appropriate local governance, management, interpretation, and ownership models that demonstrate the various pathways for preservation. Board building will be a key undertaking. Models for local governance could include co-stewardship with a nonprofit organization, affiliate status with a nonprofit or governmental organization, and private owner lease/management, among others.

Two sites – President Lincoln's Cottage and Drayton Hall – have self-selected to pilot the transition to new versions of local governance. The Trust is working with their staff and advisory councils to develop a governance agreement in alignment with the vision for historic sites.

For other sites currently in a stewardship arrangement, where the National Trust both owns and manages the property, we will begin individual conversations with those directors and boards to discuss readiness to move towards local governance in the context of a ten-year implementation plan. The Trust – using materials piloted for President Lincoln's Cottage and intended for testing and refinement in the years ahead – will provide staff and councils with an increasingly sophisticated set of tools to help determine local governance readiness and impact.

### Financial Self-Sufficiency

The new vision also calls for sites to have a financially sustainable business model that ensures self-sufficiency. The National Trust and the sites are expected to understand their business and move to change unsustainable models based on common but out-dated assumptions. Long-term financial self-sufficiency is understood as a key to responsible stewardship.

Sustainability of the physical assets (buildings, grounds, collections) – including funding for cyclical maintenance – is a critical part of financial self-sufficiency. Capitalization costs of facilities must be understood and accounted for in both short-term and long-range financial planning. Endowments are often an important element in financial self-sufficiency, but in healthy organizations should not be used

for more than 20% of the annual operating budget. They can also be important elements to support cyclical maintenance budgeting.

In implementing this new vision, the National Trust will work closely with site leadership to identify and develop recurring revenue streams to cover robust operations, programs, and cyclical maintenance needs. New and non-traditional models for historic site revenue, such as those under consideration in the shared use concept for Cooper-Molera Adobe, will be identified and supported as appropriate.

### Alignment with the Trust Mission

With the development of a new vision, the National Trust assumes the continuation of a portfolio of historic sites where the alignment between sites and the National Trust charter and values is easily articulated and recognized. Just as this vision describes the National Trust relationship to its historic sites, individual sites should articulate how they align with the Trust mission as defined in our charter: to provide for the preservation of historic sites and to facilitate public participation in the preservation of historic places. Trust sites – each in their own ways – should reflect the Trust values of collaboration, diversity, innovation, integrity, and making a difference.

Each site will articulate this alignment in different ways. Examples may include mission statements, strategic plans, programmatic collaboration, links on web sites, inclusion in guide training, joint branding, and presentations as part of visitor tours, among a host of other options. As each site moves to implement the elements of this vision, National Trust staff will work with the site staff and volunteer leadership to craft an appropriate alignment strategy.

### Exploration and Adaptation of New Models of Preservation

Finally, the new vision calls for a variety of uses and preservation techniques to be modeled across the portfolio of sites. Adaptable plans for use of the site ensure long-term preservation and sustainability.

The Trust will work with current and new partners to consider and ultimately adopt new models for sites use that ensure financial sustainability in support of preservation, engagement, and interpretation goals. It is expected that many sites will model more than one use. Concurrently, Trust staff and financial assets will be focused more than ever on preservation of the physical fabric.

The five examples below are illustrative of the range of uses and preservation models that are either already in place in our portfolio or are contemplated in the near future:

- Several of our historic sites – such as Drayton Hall – will retain a primary focus as museums. Like this Charleston site, these museums will offer a variety of cutting-edge educational programs, engage in preservation issues outside the site, expand outreach through online tools, and exhibit a range of 21st century best practices in collections curation, education, and stewardship

- Decatur House in Washington, DC, has moved under the leadership of our co-stewardship partner – the White House Historical Association – from a traditional house museum to an educational and cultural center through the David M. Rubenstein National Center for White House History at Decatur House. The center provides ongoing educational programs for students, teachers, scholars, and the general public on the history of the White House and the President's Neighborhood and has ambitious plans for growth.

- Brucemore – the National Trust site in Cedar Rapids, Iowa, administered by Brucemore, Inc. – has a long history as a center for community cultural activity and outreach, including major music and theatre festivals, an Independence Week Balloon Glow, and musical salons.

- The National Trust is working with California State Parks and local stakeholders at Cooper-Molera Adobe in Monterey to re-envision what is now a traditional house museum open by appointment only into a vibrant shared use interpretive/commercial site. This shared use approach can help provide the resources to tell a more layered and rich story of the Cooper and Molera families while helping reinvigorate the local Main Street historic district.

- Also in Monterey is the only existing example of a National Trust historic site that has been conveyed to private ownership. Casa Amesti is now owned by a private club which has maintained it to preservation standards included in a permanent covenant. The site also has requirements for public access at certain times of the year. This move to private ownership was seen as a way to ensure continued use of an important historic site which was not well suited as a museum, maintain some public benefit, and ensure financial sustainability.



Sites adopt a variety of models to ensure sustainability

## Implementation

Senior management – in growing consultation with senior management of the sites – has begun work on a ten-year transition plan that is over-arching *and* site-by-site focused, addressing questions around

- Roles (What roles will the Trust and sites play in the future of each site?)

- National/local balance (What is the connection between a national site and a local steward/partner?)

- Capacity (How do we know when a site is ready for the next step? The Trust?)

- Self-sufficiency (What ensures financial support, sustainability, and self-sufficiency?)

- Stewardship (How do we ensure care of the physical assets?)

***FY11-FY13***

The Trust took steps in each of these elements over the past three years, by defining an overarching vision, beginning the first exploration of options for revised or new relationships (e.g., Frank Lloyd Wright Home and Studio, Cooper-Molera Adobe) and beginning work on new local governance relationships with two stewardship sites that had self-selected to move forward to transition (i.e., Drayton Hall and President Lincoln's Cottage).

Three sites (Cooper-Molera Adobe, Woodlawn, and Lyndhurst) began re-visioning work using the Trust's new National Treasures campaign model, while institution of new financial tracking systems, initial work on a CRM system, and identification of training needs were among the first steps taken toward self-sufficiency. Finally, the identification of critical priorities and the undertaking of a multi-year approach to address them were the first steps toward an appropriate level of preservation stewardship.

***Piloting the Vision: FY12 – FY15***

Five sites are well into the work to pilot this vision. Drayton Hall and President Lincoln's cottage – current stewardship sites – self-selected to begin the move to new local governance models under the larger umbrella of the new vision for sites.

At the same time, the Trust began National Treasure campaigns at Cooper-Molera, Woodlawn, and Lyndhurst, bringing the full resources of the organization to help determine their future. Each has its own challenges and opportunities, and each is on a very different path towards realizing the five-part vision of a 21° century National Trust Historic Site.

***Longer Term Implementation***

As transitions are made at these five sites, the Trust will work with senior leadership across the portfolio to assess impacts, recalibrate the plan as needed, help build stronger local boards, and move forward with transitions at additional sites. Next steps:

- Initial conversations with stewardship sites over the coming months will be set to identify the specific work for transition. The conversations will take place with site directors and councils in 2014, to begin the long-term implementation planning.

- Conversations with existing co-stewardship and affiliate sites in 2014 will focus on elements of the vision at the site where strengthening is needed for success. While each conversation will be different, the initial focus on roles, national/local balance, capacity, self-sufficiency, and stewardship will guide these discussions. It is also our goal to include cyclical maintenance provisions in each site budget in the FY15 – 18 timeframe.

The spring site directors' meeting and the fall gathering at the National Preservation Conference in Savannah will serve as opportunities for cross-portfolio updates and conversation on progress and work to be accomplished.

The headquarters infrastructure to support this new vision will need to be shaped over the next three years. New support systems and new ways of working will be required for successful implementation.



With a sustained focus on implementing this new vision for sites – building upon three years of analysis and preparation – the goal is to reach the stage where the flywheel effect accelerates this work, as success encourages more sites to move towards full embrace of a vision where:

*National Trust Sites are places of national significance or impact where a variety of ownership, stewardship, business, use, and engagement practices flourish to advance the National Trust mission and model the many options for preservation*

**National Trust Stewardship Sites (2013)**
- Chesterwood, Stockbridge, MA
- Drayton Hall, Charleston, SC
- Farnsworth House, Plano, IL
- Gaylord Building, Lockport, IL
- Lyndhurst, Tarrytown, NY
- Philip Johnson's Glass House, New Canaan, CT
- President Lincoln's Cottage, Washington, DC
- Shadows-on-the-Teche, New Iberia, LA
- Villa Finale, San Antonio, TX
- Woodlawn and Frank Lloyd Wright's Pope-Leighey House, Alexandria, VA
- Woodrow Wilson House, Washington, DC

**National Trust Co-Stewardship Sites (2013)**
- Belle Grove, Middletown, VA
- Brucemore, Cedar Rapids, IA
- Cliveden, Philadelphia, PA
- Cooper-Molera Adobe, Monterey, CA
- Decatur House, Washington, DC
- Filoli, Woodside, CA
- James Madison's Montpelier, Orange, VA
- Kykuit, Tarrytown, NY
- Oatlands, Leesburg, VA

**National Trust Affiliate Sites (2013)**
- Acoma Sky City, Acoma, NM
- Hotel de Paris, Georgetown, CO
- Lower East Side Tenement Museum, New York, NY
- Museum of African American History, Boston and Nantucket, MA
- The Touro Synagogue, Newport, RI

**EXHIBIT C**

## "Best Practices for Nonprofit Governance"

PRINCIPLES  INDEPENDENT SECTOR

FOR GOOD GOVERNANCE AND ETHICAL PRACTICE

Independent Sector's *Principles for Good Governance and Ethical Practice* is the foremost guide for sound and successful practice by charities and foundations in the U.S., providing clarity about legal compliance and public disclosure, effective governance, strong financial oversight, and responsible fundraising. The 2015 edition provides considerable new value, reflecting changes in law as well as new circumstances in which the charitable sector functions, and new relationships within and between sectors. The following 33 Principles reflect the scope of the guide, while rationales and actionable steps for implementation can be found in the full guide, available at PrinciplesForGood.com

### LEGAL COMPLIANCE AND PUBLIC DISCLOSURE

1. A charitable organization must comply with all applicable federal laws and regulations, as well as applicable laws and regulations of the states and the local jurisdictions in which it is formed or operates. If the organization conducts programs outside the United States, it must also abide by applicable international laws, regulations and conventions.

2. A charitable organization should formally adopt a written code of ethics with which all of its directors or trustees, staff, and volunteers are familiar and to which they adhere.

3. A charitable organization should adopt and implement policies and procedures to ensure that all conflicts of interest (real and potential), or the appearance thereof, within the organization and the governing board are appropriately managed through disclosure, recusal, or other means.

4. A charitable organization should establish and implement policies and procedures that enable individuals to come forward with information on illegal practices or violations of organizational policies. This "whistleblower" policy should specify that the organization will not retaliate against, and will seek to protect the confidentiality of, individuals who make good-faith reports.

5. A charitable organization should establish and implement policies and procedures to protect and preserve the organization's important data, documents, and business records.

6. A charitable organization's board should ensure that the organization has adequate plans to protect its assets — its property, documents and data, financial and human resources, programmatic content and material, and its integrity and reputation — against damage or loss. The board should review regularly the organization's need for general liability and directors' and officers' liability insurance, as well as take other actions necessary to mitigate risks.

7. A charitable organization should make information about its operations, including its governance, finances, programs, and activities, widely available to the public. Charitable organizations also should consider making information available on the methods they use to evaluate the outcomes of their work and sharing the results of those evaluations.

### EFFECTIVE GOVERNANCE

A charitable organization must have a governing body that is responsible for reviewing and approving the organization's mission and strategic direction, annual budget and key financial transactions, compensation practices and policies, and fiscal and governance policies.

The board of a charitable organization should meet regularly enough to conduct its business and fulfill its duties.

The board of a charitable organization should establish its own size and structure and review these periodically. The board should have enough members to allow for full deliberation and diversity of thinking on governance and other organizational matters. Except for very small organizations, this generally means that the board should have at least five members.

The board of a charitable organization should include members with the diverse background (including, but not limited to, ethnicity, race, and gender perspectives), experience, and organizational and financial skills necessary to advance the organization's mission.

A substantial majority of the board of a public charity, usually meaning at least two-thirds of its members, should be independent. Independent members should not: (1) be compensated by the organization as employees or independent contractors; (2) have their compensation determined by individuals who are compensated by the organization; (3) receive, directly or indirectly, material financial benefits from the organization except as a member of the charitable class served by the organization; or (4) be related to anyone described above (as a spouse, sibling, parent or child), or reside with any person so described.

The board should hire, oversee, and annually evaluate the performance of the chief executive officer of the organization. It should conduct such an evaluation prior to any change in that officer's compensation, unless there is a multi-year contract in force or the change consists solely of routine adjustments for inflation or cost of living.

The board of a charitable organization that has paid staff should ensure that the positions of chief staff officer, board chair, and board treasurer are held by separate individuals. Organizations without paid staff should ensure that the positions of board chair and treasurer are held by separate individuals.

The board should establish an effective, systematic process for educating and communicating with board members to ensure they are aware of their legal and ethical responsibilities, are knowledgeable about the programs and activities of the organization, and can carry out their oversight functions effectively.

Board members should evaluate their performance as a group and as individuals no less frequently than every three years, and should have clear procedures for removing board members who are unable to fulfill their responsibilities.

Governing boards should establish clear policies and procedures setting the length of terms and the number of consecutive terms a board member may serve.

The board should review organizational and governing instruments no less frequently than every five years.

The board should establish and review regularly the organization's mission and goals and should evaluate, no less frequently than every five years, the organization's programs, goals, and activities to be sure they advance its mission and make prudent use of its resources.

Board members are generally expected to serve without compensation, other than reimbursement for expenses incurred to fulfill their board-related duties. A charitable organization that provides compensation to its board members should use appropriate comparability data to determine the amount to be paid, document the decision, and provide full disclosure to anyone, upon request, of the amount and rationale for the compensation.

## STRONG FINANCIAL OVERSIGHT

21. A charitable organization must keep complete, current, and accurate financial records and ensure strong financial controls are in place. Its board should receive and review timely reports of the organization's financial activities and should have a qualified, independent financial expert audit or review these statements annually in a manner appropriate to the organization's size and scale of operations.

22. The board of a charitable organization must institute policies and procedures to ensure that the organization (and, if applicable, its subsidiaries) manages and invests its funds responsibly, in accordance with all legal requirements. The full board should review and approve the organization's annual budget and should monitor actual performance against the budget.

23. A charitable organization should not provide loans (or the equivalent, such as loan guarantees, purchasing or transferring ownership of a residence or office, or relieving a debt or 'ease obligation) to directors, officers, or trustees.

24. A charitable organization should spend a significant amount of its annual budget on programs that pursue its mission while ensuring that the organization has sufficient administrative and fundraising capacity to deliver those programs responsibly and effectively.

25. A charitable organization should establish clear, written policies for paying or reimbursing expenses incurred by anyone conducting business or traveling on behalf of the organization, including the types of expenses that can be paid for or reimbursed and the documentation required. Such policies should require that travel on behalf of the organization is to be undertaken cost-effectively.

26. A charitable organization should neither pay for nor reimburse travel expenditures for spouses, dependents or others who are accompanying someone conducting business for the organization unless they, too, are conducting such business.

## RESPONSIBLE FUNDRAISING

27. Solicitation materials and other communications addressed to donors and the public must clearly identify the organization and be accurate and truthful.

28. Contributions must be used for purposes consistent with the donor's intent, whether as described in the relevant solicitation materials or as specifically directed by the donor.

29. A charitable organization must provide donors with specific acknowledgments of charitable contributions, in accordance with IRS requirements, as well as information to facilitate the donors' compliance with tax law requirements.

30. A charitable organization should adopt clear policies, based on its specific exempt purpose, to determine whether accepting a gift would compromise its ethics, financial circumstances, program focus, or other interests.

31. A charitable organization should provide appropriate training and supervision of the people soliciting funds on its behalf to ensure that they understand their responsibilities and applicable federal, state, and local laws, and do not employ techniques that are coercive, intimidating, or intended to harass potential donors.

32. A charitable organization should not compensate internal or external fundraisers based on a commission or a percentage of the amount raised.

33. A charitable organization should respect the privacy of individual donors and, except where disclosure is required by law, should not sell or otherwise make available the names and contact information of its donors without providing them an opportunity at least once a year to opt out of the use of their names.

## FULL ACCESS TO THE PRINCIPLES



VISIT
PRINCIPLESFORGOOD.COM
FOR ACCESS TO

* The Complete 2015 *Principles for Good Governance and Ethical Practice*
* *Principles* Legal Reference Edition
* Organizational Assessment Tool
* Comprehensive Resource Center

Uploaded: 2023FEB02 12:52 Filed By:Bar# 96965 LFARRAR Reference: EF-116617
E-Filed: 2023FEB02 LOUDOUN CC ANGELA.WALSH at 2023FEB03 15:51 CL23000869-00

EXHIBIT 6

<u>**AMENDED AND RESTATED LOAN AGREEMENT**</u>

**THIS AMENDED AND RESTATED LOAN AGREEMENT** (this "Agreement") is made effective this ___ day of April 2019 (the "Amendment Date"), by and between the **NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES** (the "National Trust"), a charitable, educational, nonprofit corporation created by Congress, with principal offices at The Watergate Office Building, 2600 Virginia Avenue NW, Suite 1100, Washington, DC 20037, and **OATLANDS, INC.** ("Oatlands"), a Virginia non-stock, nonprofit corporation with principal offices at 20850 Oatlands Lane, Leesburg, VA 20175.

This Agreement amends and restates the terms and conditions of the Loan Agreement effective as of August 1, 2017 (the "Effective Date") related to the lending of certain items in the Object Collections owned by the National Trust to Oatlands in association with the co-stewardship arrangement at Oatlands, a National Trust Historic Site located at 20850 Oatlands Plantation Lane, Leesburg, Virginia 21075, to incorporate an adjacent fifty-four (54) acre parcel known as "Oatlands Hamlet," located at 40040 Little Oatlands Lane, Leesburg, Virginia 20175 (the "Oatlands Hamlet Property") (and defined in the Cooperative Agreement collectively as the "Property") as of the Amendment Date. The National Trust and Oatlands (collectively, the "Parties") agree as follows:

1.      <u>**Background and Collections**</u>.

      **A.**     National Trust Historic Sites are comprised of structures, landscapes, and associated objects, which are treated as artifacts that tell the history of these important places, and together, comprise the National Trust's Museum Collection (as defined in the National Trust's Collections Management Policy adopted June 14, 2014, as may be amended from time to time (the "Collections Management Policy")). The Museum Collection includes a "Historic Structures and Landscapes Collection" and an "Object Collection" (both as defined in the Collections Management Policy). The Historic Structures and Landscape Collection includes historic structures (including both buildings and non-building structures) and historic landscapes (including individual landscape features) that are owned by the National Trust and interpreted for and accessible to the public. The Object Collection, on the other hand, includes objects that are owned by the National Trust, used to interpret National Trust Historic Sites to the public, and that are accessioned, and are part of the National Trust's Museums Collection. The National Trust also retains other non-historically significant objects used for educational, research, or interpretive purposes at National Trust Historic Sites that are not accessioned into the Museum Collections, which are known as "Non-Museum Objects and/or Collections." It is acknowledged that Oatlands separately owns objects and artifacts that are used to interpret the Property (the "Oatlands Collection"). For clarity, the Co-Stewardship Agreements are applicable only with respect to the NTHP Oatlands Objects Collection (as hereinafter defined) and not the Oatlands Collection.

      **B.**     In accordance with the Collections Management Policy, the Parties agree that the Mansion, Gardens, Carriage House, Pump House, Administration Building, Greenhouse, Bachelor's Cottage, Garden Dependencies, Carter Barn, Hay Barn, Dairy Barn, Pole Barn, Trunk Shed, Teahouse, Carbide Plant and Schoolhouse, the Hamlet House, historic landscape features (including, gates, walls, pathways, Balustrade, reflecting pools, Victorian fence and historic roadbeds) and the historic outbuildings and historic ancillary structures will be treated as part of the Historic Structures and Landscapes Collection (the "NTHP Oatlands Historic Structures and Landscapes Collection"). Rental properties 1, 2, and 3 and their adjacent sheds, maintenance shed, the silo, the parking lots, the Stone House, the Wood

Tenant House, the pool and other buildings and structures as mutually agreed to by the Parties will not be treated as part of the Historic Structures and Landscapes Collection.

C.      Within twelve (12) months after the Effective Date, the Parties will analyze and update the collections inventory to determine whether the inventory includes all objects located at the Property and owned by the National Trust, including without limitation those objects in the Gardens (as defined in the Cooperative Agreement) and landscape (the "NTHP Oatlands Objects Collection" and together with the NTHP Oatlands Historic Structures and Landscapes Collection, the "NTHP Oatlands Collection"). The inventory of the NTHP Oatlands Objects Collection will be finalized by the Parties within twenty-four (24) months of the Effective Date, and such final inventory will include recommendations on whether newly identified objects should be accessioned into the Object Collection or designated as part of the Non-Museum Objects and/or Collections pursuant to the Collections Management Policy.

2.      **Loan**. The National Trust, in accordance with Paragraph 4(B) of the Cooperative Agreement, agrees to loan to Oatlands upon the following terms and conditions the NTHP Oatlands Objects Collection for exhibition and use at the Property.

3.      **Term**. This Agreement shall be effective from the Effective Date until: (a) the Cooperative Agreement and Lease are terminated in accordance with their terms, whereupon this Agreement shall simultaneously terminate; or (b) this Agreement is modified or terminated by mutual written agreement of the Parties.

4.      **Care of the Collection**. Oatlands agrees that it will maintain, preserve and administer the NTHP Oatlands Objects Collection in its possession or control, in accordance with the Collections Management Policy, the Housekeeping for Historic Homes and House Museums manual, and any other policies adopted by the National Trust, as they may be amended, modified or supplemented from time to time. Collection objects acquired and accessioned, using standards and procedures for accessioning objects similar to those in the Collections Management Policy, into the Oatlands-owned collection that are used for the interpretation of the Property will be transferred to the National Trust if Oatlands dissolves or no longer operates the Property. Other objects and items acquired by Oatlands that are not accessioned into the Oatlands-owned collection and are not used for nor have any connection to the interpretation of the Property may be disposed of at the discretion of Oatlands.

A.      The NTHP Oatlands Objects Collection will be used for exhibition, study, and licensing (as approved under Paragraph 10) purposes only.

B.      Following standard historic site practices, Oatlands will exercise care to protect the NTHP Oatlands Objects Collection against loss, damage, or deterioration. Oatlands shall provide for the routine maintenance, conservation, cleaning and repair the NTHP Oatlands Objects Collection at its own expense. No non-routine repair or conservation will be performed without the written permission of the National Trust, which shall not be unreasonably withheld. Upon any such repair or conservation, Oatlands shall supply the National Trust with appropriate documentation that will record the work performed. When appropriate, the National Trust shall advise Oatlands in writing of any special requirements for maintenance, conservation, or repair of particular objects in the NTHP Oatlands Objects Collection. In the event of severe deterioration, loss or damage to any object in the NTHP Oatlands Objects Collection, Oatlands shall notify the National Trust as soon as possible, and shall complete and submit an "Incident Report Form for Property or Collections Damage or Workers Comp," with supporting photographs, no later than ten (10) calendar days after the incident to the National Trust's John and Neville Bryan Senior Manager of Museum Collections.

**C.**     Oatlands agrees that it will properly store in locations at the Property mutually agreed to and in accordance with the standards set forth in this Agreement, at its own costs and expense, all objects from the NTHP Oatlands Objects Collection that are not on public display or exhibit.

**D.**     Oatlands agrees that it will catalogue and properly store in locations at the Property mutually agreed to and in accordance with the standards set forth in this Agreement, at its own cost and expense, architectural elements, including without limitation, the architectural elements that are currently present on the Property.  The Parties acknowledge that the existing storage facilities at the Property are acceptable as of the date of this Agreement. Furthermore, within twenty-four (24) months of the Effective Date, the Parties agree to evaluate the archaeological artifacts from the Property that are currently stored at Montpelier, a National Trust Historic Site located in Orange, Virginia, and to develop an inventory of the artifacts, and a mutually agreed upon plan to either return and store the archaeological artifacts at the Property, or deaccession and/or dispose of such objects in accordance with the Collections Management Policy.

**E.**     In consultation with the National Trust, Oatlands may at any time review the NTHP Oatlands Objects Collection and make recommendations to the National Trust for deaccessioning and disposal of objects.  Any such objects may only be deaccessioned or disposed upon mutual written agreement of the Parties and in accordance with the Collections Management Policy.

**F.**     The National Trust will provide Oatlands with access to the historical data in the National Trust's collections software related to the NTHP Oatlands Objects Collection at the Property on the same terms as provided to other co-stewardship National Trust Historic Sites.  Oatlands agrees to use, input collections information and data, and maintain the collections management software as directed by the National Trust and on the same terms as provided to other co-stewardship National Trust Historic Sites.

**5.**     **Archaeological Artifacts**.  All artifacts discovered at the Property, in the future, whether through systematic archaeological excavations or through surface collecting, will be added to the NTHP Oatlands Objects Collection and are the property of the National Trust.

**6.**     **Loans**.

**A.**     The National Trust reserves the right to periodically inspect the NTHP Oatlands Objects Collection, and with six (6) months prior written agreement with Oatlands, to lend objects in the NTHP Oatlands Objects Collection to other institutions or organizations on a temporary basis for study or exhibition.  All aspects of the packing, transportation, insurance, security, and exhibition arrangements for any such loan shall be subject to the prior agreement of Oatlands.

**B.**     Oatlands may not lend or renew the loans of any of the objects in the NTHP Oatlands Objects Collection to individuals or organizations without the prior written approval from the National Trust.  All aspects of the packing, transportation, insurance, security, and exhibition arrangements for any such loan shall be subject to the prior written agreement of the National Trust.  A loan agreement will be completed by the National Trust with copies sent to Oatlands.

**C.** Responsibility for costs of packing and shipping objects in the NTHP Oatlands Objects Collection during the period of any such loan agreement shall be decided on a case by case basis by mutual agreement prior to shipment. Generally, it will be understood that the party to whom the object is being loaned will bear the costs of packing and shipping. If that party is unable or unwilling to bear the costs, then the party making the loan generally will be responsible for the cost of the loan, unless otherwise mutually agreed. Packing and shipping must be in accordance with methods approved in advance by the National Trust.

**7.** **Insurance**. The National Trust shall insure the NTHP Oatlands Objects Collection in accordance with the National Trust's Fine Arts Insurance program, and any proceeds resulting from loss or damage shall be payable to the National Trust and used for the benefit of the NTHP Oatlands Objects Collection and the Property in accordance with the Collections Management Policy. Beginning on April 1, 2018, Oatlands agrees to reimburse the National Trust for the annual costs of the premium on the Fine Arts Insurance attributable to the NTHP Oatlands Objects Collection. Oatlands bears all responsibility for obtaining the appropriate insurance for objects it accepts and owns in its own name. Under no circumstances will the National Trust be liable for any loss or damage to any property owned by Oatlands.

**8.** **Loans to Oatlands**. If Oatlands accepts loans in its own name, it will be required to execute a loan agreement with the third party. Oatlands accepts all responsibility for obtaining the appropriate insurance for such loans and agrees to indemnify, defend, and hold the National Trust harmless for any loss occurring to the National Trust as a result of any loan accepted by Oatlands.

**9.** **Photography and Filming**. Oatlands may photograph or film, or allow photography or filming of the NTHP Oatlands Objects Collection for non-commercial purposes or, with the prior written approval of the National Trust, for commercial purposes, crediting the National Trust's ownership in any publication of such photographs or films. Such photography and filming will be carried out pursuant to the Collections Management Policy and other guidelines for photography and filming provided by the National Trust. Copyright of photographs of the objects in the NTHP Oatlands Objects Collection shall be retained in the name of the National Trust.

**10.** **Reproductions**. The National Trust may, in its sole discretion, license and reproduce: (a) objects, historic structures, and historic landscape features in the NTHP Oatlands Collection; and (b) products derived from objects, designs, architectural details, elements, adaptations and derivative works of objects, historic structures and historic landscape features in the NTHP Oatlands Collection. The National Trust will receive all proceeds from its licensing and reproduction programs. Oatlands agrees that it will not license, reproduce or make adaptations of objects in the NTHP Oatlands Collection or license the name or logo of the National Trust without the National Trust's prior written approval. Oatlands further agrees to abide by the Collections Management Policy with regard to reproducing and licensing the NTHP Oatlands Collection. Any licensing proceeds received by Oatlands from reproductions of the NTHP Oatlands Collection shall be used by Oatlands for the benefit of the Property.

**11.** **Funding Eligibility**. Oatlands will be eligible to apply for funding from the Historic Sites Fund (Collections) upon the same terms and conditions as other National Trust Historic Sites.

**12.** **General Provisions**. This Agreement shall be governed by the General Provisions set forth in Paragraph 15 of the Cooperative Agreement.

**IN WITNESS WHEREOF**, the Parties have hereunto set their hands and seals the date and year first written above.

**NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES**

By:_____
      Paul W. Edmondson, Interim President & CEO

**OATLANDS, INC.**

By:_____
      Eugene Gulland, Chair

Uploaded: 2023FEB02 12:52 Filed By:Bar# 96965 LFARRAR Reference: EF-116617
E-Filed: 2023FEB02 LOUDOUN CC ANGELA.WALSH at 2023FEB03 15:51 CL23000869-00

EXHIBIT 7

## AMENDED AND RESTATED LEASE

**THIS AMENDED AND RESTATED LEASE** (this "Lease") effective as of the ___ day of April, 2019 (the "Amendment Date"), is made by and between the **NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES** (the "Lessor"), a charitable, educational, nonprofit corporation created by Congress, with principal offices at The Watergate Office Building, 2600 Virginia Avenue NW, Suite 1100, Washington, DC 20037, and **OATLANDS, INC.** (the "Lessee"), a Virginia non-stock, nonprofit corporation with principal offices at 20850 Oatlands Plantation Lane, Leesburg, VA 20175.

For and in consideration of the mutual covenants, agreements, and undertakings set forth in this Lease, the Amended and Restated Cooperative Agreement, and the Amended and Restated Loan Agreement, each entered into as of the Amendment Date (collectively, the "Co-Stewardship Agreements"), and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Lessor and Lessee (each a "Party" and collectively, the "Parties") agree as follows:

**1.     Purpose**.  The purpose of this Lease is to continue to provide possession of: (a) Oatlands Plantation, real property comprised of land, buildings, and other improvements consisting of approximately three hundred forty-two (342) acres, located at 20850 Oatlands Plantation Lane, Leesburg, Loudoun County, Virginia (the "Historic Core"), and (b) Oatlands Hamlet, real property comprised of land, buildings, and other improvements consisting of approximately fifty-four (54) acres, located at 40040 Little Oatlands Lane, Leesburg, Virginia (the "Oatlands Hamlet Property"), both described in **Exhibit A**, attached hereto and incorporated herein by reference (collectively, the "Property"), to Lessee for Lessee to continue to preserve, interpret and manage the Property as a National Trust Historic Site, as set forth in the Co-Stewardship Agreements.  This Lease amends and restates the Lease entered into between the Parties effective as of August 1, 2017 (the "Effective Date"), to incorporate the Oatlands Hamlet Property as part of the co-stewardship arrangement for the Property as of the Amendment Date, which property was acquired by Lessee on April 23, 2014 to protect the viewsheds of the Historic Core and to generate income,  and was subsequently conveyed to the Lessor on April __, 2019.

**2.     Term**.  Lessor leases the Property to Lessee for a term of thirty (30) years, beginning on the Effective Date and ending on July 31, 2047 (the "Term").  This Lease may be renewed or extended by the mutual written agreement of the Parties.  The Parties agree that, for the one-year period prior to the end of the Term, Lessor shall provide Lessee an exclusive right to renew this Lease on terms acceptable to each Party.

**3.     Rent**.  Lessee shall pay Lessor as rent, the sum of Ten Dollars ($10.00) per calendar year, or part thereof (the "Rent").  Rent shall be paid on an annual basis in advance on or before January 1 of each year of the Term.

**4.     Costs in Addition to Rent**.  Subject to the provisions of the Cooperative Agreement, Lessee covenants, agrees and undertakes to pay, in addition to the Rent, each, all and every expense of maintaining, operating and administering the Property in a clean and sightly condition for the purposes specified in Paragraph 1 and in the Co-Stewardship Agreements, including without limitation, the following costs: water/sewer, gas, electric, real

estate taxes and assessments, preservation, and restoration costs, for and during the Term of this Lease.

**5.    Condition of Property**. Lessee has examined and knows the condition of the Property and acknowledges that no representations as to the condition of, and no agreements, promises or other undertakings to decorate, alter, repair, improve, restore, or preserve the Property have been made by Lessor prior to or as an inducement of Lessee's execution of this Lease, other than the agreements set forth in the Cooperative Agreement in respect of the management of the Property during the term of such agreement.

**6.    Liability and Insurance**.

**a.    Lessee Insurance**. Lessee shall maintain in effect the insurance coverage with a reputable company with the minimum limits of liability and other terms and conditions as specified in **Exhibit B**, attached hereto and incorporated herein by reference, unless otherwise agreed to by the Parties.

**b.    Lessor Insurance.** Lessor agrees to carry, maintain, and keep in effect at all times during the Term of this Lease a policy of Special Form Cause of Loss Property insurance (including insurance against flood risk) in such amounts as are reasonable with a reputable company, against losses and damages to the Property by fire or other casualty, with standard exclusions including earthquake, naming both the Lessor and Lessee as the insureds as their interests may appear.  At the signing of this Lease, the Lessor shall deliver to the Lessee a certificate of insurance certifying that such insurance is in full force and effect and such certificate shall be renewed periodically as may be necessary to evidence that such insurance is effective throughout the Term of this Lease.  If any portion of the Property undergoes construction or renovation and Lessor determines that builder's risk insurance is required at the Property, such insurance shall be obtained by Lessor.  Lessee shall reimburse the Lessor annually for the cost of the annual insurance premiums for all such insurance provided under this Paragraph 6(b), and Lessee shall be responsible for paying all deductibles and other costs and expenses due thereunder in the event of a claim.

**c.    Damage or Destruction**.

i.    Subject to the provisions of Paragraph 6(c)(ii) below, in the event the main or supporting structures at the Property shall be damaged or rendered untenantable by fire, explosion, or any other casualty covered by insurance, the Lessee agrees to notify the Lessor as soon as reasonably possible.  Lessor agrees to repair or rebuild such structures at a cost not exceeding the amount of casualty insurance proceeds available to the Lessor.

ii.    Notwithstanding the provisions of Paragraph 6(c)(i), if insurance proceeds are either unavailable or insufficient to pay for the cost of the repair or reconstruction of damage to any or all of the main or supporting structures at the Property caused by fire, explosion, flood, earthquake or other casualty (or should Lessor and Lessee mutually determine that such damage is so significant that any such structure, or all of them, should not be repaired or rebuilt), Lessor shall have no obligation to repair or rebuild any such structure, and Lessee shall have no obligation to maintain such structures in their pre-damaged condition.  In such an event, Lessor and Lessee shall consult with each other to determine: (1) the appropriate treatment of such damaged structures, including removal, partial repair, stabilization, or otherwise; and (2) the appropriate operation of the Property.  If Lessor and Lessee mutually determine, after consultation, that casualty damage is so extensive that a major operational

change is required, the Parties shall either (1) amend the terms of the Lease to permit Lessee to continue to operate the Property as a park and gardens open to the public for the remainder of the term stated above, and for the rent as stated above, or (2) terminate the Lease. If the Lease is not terminated, all insurance proceeds awarded to either Lessor or Lessee shall be used for the benefit of the Property. In the event of termination, all insurance proceeds shall be paid over to Lessor except to the extent of actual losses to Lessee in respect of its personal property at the Property (but no amount shall be attributed to the value of the leasehold hereunder).

      **d.    Indemnification and Release**. Except as otherwise provided in this paragraph, Lessor shall not be liable for any damage or injury to Lessee or to any other person, firm or other entity on the Property or to the property of any other person, firm or entity occasioned by, resulting from, or associated with Lessee's use of the Property or the failure of the Lessee to keep the Property in repair, or from any act, omission or negligence of co-tenants, occupants of the buildings, or of other persons. All such claims or demands for any such damage or injury are hereby expressly waived by Lessee which shall save harmless, defend and indemnify Lessor, its trustees, officers, employees and agents from and against any and all such claims, demands, actions or causes of action.

      **7.    Possession Upon Termination.** At the termination of the Term of this Lease by lapse of time or otherwise as herein provided, Lessee agrees to immediately yield up possession of the Property to Lessor.

      **8.    Improvements**. All improvements made by Lessor or Lessee during the Term of this Lease are the property of the Lessor and will remain so after the Term of this Lease.

      **9.    Subleasing and Other Property Interests.**

      **a.    Subleases and/or Housing Agreements**. Except as otherwise provided in the Co-Stewardship Agreements, Lessee shall not sublet or make other arrangements for the occupancy of all or any portion of the Property by any person, firm, corporation, or other entity, without the prior written approval of Lessor, which approval shall not be unreasonably withheld, and any such sublease or other arrangement shall be in writing and expressly subject to all of the terms and conditions of this Lease and the Co-Stewardship Agreements and shall conform to all applicable laws, ordinances, and regulations. All rents, issues and profits shall be restricted solely for the benefit of the Property including its operation and management by Oatlands. PROVIDED, HOWEVER, Lessee may enter into agreements without the written approval of the Lessor allowing portions of the Property (excluding the Mansion, as defined in the Cooperative Agreement) to be occupied by employees for use as staff housing or leased to other persons, subject to the Parties entering into a written sublease or a housing agreement, in a form as determined by Lessee which shall: (1) be expressly subject to the terms and conditions of this Lease and the Co-Stewardship Agreements; (2) not extend for a term longer than three (3) years, and (3) include an option to Lessee to terminate the sublease or housing agreement upon the termination of the employee's employment or for non-employees within sixty (60) days prior written notice, subject to such minimum notice provisions or on such other terms as required by state or local law.

      **b.    Special Use/Event Rental Agreements**. Special use/event rental agreements entered into by Lessee shall not be considered subleasing of the Property for purposes of this Paragraph 9.

  **c.**  **Naming Rights**. Lessee will not give, sell or in any way transfer the right to name any building or structure, or any portion thereof, of the Property without the prior written approval of the Lessor, which approval shall not be unreasonably withheld. Under no circumstances may naming rights extend beyond the Term of this Lease.

  **10.**  **Default**. If Lessee fails to perform and observe any material covenant, agreement or undertaking contained in this Lease or the Co-Stewardship Agreements, and such failure continues for ninety (90) days after written notice thereof from Lessor, this Lease may be terminated upon the option of Lessor, PROVIDED, HOWEVER, that the ninety (90) day cure period shall be tolled during such times as disputes related to the alleged default are the subject of a dispute resolution proceeding contemplated by Paragraph 12 of the Cooperate Agreement. Either Party's failure to comply with a decision of the Management Committee or Dispute Resolution Panel (both as defined in the Cooperative Agreement) shall constitute a material default. Termination of this Lease shall automatically terminate the Co-Stewardship Agreements unless the parties shall otherwise agree at the time.

  **11.**  **Termination for Economic Reasons**. If Lessee determines that the continued operation of the Property as an historic property, on an economic self-sufficient basis, is unfeasible, taking into account the endowment income provided by Lessor, then Lessee may in its sole discretion, terminate this Lease and the other Co-Stewardship Agreements upon one hundred and eighty (180) days prior written notice to the Lessor.

  **12.**  **Eminent Domain.** If all or any part of the Property shall be taken as a result of the exercise of power of eminent domain, this Lease shall terminate as to the part so taken as of the date of taking and, in the case of a partial taking, Lessee shall have the right to terminate this Lease as to the balance of the Property by written notice to Lessor within one hundred and twenty (120) days after such date. Except to the extent Lessor and Lessee have otherwise agreed, in the event of any such taking, Lessor shall be entitled to any and all compensation, damages, income, rent, awards, or any interest therein whatsoever which may be paid or made in connection therewith.

  **13.**  **Entry by Lessor.** Lessor may, upon reasonable advanced notice to Lessee and at reasonable times, enter upon the Property to inspect it for the purpose of determining Lessee's compliance with the provisions of this Lease and the Co-Stewardship Agreements.

  **14.**  **Assignment.** This Lease may not be assigned in whole or in part by Lessee without the prior written consent of Lessor and any such attempted assignment shall be void and constitute a breach of this Lease.

  **15.**  **Miscellaneous.**

    **a.**  All covenants, promises, representations and agreements herein contained shall be binding upon, apply and inure to the benefit of Lessor and Lessee and their respective successors and assigns.

    **b.**  The rights and remedies hereby created are cumulative and the use of one remedy shall not exclude or waive the right to the use of another.

    **c.**  If any clause, phrase, provision or portion of this Lease or the application thereof to any person or circumstance shall be held by a court of competent jurisdiction to be invalid or unenforceable under the laws of the Commonwealth of Virginia or any other pertinent

jurisdiction, such event shall not affect, impair or render invalid or unenforceable the application of the remainder of this Lease or of any other clause, phrase, provision or portion hereof to any person in any circumstance.

**16.** **General Provisions**. This Lease shall be governed by the General Provisions set forth in Paragraph 15 of the Cooperative Agreement.

**IN WITNESS WHEREOF**, the Parties have hereunto set their hands and seals the date and year first written above.

**NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES**

By:_____
   Paul W. Edmondson, Interim President & CEO

**OATLANDS, INC.**

By:_____
      Eugene Gulland, Chair

## EXHIBIT A

## "Property Description"

| Property Description/Address | Parcel ID | Total Acres |
|---|---|---|
| Oatlands Plantation<br>20850 Oatlands Plantation Ln | • 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 | 250 |
| Oatlands Mill and Oatlands Dam Sites | • 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 (1.44 acres)<br>• 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 (1.45 acres) | 2.89 |
| Schoolhouse Property | • 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 | 15.29 |
| Mountain Gap School | • 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 | 1.92 |
| Not applicable | • 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 | 4.81 |
| Long Meadow | • 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 (17.99 acres)<br>• 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 (10 acres)<br>• 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 (10 acres)<br>• 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 (10 acres)<br>• 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 (10 acres)<br>• 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 (10 acres) | 67.99 |
| Oatlands Hamlet<br>40040 Little Oatlands Ln | • 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 | 54 |

1.    Comprehensive general liability coverage in the amount of $1,000,000 per occurrence and $2,000,000 per aggregate (with no exclusions for claims resulting from Sexual Abuse or Molestation);

2.    Umbrella coverage in the amount of $3,000,000 per occurrence, which shall be increased to $5,000,000 no later than April 1, 2020;

3.    Workers' Compensation coverage, limit not less than required by law;

4.    Directors and Officers liability and Employment Practices liability coverage in the amount not less than $2,000,000;

5.    Automobile liability coverage in the amount of $1,000,000 combined single limit;

6.    Contents and Fine Arts coverage for items owned by the Lessee equal to the appraised value of the property;

7.    Special Form Cause of Loss Property insurance (including insurance against flood risk) in such amounts as are reasonable with a reputable company, against losses and damages to real property owned by Lessee by fire or other casualty, with standard exclusions including earthquake, if any;

8.    Business Income insurance in an amount equal to twelve (12) months protection;

9.    Cyber liability coverage in the amount of $1,000,000, which shall be obtained by Lessee no later than April 1, 2020; and

10.    Host Liquor liability coverage in the amount of $1,000,000 each common cause and $2,000,000 per aggregate if Lessee is selling liquor without the use of a third-party vendor.

All policies must be written with insurers maintaining an A.M. Best Rating of A-IX or better and admitted to do business in the Commonwealth of Virginia. Such policy or policies shall name both Lessor and Lessee as the insureds as their interests may appear. At the signing of this Lease and on an annual basis thereafter, Lessee shall deliver to Lessor a certificate of insurance certifying that such insurance is in full force and effect and such certificate shall be renewed periodically as may be necessary to evidence that such insurance is effective throughout the Term of this Lease. Lessor reserves the right to require complete copies of all required insurance policies at any time. If requested, copies must be furnished within ten (10) business days from the date of the request. Limits required may be purchased in any combination of primary and excess to achieve the required total limits. It is expressly acknowledged that it may be necessary to adjust the limits of insurance, by mutual agreement, to take into account market forces, inflation and other factors throughout the Term of this Lease.

All coverage required in this Lease must be primary and non-contributory to any insurance maintained by the Lessor. "Primary and non-contributory" in this clause means that Lessee's policies must provide coverage before any other applicable policy of insurance,

deductible, or self-insured retention program maintained by Lessor without seeking contribution from other insurance carried by the Lessor and related entities and their respective officers, directors, and employees.

Lessee waives all rights against Lessor to the extent of any insurance carried or required to be carried under this Lease. Policies of insurance must be endorsed, as needed, to provide such waivers. Such waivers will be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged. Such waiver shall also apply to the extent that any deductible or self-insured retention applies to any such policy and to the extent that the insured party is underinsured.

All contractors, subcontractors and vendors will be required to comply with the above requirements as well; PROVIDED, HOWEVER, the limits required above may be lowered at the discretion of the Lessee. Lessee shall give prompt notice to Lessor in the event of any accident or occurrence on the Property or related in any way to this Lease or the Co-Stewardship Agreements.

EXHIBIT 8

| | |
|---|---|
| **From:** | Caleb M. Schutz <calebschutz@gmail.com> |
| **Sent:** | Wednesday, February 27, 2019 5:46 PM |
| **To:** | dave@moyeslaw.com |
| **Cc:** | Tom Mayes; Anne Nelson; Ashley Wilson; Gene Gulland; Matt Kraycinovich; Caleb Schutz |
| **Subject:** | FW: Spread sheet on the Myers numbers |
| **Attachments:** | Copy of Esimtated Net Proceeds by Acre Using Myers Report 2.27.19.xlsx |

Dave – We can't thank you enough for your participation and guidance today. Thank you as well for the attachment. We will be in touch. Caleb

Caleb M. Schutz

**From:** David Moyes
**Sent:** Wednesday, February 27, 2019 4:41 PM
**To:** 'Caleb Schutz'
**Subject:** Re: Spread sheet on the Myers numbers

Caleb,
I have attached a spread sheet showing how the numbers break down on a worst case scenario. By worst case I mean the payment of a stewardship fee and high legal. Last year average legal was below 20,000 depending on the donee involvement.
Let me know if you have any questions.
Dave

**DEMONSTRATIVE ONLY**          (red = variable inputs)

**EASEMENT CALCULATIONS FOR AR-1 ZONED PROPERTY: Oatlands Plantation**

| | | |
|---|---|---|
| Zoning: | AR-1 | |
| Acres | 250 | |
| **Before** | $ 7,600,000.00 | 50 lots not including improvements |
| **After** | $ 2,500,000.00 | 1 lot not including improvements (could be more)* |
| **Enhancement** | $ 100,000.00 | (if applicable) |
| **Donation Value** | $ **5,000,000.00** | |
| **LPC Credit Value** | $ **2,000,000.00** | (40% of Donation Value) |
| Appraisal Fee | $ (12,500.00) | (approximate) |
| Stewardship Fee | $ (25,000.00) | (approximate) |
| BDR Fee | $ (3,000.00) | (approximate) |
| Legal Fees | $ (25,000.00) | (includes fees already paid, estimated) |
| Engineering Fees | $ (10,000.00) | (approximate) |
| **Total Estimated Expenses** | $ (75,500.00) | |
| **Estimated Net After Expenses** | $ **1,924,500.00** | |

**NET IF CREDITS SOLD**

| | | | |
|---|---|---|---|
| Credit Sales Price | $ 1,800,000.00 | Assumes | 90% |
| Dept. Tax Transfer Fee | $ (100,000.00) | (5% of Claimed Credit) | |
| Credit Broker Fee | $ (90,000.00) | Broker Fee | 5% percent sales price |
| Less Expenses of Easement | $ (75,500.00) | | |
| **Net Proceeds** | $ **1,534,500.00** | | |

This is not intended as a summary of all expenses or a guaranty of an outcome

EXHIBIT 9

## Oatlands Endowment and Draws with Conservation Easement

|  | 31-Dec-2018 | 31-Dec-2019 | 31-Dec-2020 | 31-Dec-21 | |
|---|---|---|---|---|---|
| 50016 - Oatlands General Endowment | $6,081,723.17 | $6,906,989.83 | $7,631,416.02 | $8,884,143.87 | |
| 50141 - Symington Maintenance Fund | $532,726.32 | $532,726.32 | $537,488.12 | $651,261.20 | |
| Endowment Created with Conservation Easement Proceeds | $0.00 | $0.00 | $1,924,500.00 | $2,240,414.47 | |
| National Trust Oatlands Endowment | $6,614,449.49 | $7,439,716.15 | $10,093,404.14 | $11,775,819.54 | |
| Draw Per Co-Stewardship Agreement | $330,722.47 | $371,985.81 | $504,670.21 | $588,790.98 | |
| Actual Payments Received | $316,264.00 | $323,942.00 | $333,359.00 | $340,026.00 | **Total** |
| Surplus/(Deficit) | ($14,458.47) | ($48,043.81) | ($171,311.21) | ($248,764.98) | **($482,578.47)** |

EXHIBIT 10

# National Trust for Historic Preservation
## and its Subsidiaries and Affiliates

### Notes to Consolidated Financial Statements

#### (n) Measure of Operations

The Trust defines operations as all revenues and expenses that are an integral part of its current year programs and supporting activities. Non-operating support includes investment returns in excess of the Trust's aggregate board-authorized spending rate, if any.

The Trust's authorized spending rate was 5% for restricted endowment funds, for unrestricted endowment funds, and for the two general Historic Sites Funds in 2018 and 2017.

#### (o) Functional Allocation of Expenses

The costs of providing various programs and support activities have been summarized on a functional basis in the consolidated statements of activities. Direct expenses are charged to the respective program or supporting activity. Certain costs have been allocated among the programs and support services benefited based upon management's estimate of each program's share of the allocated costs.

The Trust paid professional fundraisers $402,000 and $346,843 in 2018 and 2017, respectively, for services related to capital campaigns, planned giving and general appeals, which are included as fundraising expense.

#### (p) Income Tax Status

The Trust accounts for uncertain tax positions in accordance with FASB Accounting Standards Codification (ASC) 740, *Income Taxes* (ASC 740), which requires that a tax position be recognized or derecognized based on a "more likely than not" threshold. This applies to positions taken or expected to be taken in a tax return. The Trust does not believe its financial statements include any material uncertain tax positions. The Trust is still open to examination by taxing authorities from fiscal year ended June 30, 2015 forward.

The National Trust, NMSC, and NT CDFI are Section 501(c)(3) organizations exempt from income tax as provided under Section 501(a) of the Internal Revenue Code. Unrelated business taxable income is subject to income tax.

HTLLC, a single member limited liability company, is a disregarded entity of NTCIC under the Internal Revenue Code. NTCIC is taxed on HTLLC's taxable income.

NTIS, NTHREDF and CMP LLC are treated as partnerships under the Internal Revenue Code. Accordingly, the members of the limited liability company are taxed on their proportionate share of NTIS's NTHREDF's, and CMP LLC's taxable income.

ASC 740 also requires that deferred income taxes be recognized for the difference between the financial and the tax-reporting basis of assets and liabilities using enacted tax rates and laws that are expected to be in effect when differences are expected to reverse. NTCIC accounts for income taxes under the asset and liability method. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to the differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss and tax credit carryforwards.

19

Uploaded: 2023FEB02 12:52 Filed By:Bar# 96965 LFARRAR Reference: EF-116617
E-Filed: 2023FEB02 LOUDOUN CC ANGELA.WALSH at 2023FEB03 15:51 CL23000869-00

EXHIBIT 11

#### (n) Measure of Operations

The Trust defines operations as all revenues and expenses that are an integral part of its current year programs and supporting activities. Non-operating support includes investment return in excess of the Trust's aggregate board-authorized spending rate, if any.

The Trust's authorized spending rate was 4.95% and 5.0% for restricted endowment funds, for endowment funds without donor restriction, and for the two general Historic Sites Funds in 2020 and 2019, respectively.

#### (o) Functional Allocation of Expenses

The costs of providing various programs and support activities have been summarized on a functional basis in the consolidated statements of activities. Direct expenses are charged to the respective program or supporting activity. Certain costs have been allocated among the programs and support services benefited based upon management's estimate of each program's share of the allocated costs. The method of allocation is listed below.

| Expense | Method of Allocation |
| --- | --- |
| | |
| Benefits | Actual fringe benefit rate |
| Occupancy | Full time equivalent employee headcount |
| Equipment and computer supplies | Budgeted expense percentages based on headcount |

#### (p) Income Tax Status

The Trust accounts for uncertain tax positions in accordance with FASB ASC 740, *Income Taxes* (ASC 740), which requires that an income tax position be recognized or derecognized based on a "more likely than not" threshold. This applies to positions taken or expected to be taken in an income tax return. The Trust does not believe its consolidated financial statements include any material uncertain tax positions. The Trust is still open to examination by taxing authorities from fiscal year ended June 30, 2017 forward.

The National Trust and NMSC are Section 501(c)(3) organizations exempt from income taxes as provided under Section 501(a) of the Internal Revenue Code (the IRC). Unrelated business taxable income is subject to income tax.

NTT, a single member limited liability company, is a disregarded entity of NTCIC under the IRC and operating activity from NTT flows to NTCIC.

NTIS, NTHREDF and CMP LLC are treated as partnerships under the IRC. Accordingly, the members of these limited liability companies are taxed on their proportionate share of NTIS's, NTHREDF's, and CMP LLC's taxable income, respectively.

ASC 740 also requires that deferred income taxes be recognized for the difference between the financial and the tax-reporting basis of assets and liabilities using enacted tax rates and laws that are expected to be in effect when differences are expected to reverse. NTCIC, NTS, and Greenrock operate as private entities and are subject to federal and state income taxes. They account for income taxes under the asset and liability method. Deferred tax assets and liabilities are recognized

Uploaded: 2023FEB02 12:52 Filed By:Bar# 96965 LFARRAR Reference: EF-116617
E-Filed: 2023FEB02 LOUDOUN CC ANGELA.WALSH at 2023FEB03 15:51 CL23000869-00

EXHIBIT 12

# National Trust for Historic Preservation in the United States and its Subsidiaries and Affiliates

## Notes to Consolidated Financial Statements

### (o) Measure of Operations

The Trust defines operations as all revenues and expenses that are an integral part of its current year programs and supporting activities. Non-operating support includes investment return in excess of the Trust's aggregate board-authorized spending rate, if any.

The Trust's authorized spending rate was 4.90% and 4.95% for restricted endowment funds, endowment funds without donor restriction, and the two general Historic Sites Funds in 2021 and 2020, respectively.

### (p) Functional Allocation of Expenses

The costs of providing various programs and support activities have been summarized on a functional basis in the consolidated statements of activities. Direct expenses are charged to the respective program or supporting activity. Certain costs have been allocated among the programs and support services benefited based upon management's estimate of each program's share of the allocated costs. The method of allocation is listed below.

| Expense | Method of Allocation |
|---|---|
| Benefits | Actual fringe benefit rate |
| Occupancy | Full time equivalent employee headcount |
| Depreciation | Full time equivalent employee headcount |
| Equipment and computer supplies | Full time equivalent employee headcount |

### (q) Income Tax Status

The Trust accounts for uncertain tax positions in accordance with FASB ASC 740, *Income Taxes* (ASC 740), which requires that an income tax position be recognized or derecognized based on a "more likely than not" threshold. This applies to positions taken or expected to be taken in an income tax return. The Trust does not believe its consolidated financial statements include any material uncertain tax positions. The Trust is still open to examination by taxing authorities from fiscal year ended June 30, 2018 forward.

The National Trust and NMSC are Section 501(c)(3) organizations exempt from income taxes as provided under Section 501(a) of the Internal Revenue Code (the IRC). Unrelated business taxable income is subject to income tax.

NTT, a single member limited liability company, is a disregarded entity of NTCIC under the IRC and operating activity from NTT flows to NTCIC.

NTIS, NTHREDF and CMP LLC are treated as partnerships under the IRC. Accordingly, the members of these limited liability companies are taxed on their proportionate share of NTIS's, NTHREDF's, and CMP LLC's taxable income, respectively.

NTCIC, NTS, and Greenrock operate as private entities and are subject to federal and state income taxes. They account for income taxes under the asset and liability method. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to the differences between

**VIRGINIA:**

## IN THE CIRCUIT COURT FOR LOUDOUN COUNTY

FILED

2023 MAR -7 P 1: 34

CIRCUIT COURT
CLERKS OFFICE
LOUDOUN COUNTY, VA
TESTE:_____ D.C.

| | | |
|---|---|---|
| OATLANDS INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. CL23000869-00 |
| | ) | |
| NATIONAL TRUST FOR HISTORIC | ) | |
| PRESERVATION IN THE UNITED | ) | |
| STATES, *et. al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | | |

## DEFENDANTS' DEMURRER TO THE COMPLAINT AND PLEA IN BAR

Defendants National Trust for Historic Preservation in the United States ("National Trust"), Jay C. Clemens, Martha Nelson, Phoebe Tudor, William J. Bates, Christina Lee Brown, Elizabeth Kirkland Cahill, Samuel Dixon, Damien Dwin, Tracy Frist, Kevin Gover, Linda Griego, Alison K. Hoagland, Shelley Hoon Keith, C.H. Randolph Lyon, Jennifer Skyler, G. Jackson Tankersley, Jr., and Robert Joseph Vila (the "Individual Defendants," and collectively with the National Trust, the "Defendants"), by counsel and pursuant to Rule 3:8 of the Supreme Court of Virginia, respond to the Complaint filed by Plaintiff Oatlands, Inc. ("Plaintiff") as follows:

The grounds for Defendants' Demurrer and Plea in Bar are stated below and may be amplified with points and authorities to be set forth in briefing by the Defendants.

## PLEA IN BAR

The Individual Defendants and the National Trust assert the following as grounds for their Plea in Bar:

1.      Individual Defendants and members of National Trust's Board of Trustees, Jay C. Clemens, Kevin Gover, and Linda Griego (the "Former Board Members"), have each resigned

from their office as Board members.   In view of the Former Board Members' resignations from

office, and also because the Plaintiff has sued each of them solely in their "official capacity," each

of them must be dismissed from this action as a matter of law.   The Former Board Members also

join in the Plea in Bar and Demurrer of the other Individual Defendants as set forth below to the

extent that they are not dismissed from this action in view of their resignations from office.

2.      Additionally, all Individual Defendants are entitled, as matter of law, to statutory

immunity under Virginia Code §§ 8.01-220.1:1(A), 13.1-870.1(B) and the common law of

Virginia as to all Counts in the Complaint seeking relief against them.

3.      The Defendants seek dismissal of Counts VI and VII because Plaintiff lacks

standing to assert claims related to the purported trust.

## DEMURRER

In addition to, and without waiving their Pleas in Bar, the Individual Defendants and the

National Trust assert the following as the grounds for their Demurrer to the Complaint:

## Demurrer to Count I

1.       Defendant National Trust demurs to Count I because the contractual obligations

allegedly owed to Plaintiff concerning the securing of an unspecified, undefined conservation

easement are too indefinite, as a matter of law, to be enforced.   This is especially the case with

respect to the equitable remedy of specific performance requested in this Count, which requires

that all of the essential terms of an alleged contractual obligation to be finally and definitely settled,

with none left to be determined by future negotiations.

2.      Defendant National Trust further demurs to Count I because specific performance

of the purported contractual obligation at issue as alleged in the Complaint is impossible to perform

and/or would impose great practical difficulties if performance were attempted as requested in the

Complaint. Additionally, the requested specific performance remedy would be unusually difficult for the Court to craft and administer.

## Demurrer to Count II

3.     Defendant National Trust demurs to Count II because the contractual obligations allegedly owed to Plaintiff concerning the securing of an unspecified, undefined conservation easement are too indefinite, as a matter of law, to be enforced.

4.     Defendant National Trust demurs to Count II because the because the facts alleged in the Complaint demonstrate that the harm and damages claimed by Plaintiff are too speculative, conjectural and based on uncertain contingencies to be cognizable as a matter of law.

## Demurrer to Count III

5.     Defendant National Trust demurs to Count III because rescission, the highest and most drastic exercise of power of a court of equity, is unavailable as a matter of law because the facts alleged in the Complaint demonstrate that the parties cannot be returned to the status quo ante.

6.     Count III also fails as a matter of law because granting the requested rescissory relief would offend traditional notions of equity by allowing Plaintiffs to reap a huge windfall through the return of property free and clear of any debts or mortgages without any payment or consideration in exchange therefore, despite the National Trust having used large sums of its own funds to pay off the debt and satisfy the mortgage obligations that Oatlands, Inc. had owed.

## Demurrer to Counts IV and V

7.     Defendant National Trust demurs to the breach of contract claims in Counts IV and V because, as a matter of law on the facts alleged in the Complaint, it did not breach any obligations under the contracts at issue.   In particular, the Cooperative Agreement gives the National Trust

sole discretion to determine how much of its own funds to provide to Oatlands, Inc. in connection with the Property.  Oatlands, Inc., as a matter of law, cannot hijack the National Trust's discretion under both the terms of the Cooperative Agreement and related contracts at issue, as well as under the National Trust's statutory mandate under Title 54 of the United States Code.

8.     Defendant National Trust also demurs to the breach of contract claim in Count IV because the facts alleged in the Complaint demonstrate that the harm and damages claimed by Plaintiff are too speculative, conjectural and based on uncertain contingencies to be cognizable as a matter of law.

9.     Defendant National Trust demurs to Count V on the basis that declaratory judgment is unavailable as a matter of law because the facts alleged in the Complaint admit that the rights and obligations, and disputes between the parties relating thereto, have already matured.

### Demurrer to Attorneys' Fee Claims in Counts I through V

10.     Defendant National Trust demurs to Plaintiff's request for an award of attorneys' fees under  Counts I through V because none of the contracts at issue contain provisions authorizing the recovery of attorneys' fees in connection with any claims or litigation, or that would otherwise enable Oatlands, Inc. to recover its attorneys' fees in this case.

### Individual Defendants' Demurrer Counts I through V

11.     The Individual Defendants demur to Counts I through V on the grounds that (i) the Complaint makes no specific allegations of any actional conduct or omissions by them, and seeks no relief or damages from any or all of the Individual Defendants; (ii) the Individual Defendants are not parties to any of the contracts at issue in Counts I through V and, therefore, not liable as a matter of law for any claimed breaches of contractual duties under those contracts; and (iii) the Individual Defendants are sued only in the "official capacity," and therefore any claims that might

possibly be asserted against them must be treated as claims against National Trust, the corporate entity.

12. To the extent that Counts I through V are found to include claims against, or seek relief from, any or all of the Individual Defendants, then the Individual Defendants:

    a. Demur to Counts I through V because the Individual Defendants are entitled, as matter of law, to statutory immunity under Virginia Code §§ 8.01-220.1:1(A), 13.1-870.1(B), and the common law of Virginia.

    b. And if the Individual Defendants are found not to have statutory immunity in whole or in part for some or all of Counts I through V of the Complaint, then the Individual Defendants adopt and join in by reference each of the grounds for demurrer to Counts I through V asserted by the National Trust above.

### Demurrer to Counts VI and VII

13. The Individual Defendants demur to Counts VI and VII because they are entitled, as matter of law, to statutory immunity under Virginia Code §§ 8.01-220.1:1(A), 13.1-870.1(B), and the common law of Virginia.

14. The Individual Defendants further demur to Counts VI and VII because, as a matter of law, they cannot be deemed trustees of any charitable trust as alleged in the Complaint. Rather, to the extent that any charitable trust as alleged in the Complaint were deemed to exist, then the sole trustee of any such trust would be the National Trust, the Congressionally-created not-for-profit corporation established pursuant to Title 54 of the United States Code, that is the only person or entity at issue having the powers to, among other things, receive donations, manage its endowment, and to sue and be sued in its own capacity. The Individual Defendants, as members of the National Trust's Board, are not, as a matter of law, individual trustees of any charitable trust

as alleged in the Complaint, but only corporate Board members acting in that capacity on behalf of National Trust, and, therefore, should be dismissed.

15. To the extent that the Individual Defendants' assertions of statutory immunity, and their demurer asserted in the previous paragraph are not sustained in whole or in part, then the Individual Defendants also further demur to Counts VI and VII as stated below in Paragraphs 16 and 17.

16. The National Trust and the Individual Defendants demur to Counts VI and VII because the relationship between the parties is contractual and the National Trust did not breach any obligations under the contracts for the reasons asserted in the demurrers to Counts I through V; based on the facts alleged in the Complaint, including the contracts attached thereto, no trust/beneficiary relationship was created or otherwise exists as a matter of law between the National Trust and Oatlands, Inc. and neither the National Trust nor its Board members have the duties as trustees alleged in the Complaint.

17. Alternatively, even if the Complaint were found to have sufficiently alleged the existence of any charitable trust and duties as trustees owed by the National Trust and/or its Board members duties, Counts VI and VII would still fail because:

    a. As a matter of law, Oatlands, Inc. lacks standing to assert a breach of trust on the facts alleged; Oatlands, Inc. is not a qualified beneficiary as alleged in the complaint with standing to assert the claims it has alleged in the Complaint. Rather, Oatlands, Inc., is merely a party to the contracts it has entered into with National Trust, and has only the rights that may be afforded to it under those contracts. In the alternative, and to the extent that the Complaint may properly allege the existence of any property deemed to be held in, or subject to, a

charitable trust, then, at the very most, Oatlands, Inc. would be considered a trustee's agent to carry out the matters specified in the contracts between National Trust and Oatlands, Inc. that National Trust would otherwise have carried on its own. An agent of a trustee, as a matter of law, is not a qualified beneficiary and, therefore, has no standing to sue as one for an alleged breach of trust.

b. As a matter of law, any duties allegedly owed to Oatlands, Inc. would be limited to the duties defined by the terms of the Parties' contracts, and the Complaint fails to allege any cognizable breach of contractual duties for the reasons previously stated.

c. Any alleged breaches of trust alleged by Oatlands, Inc. that are associated with the National Trust's use of the Symington Fund (as defined in the Complaint) in connection with the Oatlands Hamlet property acquisition are barred as a matter of law because Oatlands, Inc. specifically requested and agreed to the use of those funds for that specific purpose and cannot be heard to claim that such uses were improper or otherwise inconsistent with the terms of the underlying gift. In addition, such uses of funds were fully consistent with the terms of the gift at issue, were used for the benefit of the Oatlands historic property owned by National Trust, and certainly within the reasonable range of discretion of the National Trust and its Board members to determine as such, assuming, arguendo, that National Trust and its Board members were treated as charitable trustees as alleged in the Complaint.

d.  Any breaches of trust relating to the National Trust's purported obligations to secure an unspecified, undefined conservation easement fails because those claimed obligations are too indefinite, as a matter of law, to be enforced.

e.  Any alleged breaches of trust based on the National Trust's alleged failure to provide additional amounts of endowment funding sought by Oatlands, Inc. fail as a matter of law because the National Trust has sole discretion to determine the amount of its endowment funds to provide to Oatlands, Inc. and, further, it would be reasonable as a matter of law for the National Trust to so conclude and act accordingly with respect to Oatlands, Inc..

f.  Oatlands, Inc.'s claims for damages based on alleged breaches of trust fail as a matter of law because the facts alleged in the Complaint demonstrate that the harm and damages claimed by Plaintiff are too speculative, conjectural and based on uncertain contingencies to be cognizable under Virginia law.

WHEREFORE, the Court should sustain Defendants' Demurrer and grant their Plea in Bar and dismiss all claims for the reasons described above with prejudice.

By: _____

Arthur E. Schmalz (VSB No. 36014)
Susan F. Wiltsie (VSB No. 30390)
Ryan M. Bates (VSB No. 74661)
Steven DiBeneditto (VSB No. 92888)
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, NW
Washington, D.C.  20037
Telephone: (202) 955-1500
Facsimile: (202) 778-2201
aschmalz@hunton.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on March 7, 2023, a copy of the Defendants' Demurrer and Plea in Bar was served by e-mail and first class mail on:

Bradley D. Jones, Esq.
Lauren Farrar, Esq.
ODIN FELDMAN & PITTLEMAN, P.C.
1775 Wiehle Avenue, Suite 400
Reston, Virginia 20190
703.218.2176 (direct)
703.218.2160 (facsimile)
Brad.Jones@ofplaw.com
Lauaren.Farrar@ofplaw.com

*Counsel for Plaintiff*

_____
Arthur E. Schmalz