**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

OATLANDS, INC.,

Plaintiff,

v.

NATIONAL TRUST FOR HISTORIC
PRESERVATION IN THE UNITED
STATES; JAY C. CLEMENS, TRUSTEE;
MARTHA NELSON, TRUSTEE; PHOEBE
TUDOR, TRUSTEE; WILLIAM J. BATES,
TRUSTEE; CHRISTINA LEE BROWN,
TRUSTEE; ELIZABETH KIRKLAND
CAHILL, TRUSTEE; SAMUEL DIXON,
TRUSTEE; DAMIEN DWIN, TRUSTEE;
TRACY FRIST, TRUSTEE; KEVIN
GOVER, TRUSTEE; LINDA GRIEGO,
TRUSTEE; ALISON K. HOAGLAND,
TRUSTEE; SHELLEY HOON KEITH,
TRUSTEE; C.H. RANDOLPH LYON,
TRUSTEE; JENNIFER SKYLER,
TRUSTEE; G. JACKSON TANKERSLEY,
JR., TRUSTEE; AND ROBERT JOSEPH
VILA, TRUSTEE,

Defendants.

Civil Action No. 1:23-cv-00344-RDA-JFA

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Arthur E. Schmalz (VSB No. 36014)
Susan F. Wiltsie (VSB No. 30390)
Ryan M. Bates (VSB No. 74661)
Steven DiBeneditto (VSB No. 92888)
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, NW
Washington, D.C.  20037
Telephone: (202) 955-1500
Facsimile: (202) 778-2201
aschmalz@hunton.com
swiltsie@hunton.com
rbates@hunton.com
sdibeneditto@hunton.com

*Counsel for Defendants*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION AND SUMMARY OF ARGUMENT ................................................................1

STATEMENT OF FACTS ...............................................................................................................3

I.      Congress established NTHP as a nonprofit corporation to hold and preserve historic properties across the United States. .......................................................................................3

II.     The Oatlands Historic House & Gardens and NTHP's endowment funds for it. ..................4

III.    NTHP's federal charter authorizes it to manage historic properties through "cooperative agreements" with local property managers like OI who are required to be financially self-sufficient. ........................................................................................................................5

IV.     OI is the local property manager for the Property under a cooperative agreement. ...............6

        A.   Under the Co-Stewardship Agreements, NTHP leases the Property to OI for nominal consideration in exchange for OI managing and maintaining the Property at its own expense on a financially self-sufficient basis. ....................................................6

        B.   NTHP has "sole discretion" over how much of its endowment funds to provide to OI, and "sole discretion" over all material repairs, modifications or construction on the Property. ..................................................................................................................8

        C.   NTHP agrees to buy Oatlands Hamlet from OI in exchange for paying off OI's $1.3 million mortgage, using proceeds from the Symington Fund. .........................................9

        D.   The Cooperative Agreement includes an "agreement to agree" on a possible "conservation easement" to be placed on the Historic Core. ..........................................9

        E.   OI has the unilateral right to terminate the Agreements if it ever finds them to be economically unfeasible ..............................................................................................10

CAUSES OF ACTION ASSERTED IN THE COMPLAINT .......................................................11

ARGUMENT ................................................................................................................................12

I.      The breach of contract claims in Counts I through V fail to state a claim. ..........................13

        A.   Counts IV and V fail because the Cooperative Agreement gives NTHP "sole discretion" to determine how much of its endowment funds to provide to OI. ...............14

        B.   Separately, Count V should be dismissed because a declaratory judgment is improper when alleged actionable conduct and injury has already occurred. ................15

        C.   Counts I through III should be dismissed because the purported obligation to negotiate and secure a conservation easement is too indefinite to be enforced. .............15

        D.   Count I should also be dismissed because specifically enforcing the conservation easement provision is impracticable and inequitable to fashion and administer. ...........17

        E.   The Court should dismiss Count III's request for rescission because it is impossible to return the parties to the status quo and the relief sought is patently inequitable. .......18

II.     Counts VI and VII should be dismissed because they fail to state a legally cognizable claim for breach of trust. ......................................................................................................19

i

A. Count VI and VII should be dismissed because no trust relationship exists between the parties. .................................................................................................................20

   1. The Virginia Uniform Trust Code doesn't apply or transform NTHP into a trust.... 21

   2. The Co-Stewardship Agreements are contracts, not trusts......................................... 24

B. Even if the Complaint sufficiently alleged the existence of a trust, Counts VI and VII fail to plead facts constituting any actionable breach of trust. ................................25

C. Counts VI and VII must fail against the individual board members because   (i) they are not "trustees" and (ii) NTHP is the real party in interest. .........................................27

D. Alternatively, Count VI and VII fail against the individual Board members because they have statutory immunity...........................................................................................29

CONCLUSION....................................................................................................................29

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

<u>CASES</u>:

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)............................................................................................13

*Beazer Homes Corp. v. VMIF/Anden Southbridge Venture,*
    235 F. Supp. 2d 485 (E.D. Va. 2002) .............................................................16, 17

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)............................................................................................13

*Blunt v. Lentz,*
    241 Va. 547 (1991) .........................................................................................14, 15

*Bolling v. King Coal Theatres, Inc.,*
    185 Va. 991 (1947) ............................................................................................20

*Borg v. Warren,*
    545 F. Supp. 3d 291 (E.D. Va. 2021) ...............................................................29

*Burdette v. Brush Mountain Ests., LLC,*
    278 Va. 286 (2009) ............................................................................................18

*Chattin v. Chattin,*
    245 Va. 302 (1993) ............................................................................................18

*Dodge v. Trustees of Randolph-Macon Woman's Coll.,*
    276 Va. 10, 16-17 (2008). ................................................................................21

*Donnelly v. Donatelli & Klein, Inc.*
    258 Va. 171 (1999) ............................................................................................15

*Duke v. Tobin,*
    198 Va. 758 (1957) ............................................................................................17

*E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship,*
    213 F.3d 175 (4th Cir. 2000) ............................................................................14

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.,*
    637 F.3d 435 (4th Cir. 2011) ............................................................................14

*Glob. Hub Logistics v. Tamerlane Glob. Servs., Inc.,*
    No. 1:12–cv–1350 (GBL/IDD), 2013 WL 1332048 (E.D. Va. Mar. 29, 2013) .....................17

iii

*Holtzman Oil Corp. v. Green Project, LLC*,
   No. 141863, 2016 WL 3208943 (Va. Apr. 21, 2016) ............................................................18

*In re Church Trs.*,
   20 Va. Cir. 199 (1990) ....................................................................................................24, 25

*Keepe v. Shell Oil Co.*,
   220 Va. 587 (1979) ...........................................................................................................28

*Kentucky v. Graham*,
   473 U.S. 159 (1985) ..........................................................................................................29

*Palmer & Palmer Co., LLC v. Waterfront Marine Constr., Inc.*,
   276 Va. 285 (2008) ...........................................................................................................14

*Penn v. Keller*,
   178 Va. 131 (1941) ...........................................................................................................24

*Perel v. Brannan*,
   267 Va. 691 (2004) ...........................................................................................................18

*Potomac Auto Mall Holdings, Inc. v. Blue Clover Fin., LLC*,
   No. 1:20-cv-865, 2021 WL 1536581 (E.D. Va. Apr. 16, 2021) ...........................................17

*Reineck v. Lemen*,
   292 Va. 710 (2016) ...........................................................................................................29

*S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*,
   713 F.3d 175 (4th Cir. 2013) ..............................................................................................14

*Schmidt v. Household Fin. Corp., II*,
   276 Va. 108 (2008) ...........................................................................................................19

*Shepherd v. Davis*,
   265 Va. 108 (2003) ...........................................................................................................18

*Tapia v. U.S. Bank. N.A.*,
   718 F. Supp. 2d 689 (E.D. Va. 2010), *aff'd*, 441 Fed. Appx. 166 (4th Cir. 2011) ............15, 16

*Torrez v. Comacho*,
   66 Va. Cir. 161 (2004) .......................................................................................................20

*United States ex rel. Garzione v. PAE Gov't Servs., Inc.*,
   164 F. Supp. 3d 806 (E.D. Va. 2016) ..................................................................................13

*W.A.K. ex rel. Karo v. Wachovia Bank, N.A.*,
   712 F. Supp. 2d 476 (E.D. Va. 2010) ......................................................................26, 27, 28

iv

*W.J. Schafer Assocs., Inc. v. Cordant, Inc.*,
254 Va. 514 (1997) ..................................................................................17

*Wilburn v. Mangano*,
299 Va. 348 (2020) ..................................................................................18

*Young-Allen v. Bank of Am., N.A.*,
298 Va. 462 (2020) ..................................................................................19

**FEDERAL STATUTES**

54 U.S.C. § 312102(a) ..................................................................................3

54 U.S.C. § 312104(a) ...............................................................................3, 4

54 U.S.C. § 312104(e) ................................................................................30

54 U.S.C. § 312105(c) ................................................................................28

54 U.S.C. § 312105(h) ..................................................................................5

**OTHER STATUTES**

Va. Code §§ 8.01-220.1:1(A), 13.1-870.1(B) ..........................................29

Va. Code §§ 8.01-220.1:1(C), 13.1-870.1(C) ..........................................30

Va. Code § 13.1-627(A)(1) .........................................................................28

Va. Code § 13.1-853 ...................................................................................21

Va. Code §§ 58.1-510-513 ..........................................................................11

Va. Code § 64.2-701 ...................................................................................28

Va. Code § 64.2-719 ...................................................................................28

Va. Code § 64.2-754 ...................................................................................28

Va. Code § 64.2-764(B)(4) ...................................................................26, 28

Va. Code § 64.2-797 ...................................................................................27

**OTHER AUTHORITIES**

Restatement (Second) of Trusts § 16A ......................................................29

## INTRODUCTION AND SUMMARY OF ARGUMENT

This case is a straightforward contract dispute between two nonprofit corporations, Plaintiff Oatlands, Inc. ("OI") and Defendant National Trust for Historic Preservation in the United States ("NTHP").  Simply put, OI, a local property manager, has become dissatisfied with the terms of contracts under which it agreed to lease and manage a historic mansion and estate in Leesburg, Virginia, known as the Oatlands Historic House & Gardens (the "Property"), which is owned by NTHP.  The Property is one of many historic properties owned by NTHP, a federally chartered nonprofit corporation created in 1949 to acquire and preserve historic lands and buildings throughout the country.

OI's Complaint (ECF 1-1) is a smorgasbord of overheated, conclusory rhetoric, topped off with a sprinkle of inapplicable trust law principles.  OI's claims, however, are belied by the plain language of the controlling contracts, which this Court is obliged to follow and enforce under well-settled Virginia law.  Under those agreements (attached as Exhibits 5-7 to the Complaint), NTHP agreed to lease the Property to OI for the nominal sum of $10 per year, allowing OI to earn and keep all the revenue from admission fees and hosting events, as well as its own fundraising efforts. In return, OI agreed to operate and maintain the Property at its own expense, and to do so on a financially self-sufficient basis, without reliance upon NTHP for its primary economic support. The requirement that OI be financial self-sufficient is necessary, as the parties' agreement acknowledges that NTHP's own endowment funds have never been sufficient to provide for the operation and maintenance of the Property.

Thus, Plaintiff's assertion that NTHP must provide a certain percentage or amount of its endowment funds to OI is baseless and contrary to the plain language of the governing contracts. Indeed, the principal contract (the "Cooperative Agreement") gives NTHP "sole discretion" to

1

determine how much of its endowment funding to give to OI each year.  *See, e.g.*, Amended and Restated Cooperative Agreement (Compl., Ex. 5) (the "Coop. Agmt." or "Cooperative Agreement") ¶ 6(B)).  NTHP likewise has "sole discretion" to approve or deny any material repairs, modifications or construction to the Property that OI may propose.  *See id.*, ¶¶ 4(A)(i), 5(C).

OI turns a blind eye to these unambiguous provisions, and seeks to hijack NTHP's plenary discretion over the use of its endowment funds for the Property, and over any material repairs, modifications or construction to be performed.  But this Court is not permitted to disregard the governing contracts or to second guess NTHP's business judgment as to the management of its own property—judgment that involves not only the Property, but also numerous other historic properties across the country that NTHP owns.

Faring no better is OI's claim that NTHP breached the Cooperative Agreement by allegedly failing to use "best efforts" to procure and encumber the Property with an undefined "conservation easement" to be determined through future negotiations between the parties.  Not only do OI's own allegations reveal the impracticability of such an easement, but the terms of the Cooperative Agreement also reveal that the conservation easement provisions are nothing more than an unenforceable "agreement to agree."

Additionally, OI's claim of being financially "starved" by NTHP is at odds with the plain terms of the Cooperative Agreement, which, as noted, require OI to operate and maintain the Property on a financially self-sufficient basis, without primary reliance on NTHP's discretionary endowment contributions.  And if OI ever finds that its obligations have become financially infeasible—including based on the amount discretionary financial support from NTHP—OI can terminate them without penalty.  *See* Amended and Restated Lease ("Lease"), Compl., Ex. 7 ¶ 11.

In its last two counts, OI tries to shoehorn the parties' contract dispute into an ill-fitting trust law mold under the Virginia Uniform Trust Code.  As shown below, Virginia law does not allow litigants to use the law of trusts to supplant contract and corporation law principles in disputes like this.

Finally, OI has also sued each of NTHP's individual Board members in their official capacity, even though they are not parties to any contracts with OI, and owe no legal duties to OI or to anyone other than NTHP.  Moreover, each of the Board members is entitled as a matter of law to statutory immunity under the Virginia Code, requiring their dismissal from this case.

All of OI's claims fail as a matter of law and should be dismissed with prejudice.

## <u>STATEMENT OF FACTS</u>

Because the Complaint is long on conclusory rhetoric and short on any discussion of the controlling agreements, it is necessary to provide those important details here.

### I.    **Congress established NTHP as a nonprofit corporation to hold and preserve historic properties across the United States.**

In 1949, the U.S. Congress created NTHP as "a charitable, educational, and nonprofit corporation" charged with acquiring and preserving historic American lands, buildings, objects, and antiquities of national significance, and to facilitate participation of the public in the same. *See* 54 U.S.C. § 312102(a); Compl. ¶ 2; Coop. Agmt., Ex. B at  1.  Consistent with a conventional corporate control structure, Congress vested control of NTHP in a board of directors, referred to as a Board of Trustees.  *See* 54 U.S.C. § 312104(a).  The Board consists of:  (1) the U.S. Attorney General, the U.S. Secretary of the Interior, and the Director of the National Art Gallery as *ex officio* members, and (2) not fewer than six general Board Members who are citizens of the United States. *Id.*  Each Board Member serves a term of up to five years, and receives no compensation.  *Id.* § 312104(c)(2), (e).

3

Congress vested NTHP with all the typical powers of a nonprofit corporation, including the power and authority:  (1) to sue and be sued in its own name; (2) to adopt a corporate seal; (3) to create a constitution, bylaws, and regulations; and, as relevant here, (4) to contract and to execute cooperative agreements under terms and conditions that NTHP deems advisable.  *Id.* § 312105(c)-(e) & (h)-(i).  NTHP can also appoint and prescribe the duties of officers, agents, and employees to assist the Board in carrying out its duties.  *Id.* § 312105(j).

## II.    The Oatlands Historic House & Gardens and NTHP's endowment funds for it.

The 396-acre Property at issue consists of two components:  (1) a large tract containing a two hundred year-old mansion, with formal gardens and ancillary structures (the "Historic Core"), *see* Coop. Agmt. ¶ 1(A); and (2) "an adjacent fifty-four (54) acre parcel known as 'Oatlands Hamlet'" ("Oatlands Hamlet").  Coop. Agmt., Preamble.  A map showing the Historic Core and adjacent Oatlands Hamlet parcel is attached as Exhibit A to the Cooperative Agreement, pertinent portions of which appear as follows (highlights added):



NTHP acquired the Historic Core in 1965 by gift from Margaret Eustis Finley and her husband and sister.  Compl. ¶ 25.  Afterward, Ms. Finley donated a $500,000 "endowment fund" *to NTHP*, on the condition that NTHP use the income generated from it for the Property's maintenance and preservation (the "Finley Fund").  Compl., Ex. 1.  The entirety of NTHP's

endowment funds specifically earmarked for the Property consist of the Finley Fund and another fund established in 2004 by a $1.25 million gift *to NTHP* from Valerie Symington ("Symington Fund") to be used exclusively for the "Oatlands" historic estate.  Compl. ¶¶ 29-31 & Exs. 3-4 & Coop. Agmt. ¶ 6(B).

Although the Historic Core and Oatlands Hamlet tracts have nominally different street addresses, as previously observed, they directly abut one another, and are, admittedly, fully integrated as the overall historic estate comprising the Property.  *See* Coop. Agmt. ¶ 1(B) (OI originally acquired Oatlands Hamlet "to protect the viewsheds from the Mansion and of the Historic Core," and, prior to conveying it to NTHP, OI "administered and interpreted that property . . . as part of the larger historic site.").  Thus, to help preserve the Historic Core, NTHP purchased the Oatlands Hamlet parcel from OI in 2019 in exchange for paying off about $1.3 million of OI's mortgage debt on the tract.  *Id.*, ¶ 6(B).  OI expressly requested and agreed that NTHP would pay off OI's mortgage debt on the Oatlands Hamlet parcel using the Symington Fund.  *Id.*

III.   **NTHP's federal charter authorizes it to manage historic properties through "cooperative agreements" with local property managers like OI who are required to be financially self-sufficient.**

Congress authorized NTHP to hold and manage historic properties either directly, or by contracting with local property managers through "cooperative agreements . . . under terms and conditions that [NTHP] considers advisable . . . ." 54 U.S.C. § 312105(h).  The Cooperative Agreement with OI incorporates and attaches NTHP's corporate policies for operating and managing its numerous historic sites as set forth in an NTHP Historic Sites Vision Statement ("Vision Statement").  *See* Coop. Agmt., Ex. B at 1.   Because of NTHP's very limited financial resources for managing its properties, the Vision Statement policies require local property managers under cooperative agreements to be financially self-sufficient in managing their assigned

properties: "[l]ong-term financial self-sufficiency is understood as a key to responsible stewardship" by local property managers, including their ability to provide their own "funding for cyclical maintenance" of the site entrusted to their care.  *Id*. at 4.  NTHP even warns local property managers not to rely upon NTHP's discretionary contributions from its endowment funding, noting that "healthy organizations" serving under cooperative agreements should not rely on NTHP endowment contributions for any "more than 20% of [their] annual operating budget."  *Id*. at 4-5.

IV.   **OI is the local property manager for the Property under a cooperative agreement.**

As previously observed, OI serves as NTHP's local property manager for the Property under the terms of a cooperative agreement, the original version of which was executed in 1984. Compl. ¶ 37; Coop. Agmt. ¶ 1(B).  In 2019, the parties amended the existing agreement through a suite of contracts consisting of: (1) the Cooperative Agreement (Compl., Ex. 5); (2) the Amended and Restated Lease (Compl., Ex. 7) (the "Lease"); and (3) the Amended and Restated Loan Agreement (Compl., Ex. 6) (the "Loan") (the Loan, together with the Cooperative Agreement and Lease, are collectively referred herein as the "Co-Stewardship Agreements").  OI readily concedes that these agreements "govern the current relationship between [the parties]." Compl. ¶ 42.

A.   **Under the Co-Stewardship Agreements, NTHP leases the Property to OI for nominal consideration in exchange for OI managing and maintaining the Property at its own expense on a financially self-sufficient basis.**

Consistent with NHTP's above-referenced corporate policy for sites managed under cooperative agreements, the Co-Stewardship Agreements require OI to operate and maintain the Property at its own expense on a financially self-sufficient basis, thereby enabling NTHP to preserve its limited endowment funding.  Specifically, for the nominal sum of only $10 per year, OI leases the Property from NTHP, including not only the historic lands and structures, but also NTHP's "Museum Collection" of historic artifacts.  Lease (Compl., Ex. 7) ¶¶ 1, 3; *see also* Loan

6

(Compl. Ex. 6) ¶¶ 1-3.  OI can use the Property to generate revenue to help defray its maintenance expenses through fees paid by visitors and users of the site for events such as weddings and galas, as well as to support other OI fundraising efforts.  Lease ¶¶ 1, 9; Coop. Agmt. ¶¶ 1(B), 3(B)(ii).

In return for its essentially rent-free lease of the Property, OI agreed to be financially responsible for all costs of maintaining, operating and preserving the Property:

> Subject to the provisions of the Cooperative Agreement, *[OI] covenants, agrees and undertakes to pay*, in addition to the Rent, *each, all and every expense of maintaining, operating and administering the Property in a clean and sightly condition* for the purposes specified in Paragraph 1 and in the Co-Stewardship Agreements, *including without limitation, the following costs*:  water/sewer, gas, electric, real estate taxes and assessments, *preservation, and restoration costs*, for and during the Term of this Lease.

Lease ¶ 4 (emphasis added).  In addition to requiring OI to carry out these stewardship responsibilities at its own expense, the Cooperative Agreement expressly incorporates the policies of NTHP's Vision Statement, including those discussed above requiring local property managers like OI to be financially self-sufficient, and not dependent upon support from NTHP's discretionary endowment contributions.  Coop. Agmt. ¶ 3(A); *see also id*. ¶ 3(B)(ii).  Indeed, the agreement specifically requires OI to "operate a financially sustainable business model for the Property that aims at achieving [financial] self-sufficiency, taking into account both funds provided by or through [NTHP] and those raised by [OI]."  *Id*. ¶¶ 1(B), 6(A).

Thus, OI is also obligated to use "its best efforts to raise funds" to meet the "capital needs of the Property."  *Id*., ¶ 1(B).  Indeed, OI fully understood why it must operate and maintain the Property at its own expense, on a financially self-sufficient basis, as the Cooperative Agreement acknowledges that "the endowment funds held by the [NTHP] and identified herein are inadequate to provide for the financial needs of the Property."  Coop. Agmt. ¶ 1(B).  OI grumbles about its

perceived inadequacy of NTHP's discretionary endowment contributions, but mentions absolutely nothing about these key provisions, or its own fundraising efforts required by the contracts.

> **B.**   **NTHP has "sole discretion" over how much of its endowment funds to provide to OI, and "sole discretion" over all material repairs, modifications or construction on the Property.**

Because OI is required to operate and maintain the Property on an economically self-sufficient basis, NTHP is not required to provide OI with, or maintain, any specific level of financial support from NTHP's endowments funds.  Rather, NTHP retains "sole discretion" to decide how much of its endowment funds to provide to OI from time to time.  *See* Coop. Agmt. ¶ 6(B) (recognizing that all "National Trust endowment funds," including funds from the Symington Fund earmarked for the Property, are to be invested and ***managed by the National Trust*** . . . ***in its sole discretion***. . . ." (emphasis added)).  Thus, while Paragraph 6(B)(i) of the Cooperative Agreement contemplates NTHP making quarterly payments to OI from NTHP's endowment funds, nothing in that or any other paragraph of the contract obligates NTHP to make or continue endowment payouts in any particular amount; rather, any payouts are to be made as "authorized by the National Trust Board . . . ."  *Id.* ¶ 6(B)(i).  Despite this plain language, OI theorizes that it somehow has the right to receive 5% of NTHP's endowment funds for the Property annually, and that NTHP is prohibited from ever reducing the amount of its endowment payouts as its Board may deem appropriate and prudent in its discretion.  Compl. ¶ 63 & Introduction.

NTHP's retention of "sole discretion" to determine its endowment fund payouts to OI also mirrors NTHP's "sole discretion" to determine all material repairs, modifications or construction at the Property beyond the normal maintenance work that OI is obligated to perform at its own expense.  *See* Coop. Agmt. ¶ 4(A)(i) (NTHP must provide written approval for all "material changes resulting from alteration, improvement, restoration, repair, preservation, new

construction, landscape modifications, or any other physical changes," and such approval "***may be withheld or conditioned in [NTHP's] sole discretion***" (emphasis added)); *see also id.* ¶ 5(C) (OI must provide NTHP with "drafts of drawings, conceptual plans, schematic designs, construction documents and specifications" for any proposed material repairs or modifications, which NTHP "***may approve . . . or may withhold or condition its approval in its sole discretion*** . . . ." (emphasis added)).  Despite these unambiguous provisions, OI accuses NTHP of wrongfully refusing to consent to certain modifications and repairs OI allegedly proposed.  Compl. ¶¶ 99-107, 196.

### C.    NTHP agrees to buy Oatlands Hamlet from OI in exchange for paying off OI's $1.3 million mortgage, using proceeds from the Symington Fund.

As noted above, under the Cooperative Agreement, NTHP bought the Oatlands Hamlet from OI in exchange for paying off about $1,300,000 of OI's mortgage debt on the tract.  *See* Coop. Agmt. ¶ 6(B).  Nonetheless, OI asserts that NTHP acquired the property "for no consideration."  Compl. ¶¶ 39, 56.  Similarly, OI accuses NTHP of a "breach of trust" by using the Symington Fund to retire OI's mortgage debt, *id*. ¶¶ 39-40, 56, 179, 180, 185, even though that is exactly what the Cooperative Agreement required NTHP to do.  Coop. Agmt. ¶ 6(B).

### D.    The Cooperative Agreement includes an "agreement to agree" on a possible "conservation easement" to be placed on the Historic Core.

The Cooperative Agreement recognizes a possibility of future NTHP endowment funds for the Property being generated through a potential tax-qualified conservation easement to be negotiated by the parties and placed on the Historic Core in the future.  *Id*. ¶¶ 6(B), 13. Specifically, the parties agreed to use "best efforts" to negotiate and pursue a "mutually-acceptable conservation easement on the Historic Core using the Virginia Land Preservation Tax Credit program, with any net funds received to be held by the National Trust in a board-designated endowment for the Property, subject to approval of the terms by the National Trust Board and the

Oatlands Board." *Id.* ¶ 13.  Any funds to be realized from a possible conservation easement would have to be supplied by some potential future donor in exchange for tax credits.  Compl. ¶ 50.

So to generate any new funds for the Property, much less the $2 million envisioned by OI, Compl. ¶ 47, several uncertain contingencies would have to come to fruition:  (1) the parties would have to reach agreement on acceptable terms for a conservation easement; (2) the easement would have to be approved under Virginia's tax credit program[1]; (3) the parties would have to find a donor to contribute an amount acceptable to both parties in exchange for tax benefits from the easement; and (4) the parties would have to agree on the terms of a Board designated endowment. Coop. Agmt. ¶ 13.  As discussed below, uncertain and amorphous provisions like these are an unenforceable "agreement to agree."  *See infra* Argument § I(C).

In any event, OI acknowledges that NTHP *did* attempt to negotiate a conservation easement on the Historic Core, but found it was precluded by its existing conservation easements.  Compl. ¶¶ 51-52.  Despite this acknowledgement, OI asks the Court to force NTHP to divest itself of all incompatible easements held by others, or to create a limited liability company to hold "the property." *Id.* ¶ 53.  NTHP has declined to take these extreme steps.  *Id.* ¶ 54.  As explained below, these measures are not feasible as a matter of law.  *See infra* Argument § I(D).

**E.    OI has the unilateral right to terminate the Agreements if it ever finds them to be economically unfeasible.**

OI tries to portray NTHP as a bully "using its economic power as the primary source of funding for [OI] to starve [OI] of the resources to care for and maintain the property . . . ." *Id.*

---

[1]  Obtaining approval is complex and challenging.  *See* Va. Code §§ 58.1-510 through -513.  Among other things, valuation must be supported by a qualified appraisal, *id.*, § 58.1-512(B), and, if over $1 million (OI desired over $2 million), in addition to approval by the Virginia Department of Taxation, the conservation value must also be reviewed and verified by the Director of the Virginia Department of Conservation and Recreation.  *Id.*, § 58.1-512(D)(3).

¶ 198.  But this conclusory assertion ignores the very terms of the Cooperative Agreement that say the exact opposite—OI is to be financially self-sufficient, and not dependent on NTHP as a primary source of funding.

Furthermore, the financial self-sufficiency provisions of the Co-Stewardship Agreements do not force OI to remain stuck forever in an economically untenable arrangement as OI tries to suggest.  In fact, the exact opposite is true: OI can terminate the agreements without penalty or consequence if it ever "determines that the continued operation of the Property as an historic property, on an economic self-sufficient basis, is unfeasible, taking into account the endowment income provided by Lessor."  Lease ¶ 11; Coop. Agmt. ¶ 2(a).

## CAUSES OF ACTION ASSERTED IN THE COMPLAINT

Although containing six counts, the Complaint actually consists of only two causes of action—breach of contract and "breach of trust"—arising from four general categories of grievances:  (1) OI's disagreement with NTHP's discretionary decisions over how much of its endowment funds to provide to OI; (2) OI's disagreement with NTHP's discretionary decisions over repairs and modifications to the Property; (3) NTHP's alleged failure to use "best efforts" to secure an unspecified conservation easement; and (4) OI's theory that it was wrongful for NTHP to use the Symington Fund to pay off OI's mortgage debt in exchange for transfer of the Oatlands Hamlet parcel, even though this was precisely what OI agreed to under the Cooperative Agreement.  More specifically, in Counts I through V, OI requests multiple (and inconsistent) remedies for NTHP's alleged breaches of the Co-Stewardship Agreements:

**Count I**:  Specific performance, requiring NTHP to negotiate a mutually acceptable conservation easement for the Historic Core, and to divest any of its existing conservation easements that may preclude any new, to-be-negotiated conservation easement.

**Count II**:  In the alternative to Count I, requesting money damages "of at least $2.5 million" against NTHP for failing to reach agreement with OI on a conservation easement.

**Count III**:  In the alternative to Counts I and II, partial rescission of the Cooperative Agreement, requiring NTHP to return the Oatlands Hamlet property to OI and without being repaid the $1.3 million it spent to retire OI's prior mortgage debt on the parcel.

**Count IV**:  Requesting "at least $500,000" of money damages because OI claims it should have received more of NTHP's endowment funding than NTHP authorized.

**Count V**:   Requesting a declaratory judgment that NTHP's allegedly inadequate endowment fund payments to OI breached the Cooperative Agreement.

Then, in Counts VI and VII, OI attempts to transform these contract claims into breaches of a putative "trust," with OI as the beneficiary and NTHP and its Board members as the trustees. For example, Counts VI and VII recycle the same grievances as in Counts I through V: the failed "conservation easement" agreement to agree, and NTHP's discretionary decisions on endowment fund payments to OI and repairs and modifications to the Property.  Compl. ¶¶ 178-185, 194-198. These counts also assail NTHP's use of the Symington Fund to pay off OI's mortgage on the Oatlands Hamlet as a "breach of trust," even though that was exactly what OI requested and agreed to in the Cooperative Agreement.  *Id*. ¶¶ 179, 185, 195.  The relief sought in Count VI is also largely duplicative of OI's breach of contract remedies, including the same $2.5 million and $500,000 damages requests as in Counts II and IV, and a return of the Oatlands Hamlet property without refunding the $1.3 million NTHP paid to retire OI's mortgage debt—the same as Count III.  *Id.* ¶ 188.  In Count VII, OI asks the Court to remove each of NTHP's Board members, to appoint a "special fiduciary" in their place, and to award OI its attorneys' fees. *Id*. ¶ 199.

For the reasons explained below, all of OI's claims fail as a matter of law.

## **ARGUMENT**

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).  "A claim

has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The pleading "must 'possess enough heft'—that is, 'factual matter,'" to make the plaintiff's claims "plausible," not merely "conceivable." *United States ex rel. Garzione v. PAE Gov't Servs.*, *Inc.*, 164 F. Supp. 3d 806, 811 (E.D. Va. 2016) (citations omitted). And while properly alleged facts in the Complaint are presumed true, "legal conclusions drawn from the facts" alleged, or any "unwarranted inferences, unreasonable conclusions, or arguments" are not. *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000). The Court must also consider any "documents attached or incorporated into the complaint." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc*., 637 F.3d 435, 448 (4th Cir. 2011). "In the event of conflict between the bare allegations of the complaint and any exhibit attached to the complaint, the exhibit prevails." *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 182 (4th Cir. 2013) (alterations in original and citation omitted).

## I.   <u>The breach of contract claims in Counts I through V fail to state a claim</u>.

Counts I through V seek a hodgepodge of legal, declaratory, and equitable relief arising from NTHP's alleged breaches of the Cooperative Agreement. They all fail as a matter of law, because they rely on claimed rights that are inconsistent with the Co-Stewardship Agreements.

Under black-letter Virginia law, "the parties' contract becomes the law governing the case unless it is repugnant to some rule of law or public policy." *Palmer & Palmer Co., LLC v. Waterfront Marine Constr., Inc.*, 276 Va. 285, 289 (2008). "'It is the function of the court to construe the contract made by the parties, not to make a contract for them. . . . The guiding light in the construction of a contract is the intention of the parties as expressed by them in the words they have used, and courts are bound to say that the parties intended what the written instrument

plainly declares.'" *Blunt v. Lentz*, 241 Va. 547, 552 (1991) (citation omitted).  Thus, this Court can and should ignore OI's allegations that are inconsistent with the controlling Co-Stewardship Agreements and other exhibits attached to the Complaint.  *S. Walk at Broadlands*, 713 F.3d at 182.

### A.   Counts IV and V fail because the Cooperative Agreement gives NTHP "sole discretion" to determine how much of its endowment funds to provide to OI.

OI's breach of contract claims in Counts IV and V fail because they are premised on alleged rights that are inconsistent with the actual terms of the parties' contracts.  As explained above, Paragraphs 6(B) and 6(B)(i) of the Cooperative Agreement give the Board "sole discretion" to determine the amount of any payouts from its endowment funds.  *See supra* Statement of Facts ("SOF") § IV(B).  Those provisions do not obligate NTHP to provide an annual 5% endowment payout (or any specific amount), much less in perpetuity as claimed by OI.  Compl. ¶¶ 60-65, 169-170.  Rather, under Paragraph 6(B), NTHP has "sole discretion" to determine how much of its endowment funds to provide to OI each year.  *See, e.g.*, *Donnelly v. Donatelli & Klein, Inc.*, 258 Va. 171, 180-81 (1999) (holding that "sole discretion" in a partnership agreement could not be more "explicit" in giving defendant controlling authority to make financing decisions for the partnership).  Thus, because NTHP has "sole discretion" to alter previously approved endowment payouts, its decision to reduce an earlier payout authorization (which OI labels the "Spending Policy") is not an unlawful unilateral contract modification as OI claims.  Compl. ¶¶ 70-80.  OI's gripes about NTHP's financial support are further undermined by the plain language in the Lease and Cooperative Agreements that require OI to operate and maintain the Property at its own expense, on a financially self-sufficient basis.  *See supra* SOF § IV(A)-(B).

Finally, these terms do not lock OI into an unfair or oppressive transaction as it tries to suggest.  As previously observed, OI can terminate the Co-Stewardship Agreements without penalty if it ever finds the terms to be economically infeasible.  *See supra* SOF § IV(E).

14

**B.      Separately, Count V should be dismissed because a declaratory judgment is improper when alleged actionable conduct and injury has already occurred.**

It is well settled that "'declaratory judgments are designed to declare rights so that parties can conform their conduct to avoid future litigation,' and ***are untimely if the questionable conduct has already occurred or damages have already accrued***." *Tapia v. U.S. Bank. N.A.*, 718 F. Supp. 2d 689, 695 (E.D. Va. 2010), *aff'd*, 441 Fed. Appx. 166 (4th Cir. 2011)  (emphasis added) (citation omitted).  Thus, in *Tapia*, this Court dismissed a request for a declaratory judgment to declare a foreclosure of the plaintiffs' home to have been unlawful because "any wrong Plaintiffs [may have] suffered as a result of the allegedly deficient foreclosure has already occurred." *Id*. at 696.

These principles require dismissal of OI's declaratory judgment claim in Count V.  OI asks this Court to declare that NTHP has violated the Cooperative Agreement by reducing the amount of its discretionary Endowment Draw payments to OI, *see* Compl. ¶¶ 173-176, while simultaneously suing NTHP in Count IV for the same allege breach of contract, and claiming to have suffered "at least $500,000" of damages as a consequence. *Id*. ¶¶ 168-172.  Thus, like the plaintiff in *Tapia*, "any wrong [OI may have allegedly] suffered as a result of the [alleged breach of contract] has already occurred," and so "a declaratory judgment at this stage is inappropriate." 718 F. Supp. 2d at 696.

**C.      Counts I through III should be dismissed because the purported obligation to negotiate and secure a conservation easement is too indefinite to be enforced.**

Counts I (Specific Performance), II (Damages), and III (Rescission) are an assortment of alternative (and inconsistent) remedies for the same alleged breach of the Cooperative Agreement: Paragraph 13's aspirational language about potentially securing a tax-qualified conservation easement on the Historic Core in the hope of finding a donor/purchaser of the tax credit to fund a new Property-specific endowment to be held by NTHP.  Compl. ¶¶ 144-167.

15

All three counts fail as a matter of law because the terms of paragraph 13 are an indefinite and unenforceable "agreement to agree."  Indeed, "[i]t is well settled under Virginia law that agreements to negotiate at some point in the future are unenforceable." *Beazer Homes Corp. v. VMIF/Anden Southbridge Venture*, 235 F. Supp. 2d 485, 490-91 (E.D. Va. 2002) (holding that the parties' agreement "to 'negotiate in good faith to reach a mutually acceptable Contract,'" was an unenforceable "agreement[] to agree in the future.").  Such provisions are known as "agreements to agree," and are unenforceable because they are simply "too vague and too indefinite to be enforced." *Id*. at 490 (quoting *W.J. Schafer Assocs., Inc. v. Cordant, Inc.*, 254 Va. 514, 519 (1997)).  In such a situation, courts will treat the "agreement to agree" provision as unenforceable and otherwise hold the parties to the enforceable provisions of the contract. *E.g.*, *Potomac Auto Mall Holdings, Inc. v. Blue Clover Fin., LLC*, No. 1:20-cv-865, 2021 WL 1536581, at *4-5 (E.D. Va. Apr. 16, 2021) (enforcing the "binding" sections but not the "non-binding" sections of a "Commitment Letter").  The language in Paragraph 13 requiring the parties to use "best efforts" does nothing to alleviate the "agreement to agree" problem. *See Glob. Hub Logistics v. Tamerlane Glob. Servs., Inc.*, No. 1:12–cv–1350 (GBL/IDD), 2013 WL 1332048, at *5 (E.D. Va. Mar. 29, 2013) (holding that provision requiring the parties to use "their best efforts" to reach a settlement within the next 30 days is an unenforceable agreement to agree).

For the reasons explained above, the conservation easement provisions at issue are even more indefinite and dependent on future contingencies than the unenforceable agreements to agree in the cases cited above. *See supra* SOF § IV(D).  For example, Paragraph 13 of the Cooperative Agreement calls for the parties first to attempt to negotiate a "mutually-acceptable conservation easement;" then try to secure approval under Virginia's tax credit program; and, if approved, then hope that someone will step forward and pay some indeterminate amount in exchange for the tax

benefits of the easement; and finally attempt to agree on terms for an appropriate Board designated endowment. *Id*.

While the indefiniteness of Paragraph 13 renders Counts I through III infirm as a matter of law, it is particularly fatal to OI's specific performance claim in Count I. Indeed, "[i]t is an elementary principle that a court of equity will not specifically enforce a contract unless it be complete and certain. All the essential terms of the contract must be finally and definitely settled. None must be left to be determined by future negotiations." *Duke v. Tobin*, 198 Va. 758, 759 (1957); *see also Wilburn v. Mangano*, 299 Va. 348, 353 (2020) (refusing to specifically enforce a purchase contract lacking a fixed price term or any defined method "for ascertaining [price] *with certainty*" (emphasis in original) (citation omitted)); *Holtzman Oil Corp. v. Green Project, LLC*, No. 141863, 2016 WL 3208943, at *3-4 (Va. Apr. 21, 2016) (refusing to specifically enforce a contract provision contingent and dependent on future discussions and negotiations).

**D.   Count I should also be dismissed because specifically enforcing the conservation easement provision is impracticable and inequitable to fashion and administer.**

Count I also fails for an additional reason: Under Virginia law, specific performance is an inappropriate remedy "if performance by the defendant would be impossible, or if the enforcement of the decree would be unusually difficult for the court," or would "result in great practical difficulties." *Perel v. Brannan*, 267 Va. 691, 700 (2004); *Chattin v. Chattin*, 245 Va. 302, 306-07 (1993). And specific performance is "not a matter of right, but rests in the discretion of the trial court to be granted or refused according to established principles and the facts of each case." *Shepherd v. Davis*, 265 Va. 108, 122 (2003) (citation omitted). OI's own allegations and requested relief demonstrate why the Court must exercise that discretion in favor of dismissing Count I.

First, OI requests, among other things, that NTHP be forced to "divest itself of any contrary easements or properties" that may be necessary to clear the path for NTHP to acquire the

conservation easement and tax benefit for the Historic Core.  Compl. ¶ 149(1).  That requested

relief is impossible for NTHP to perform unilaterally, since an easement, by definition, is a two-

party obligation between the easement holder (or dominant estate) and the landowner (or servient

estate).  *Burdette v. Brush Mountain Ests., LLC*, 278 Va. 286, 292-93 (2009).  NTHP cannot

unilaterally extinguish the pre-existing rights of third-party easement holders.

Second, given all the indefinite terms and contingencies surrounding the conservation

easement process, fashioning a decree that would fully enforce Paragraph 13 of the Cooperative

Agreement would be virtually impossible, and, at the very least, impose "great practical

difficulties."  Accordingly, Count I should be dismissed with prejudice.

**E.    The Court should dismiss Count III's request for rescission because it is impossible to return the parties to the status quo and the relief sought is patently inequitable.**

Like the specific performance sought in Count I, Count III's request for rescission is not a

cause of action, but a remedy for an underlying breach of contract claim.  *See Young-Allen v. Bank*

*of Am., N.A.*, 298 Va. 462, 469 (2020) ("Rescission based upon a breach of contract is not a cause

of action in itself, but rather a remedy.").  And the remedy of rescission is not only the polar

opposite of specific performance, but it is also the "highest and most drastic exercise of the power

of a court of chancery."  *Schmidt v. Household Fin. Corp., II*, 276 Va. 108, 115 (2008) (citation

omitted).  More importantly, rescission is appropriate only if the Court can "substantially . . .

restore the parties to the position which they occupied before they entered into the contract."

*Schmidt*, 276 Va. at 115 (citation omitted).  This principle dooms OI's request for rescission.

Here, it is impossible for the Court to return the parties to their pre-contract position.  As

explained above, OI previously owned the Oatlands Hamlet parcel, which was encumbered with a

$1.3 million mortgage.  The parties agreed that NTHP would purchase that parcel from OI in

exchange for paying off OI's $1.3 million mortgage.  *See supra* SOF § IV(C).  With that transaction now complete, it is highly impractical (if not impossible) to undo and return the parties to the status quo.  The Court would have to order OI's former mortgage lender (a non-party) to reinstate the $1.3 million loan at the previous terms, return the payoff proceeds to NTHP and then transfer title of Oatlands Hamlet back to OI, encumbered by a deed of trust securing the mortgage.

Additionally, because the Oatlands Hamlet exchange was supported by valuable consideration—$1.3 million of debt relief received by OI—rescission is inappropriate.  *See e.g.*, *Torrez v. Comacho*, 66 Va. Cir. 161, 168 (2004) (holding that lack of consideration must be "substantial" or "total" for rescission).  OI also asks the Court to rescind the Oatlands Hamlet transfer provisions of the Cooperative Agreement and return the property to OI debt free, without even offering, much less committing, to repay the $1.3 million that NTHP spent to discharge OI's mortgage.  Given that rescission is the most drastic of equitable remedies, such a result would mock the maxim that "[t]hose who invoke the aid of equity to rescind a contract must do equity . . .." *Bolling v. King Coal Theatres, Inc.*, 185 Va. 991, 1000 (1947).  Accordingly, Count III should be dismissed with prejudice.

## II.   <u>Counts VI and VII should be dismissed because they fail to state a legally cognizable claim for breach of trust</u>.

Unable to cope with the plain language of the Co-Stewardship Agreements, OI tries to transform the parties' contractual relationship into to a trustee/beneficiary relationship governed by the Uniform Trust Code in Counts VI and VII.  This attempt fails for several reasons.

First, there is no trust relationship between the parties here, but merely a contractual relationship between two nonprofit corporations, governed by the Co-Stewardship Agreements. As discussed below, the Supreme Court of Virginia has recently explained that a contractual relationship between two parties is not a trust.  And in a dispute very similar to the present one,

the same Court has also explained that a nonprofit charitable corporation is not to be treated as a trust, but as the corporation that it is, subject to the statutes governing corporations, not the Uniform Trust Code.

Second, even if the parties' relationship was governed by trust law (which it is not), the Complaint fails to plead plausible facts that would support a viable claim for breach of trust.

Third, at the very minimum, OI's breach of trust claims against the NTHP's individual Board members fail because, as a matter of law, they are not trustees of any trust. If any trust existed (which it does not), the trustee would only be NTHP, and not its individual Board members. In any event, NTHP's Board members are all entitled as a matter of law to statutory immunity. For these reasons, which are explained further below, Counts VI and VII should be dismissed with prejudice.

### A.    Count VI and VII should be dismissed because no trust relationship exists between the parties.

As noted above, NTHP is a federally chartered nonprofit corporation established by statute. *See supra* SOF § I.  Under Virginia law, "[a]ll corporate powers" of nonstock corporations like NTHP "shall be exercised by or under the authority of, and the business and affairs of the corporation managed under the direction of, its board of directors . . . ."  Va. Code § 13.1-853. And in discharging this authority, directors of corporations are required to act "in accordance with [their] good faith business judgment of the best interests of the corporation." *Id.* § 13.1-870(A). Thus, the Board's duties are to NTHP, not to OI or anyone else.  In contrast, a trustee has the duty to manage trust assets "solely in the interests of the beneficiaries."  Va. Code § 64.2-764.

20

1.      **The Virginia Uniform Trust Code doesn't apply or transform NTHP into a trust.**

Not surprisingly, in *Dodge v. Trustees of Randolph-Macon Woman's College*, the Supreme Court of Virginia recognized that the actions and decisions made by nonprofit corporations and their directors are governed by the principles of corporation law, not the Virginia Uniform Trust Code ("VUTC").  276 Va. 10, 16-17 (2008).  In *Dodge*, the plaintiffs were alumni and supporters of Randolph Macon University who donated funds for the purpose of supporting the College as a single-sex institution for women.  *Id*. at 12.  Because of these and other similarly restricted gifts to the University, the plaintiffs (like OI here as to NTHP) claimed that "the College is a charitable trust and that the plaintiffs are beneficiaries within the intendment of the Uniform Trust Code." *Id*. at 13.  They sued the College—which existed as a non-stock corporation—claiming a breach of trust when its governing Board of Trustees voted to accept male students, alleging that "the College's actions are contrary to the plaintiffs' interests as trust beneficiaries and contrary to the charitable purposes of the corporation."  *Id*.  The trial court dismissed the action on a demurrer, holding that "the Uniform Trust Code is not applicable to the College," and that the actions of the College's Board were governed solely by "the provisions of the Virginia Nonstock Corporation Act . . . ."  *Id*. at 13-14.  On appeal, the Supreme Court of Virginia agreed and affirmed for reasons equally applicable to Counts VI and VII of OI's Complaint.

*Dodge* observed that the Uniform Trust Code applies only to "an *express* inter vivos trust, charitable trust, or noncharitable trust created pursuant to a statute, judgment, or decree," and that no such express trust is created simply because a nonprofit corporation has received "real property" and "funds donated" by benefactors for particular charitable purposes.  *Id*. at 13, 17 (emphasis added) (citing former Va. Code § 55-541.02(A), currently Va. Code § 64.2-700(A)).  No express trust instrument existed, and the claimed charitable purposes of the University and restricted

charitable gifts to it do not constitute an "express trust." *Id*. at 14-17.  Indeed, a different result would improperly "transform every nonstock charitable corporation in Virginia, or that does business in Virginia, into a trust that is subject to the Uniform Trust Code." *Id*. at 17.  Simply put, the VUTC "does not authorize a circuit court to declare by judicial fiat that a nonstock charitable corporation is a trust." *Id*. at 18.

Nor is a nonprofit corporation, like the College, transformed into a trust by a section of the Virginia Code that authorizes the Virginia Attorney General, in an appropriate case, to treat "the assets of a charitable corporation incorporated in Virginia . . . [to] be deemed to be held in trust for the public . . . ." *Id*. at 16 (citing Va. Code § 2.2-507.1).  The Court observed that the statute expressly contemplated nonprofit corporations being governed by corporation statutes, not trust law, as it provides that "[n]othing contained in this section is intended to modify the standard of conduct applicable under existing law to the directors of charitable corporations incorporated in or doing any business in Virginia." *Id*. (quoting Va. Code § 2.2-507.1(B)).

Accordingly, the Court correctly held that the "College is not subject to the Uniform Trust Code" and that neither the VUTC, nor trust law principles in general "impose any duties upon a nonstock charitable corporation." *Id*. at 18.  Rather, "the Virginia Nonstock Corporation Act, and the common law govern the standards of conduct applicable to directors of nonstock charitable corporations." *Id*. at 17.  To hold otherwise would usher in a "drastic change in Virginia's established law" and require statutory authorization from the General Assembly. *Id.* at 16.

Counts VI and VII should be dismissed for the very same reasons as the Court held in *Dodge*.  Like the plaintiffs in *Dodge*, OI is improperly trying to use the VUTC to transform NTHP—a nonprofit corporation—into a trust as a means of procuring a judicially-enforced hostile takeover of the NTHP Board's business judgment.  Also like *Dodge*, the Complaint neither

describes nor identifies any "express trust" to which the VUTC might apply.  The Complaint never once identifies exactly what the supposed "trust" at issue consists of, and at most appears to assert (like the plaintiffs in *Dodge*) that some sort of implied trust arose from conditions imposed by the donors of the Finley Fund and Symington Fund.  Compl. ¶¶ 178-185.  Those gifts are no different from the restricted gifts made by the plaintiffs in *Dodge* that were held *not* to create an express trust subject to the VUTC.  276 Va. at 14-17.

Because no express trust exists here, any trust OI purports to exist could only be some kind of implied trust which is not governed by the VUTC.  Accordingly, any such implied trust would be governed by non-VUTC common law trust principles.  But under common law, OI could not be a beneficiary or otherwise have standing to enforce any putative implied charitable trust. Indeed, not even donors of restricted gifts had standing to sue after making their gift.  *See Penn v. Keller*, 178 Va. 131, 140-41 (1941) ("[W]here the donor has effectually passed out of himself all interest in the fund devoted to a charity, neither he, nor those claiming under him, have any standing in a court of equity as to its disposition and control.").  Rather, under the common law, only the Attorney General representing the public at-large had standing to enforce such a charitable gift—not individuals or entities with parochial self-interests of their own.  *E.g.*, *In re Church Trs.*, 20 Va. Cir. 199, 201 (1990) ("Ordinarily, the Attorney General has a preclusive right to institute proper proceedings to prevent a misuse of property devoted to a public charity.").

OI is obviously not the Attorney General.  Moreover, if the donors of the gifts at issue would not have standing to assert the conditions of their gifts, it's hard to imagine how OI could have any greater standing.  OI's "breach of trust" claims fail for these additional reasons.

### 2.    The Co-Stewardship Agreements are contracts, not trusts.

Nor do the Co-Stewardship Agreements establish a trust relationship between the parties. In *Boyle v. Anderson*, the Supreme Court of Virginia recently explained that a trust is not a contract, and a contract is not a trust, as the two types of instruments and relationships existing under them are different in several important ways.  301 Va. 52, 56-57  (2022).  For example, a contract serves to create binding obligations negotiated by two parties and supported by consideration, while a trust's purpose is a "donative" interest in property.  *Id.*  The two instruments are also formed differently—a contract results from acceptance of an offer and exchange of consideration between two parties, but the beneficiary of a trust need not even know the trust exists for it to be formed, much less provide any consideration for becoming a beneficiary.  *Id.* at 57.  The parties to a contract do not owe fiduciary duties to each other, but only the duties prescribed by the agreement; by contrast, a trustee owes fiduciary duties to the beneficiary of the trust.  *Id.* at 57-58.  And finally, a trust has a divisible property interest between trustee (legal interest) and a beneficiary (equitable interest).  *Id.* at 58.  No such divisible property interests exists for parties to a contract.  *Id.*

The Co-Stewardship Agreements bear all the hallmarks of a contract, not a trust.  The parties are two sophisticated nonprofit corporations who mutually negotiated and assented to the contracts at issue—a transactional, not donative, relationship.  And OI does not have any equitable interest in the Property or NTHP's endowment funds.  Rather, as previously observed, NTHP owns the Property outright and also owns, and retains full discretion over the use of, its endowment funds.  In contrast, OI's interest in the Property and the funds is purely contractual as a lessee under the Lease and subject to the terms of the other Co-Stewardship Agreements.  If the parties were to end the Co-Stewardship Agreements tomorrow, OI would have no right to possess the

Property or NTHP's endowment funds.  These features show a relationship between the parties based on contract and not pursuant to some vague "trust" duties.

     **B.**      **Even if the Complaint sufficiently alleged the existence of a trust, Counts VI and VII fail to plead facts constituting any actionable breach of trust.**

No trust relationship between OI and NTHP and its Board members exists for the reasons just explained.  But even if one did (which is not the case), the Complaint fails to allege facts sufficient to support any cognizable breach of trust.

The allegations supporting Counts VI and VII fall into two general categories:  NTHP, as a putative "trustee," breached (1) its duty of loyalty to OI by using proceeds from the Symington Fund in a purportedly self-interested transaction to acquire the Oatlands Hamlet parcel; and (2) NTHP breached its duty of prudent administration of the putative trust by failing to adequately maintain the Property and by using the Symington Fund for purposes other than the Historic Core.

For the first category, OI cannot allege a breach of trust claim based on NTHP's use of the Symington Fund for acquisition of the Oatlands Hamlet parcel.  OI asserts that such use was improper self-dealing by NTHP as a putative trustee, and in violation Ms. Symington's instructions that her gift be used by NTHP "exclusively" for the "Oatlands" property as it existed at that time of her gift, *i.e.*, the Historic Core.  Compl. ¶¶ 175, 185, 194.  But these claims are eviscerated by the plain language of the Cooperative Agreement in which OI expressly consented to the very conduct that it assails as a breach of trust.  *See* Coop. Agmt. ¶ 6(B); *see also supra* SOF § IV(C).  A trustee's conduct that allegedly constitutes a breach of fiduciary duty is deemed permissible under the VUTC if ratified by the beneficiary.  *See* Va. Code § 64.2-764(B)(4); *W.A.K. ex rel. Karo v. Wachovia Bank, N.A.*, 712 F. Supp. 2d 476, 485-86 (E.D. Va. 2010) (acknowledging that the VUTC allows a beneficiary to "authorize a trustee to engage in an otherwise prohibited transaction").  Since OI contends that it is a beneficiary under the purported trust, Compl. ¶¶ 181-

182, and it expressly authorized NTHP to purchase the Oatlands Hamlet from OI using proceeds from the Symington Fund, Coop. Agmt. ¶ 6(B), OI necessarily ratified the Oatlands Hamlet parcel transaction.  As a result, no breach of trust claim can arise from this set of allegations.

Nor could use of the Symington Fund for the Oatlands Hamlet transaction constitute any breach of prudent administration duties under any putative trust.  The Cooperative Agreement acknowledges that the integration of Oatlands Hamlet with the Historic Core helped to protect the viewsheds from the Historic Core and preserve the overall historic Oatlands estate.  *See supra* SOF § II.  Thus, even apart from OI's ratification, it is difficult to imagine how using the Symington Fund to acquire Oatlands Hamlet could not have been a reasonable interpretation of Ms. Symington's donative intent to have her gift used exclusively for the Oatlands plantation property as it existed at that time.  *See, e.g.*, *W.A.K. ex rel. Karo*, 712 F. Supp. 2d at 482 (a trustee's interpretation of trust language need only be "reasonable and relied on in good faith" to pass fiduciary muster).

OI also ratified any alleged breach of trust based on its allegations that NTHP violated its duties as a putative trustee by allegedly not maintaining the Historic Core in "pristine condition," as purportedly required by the terms of Ms. Finley's donation.  Compl. ¶¶ 185, 196-197.  For starters, the "pristine condition" language OI repeatedly quotes appears nowhere in the actual instrument constituting the terms of Ms. Finley's gift that she and NTHP both signed.  *See* Compl., Ex. 1.  Rather, that language appears only in a subsequent letter from NTHP's then-Chairman thanking Ms. Finley for her gift.  Compl., Ex. 2.  Thus, to the extent that the Finley gift could give rise to a trust enforceable by OI over half a century later (which it does not), it is the express terms of her gift, and not a later thank you letter, that would establish any putative "trust" conditions.

26

*See* Va. Code § 64.2-797 (providing that a trustee satisfies its duty by acting "in reasonable reliance on the ***terms of the trust as expressed in the trust instrument***" (emphasis added)).[2]

In any event, OI's consent to the terms of the Cooperative Agreement ratifies any alleged issues regarding NTHP's purported maintenance and preservation obligations.  As previously explained, OI agreed that, since inception of the cooperative agreement in 1984, NTHP itself has never had sufficient funds to maintain and preserve the Property, and OI agreed to be responsible for maintenance of the Property at its own expense on a financially self-sufficient basis.  *See supra* SOF § IV(A), (B).  Thus, it is *OI* who is contractually responsible for any allegedly deficient maintenance of the Property, not NTHP.  Nor can OI claim NTHP breached any putative "trust" obligations by allegedly failing to supply additional endowment funding to OI, or to approve repairs and construction allegedly proposed by OI.  Again, by agreeing that NTHP retained sole discretion to decide upon endowment contributions to OI, and to approve or disapprove any proposed repairs, modifications or construction beyond OI's normal maintenance obligations, OI, as the purported trust "beneficiary," necessarily ratified any claimed breaches of trust.  Va. Code § 64.2-764(B)(4); *W.A.K. ex rel. Karo, N.A.*, 712 F. Supp. 2d at 485-86.

**C.    Counts VI and VII must fail against the individual board members because (i) they are not "trustees" and (ii) NTHP is the real party in interest.**

Under Virginia law, a corporation is a "legal person, separate and distinct from the persons who own it . . . ." *Keepe v. Shell Oil Co.*, 220 Va. 587, 591 (1979).  Thus, corporations have the power "to sue and be sued, complain and defend in [their] name." Va. Code § 13.1-627(A)(1).  It's undisputed that NTHP is a corporation established by Congress that can "sue and be sued in its

---

[2]    Nor does the actual Finley gift purport to impose any particular maintenance criteria. Rather, it states only that her gift is to be used for the "maintenance and preservation of property known as 'Oatlands.'"  Compl., Ex. 1.

corporate name."  54 U.S.C. § 312105(c).  NTHP is therefore a corporation with a legal existence separate and distinct from its managing Board members.

For reasons previously explained, neither the Finley nor Symington gifts nor the Co-Stewardship Agreements create any trust relationship, particularly one enforceable by OI.  But even if they could, any trustee under them would be *NTHP*, and not its individual Board members.  Under the VUTC, a trustee is a "a ***person*** designated as trustee [who] accepts the trusteeship . . . ."  Va. Code § 64.2-754 (emphasis added); *see also* Va. Code § 64.2-701 (A "'Person' means  . . . business or nonprofit entity . . . or other legal entity").  And the creation of a trust involves, among other things, "[t]ransfer of property to another person as trustee . . . by the settlor or by the settlor's agent . . . ."  Va. Code § 64.2-719.

Here, NTHP's individual Board members are not named as the recipients of any gifts at issue—NTHP is the only named donee.  Compl., Exs. 1, 3.  Similarly, the individual Board members are not parties to the Co-Stewardship Agreements, meaning that they cannot be held liable under those contracts.  *Borg v. Warren*, 545 F. Supp. 3d 291, 323 (E.D. Va. 2021) ("[O]nly the corporation becomes liable for the legal duties prescribed by the contract" made in the name, and on behalf of, the corporation).  Accordingly, NTHP's Board members cannot be deemed trustees.  *See also* Restatement (Second) of Trusts § 16A ("The officers and directors of a corporation, although they are fiduciaries [to the corporation], are not trustees.").

Furthermore, NTHP's Board members were sued solely in their "official capacity."  Compl. ¶¶ 3-19.  As such, OI's causes of action are claims against NTHP, and not against the Board members.  *E.g.*, *Reineck v. Lemen*, 292 Va. 710, 722 (2016) ("A person who sues or is sued in his official or representative capacity is, in contemplation of law, regarded as a person distinct from the same person in his individual capacity and is a stranger to his rights or liabilities

as an individual." (citation omitted)); *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (claims against officers in their official capacity are "treated as a suit against the entity" because the entity is "the real party in interest").  Thus, any claims against NTHP's Board members are duplicative of the claims against NTHP and should be dismissed.

> ### D. Alternatively, Count VI and VII fail against the individual Board members because they have statutory immunity.

Finally, the unpaid Board Members are statutorily immune from suit or liability, requiring dismissal of all claims against them.  *See* Va. Code §§ 8.01-220.1:1(A), 13.1-870.1(B) (providing that directors and officers of tax exempt entities who serve without compensation are statutorily immune from all liability for actions taken by them in their official capacity).  It is uncontroverted that NTHP is a nonprofit corporation exempted from taxation under Section 501(c)(3) of the Internal Revenue Code, and that, by law, NTHP's Board members are required to serve without compensation.  54 U.S.C. § 312104(e).  And the Complaint contains no facts establishing "willful misconduct or a knowing violation of the criminal law," the only exception to immunity.  Va. Code §§ 8.01-220.1:1(C), 13.1-870.1(C).   Accordingly, all claims asserted against NTHP's Board members must be dismissed in light of their statutory immunity.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.  Furthermore, given the profound substantive flaws in the Plaintiff's Complaint, Defendants respectfully request that the Court not give Plaintiff leave to amend, as amendment would be futile.  *See In re PEC Solutions, Inc. Sec. Litig.*, 418 F.3d 379, 391 (4th Cir. 2005) ("Leave to amend need not be given when amendment would be futile."); *accord Dolgaleva v. Va. Beach City Pub. Schs.*, 365 F. App'x 820 (4th Cir. 2010).

Dated:  March 23, 2023

Respectfully submitted,

By:  /s/ Arthur E. Schmalz
      Arthur E. Schmalz (VSB No. 36014)
      Susan F. Wiltsie (VSB No. 30390)
      Ryan M. Bates (VSB No. 74661)
      Steven DiBeneditto (VSB No. 92888)
      HUNTON ANDREWS KURTH LLP
      2200 Pennsylvania Avenue, NW
      Washington, D.C.  20037
      Telephone: (202) 955-1500
      Facsimile: (202) 778-2201
      aschmalz@hunton.com
      swiltsie@hunton.com
      rbates@hunton.com
      sdibeneditto@hunton.com

      *Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on March 23, 2023, certify that on this day, I electronically filed this document with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to all counsel of record, and also caused a copy to be delivered by electronic and first class mail to the following counsel for the Plaintiff:

Bradley D. Jones, Esq.
Lauren Farrar, Esq.
ODIN FELDMAN & PITTLEMAN, P.C.
1775 Wiehle Avenue, Suite 400
Reston, Virginia 20190
703.218.2176 (direct)
703.218.2160 (facsimile)
Brad.Jones@ofplaw.com
Lauren.Farrar@ofplaw.com

By:   /s/ Arthur E. Schmalz
      Arthur E. Schmalz

30