IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| OATLANDS, INC., | ) |
|    Plaintiff, | ) |
| v. | )   Civil Action No. 1:23-cv-344 (RDA/JFA) |
| NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES, *et al.*, | ) |
|    Defendants. | ) |

**<u>MEMORANDUM OPINION AND ORDER</u>**

This matter comes before the Court on Defendants the National Trust for Historic Preservation in the United States and its Trustees' Motion to Dismiss for Failure to State a Claim ("Motion to Dismiss") (Dkt. 8). This Court has dispensed with oral argument as it would not aid in the decisional process. *See* Fed. R. Civ. P. 78(b); Loc. Civ. R. 7(J). This matter has been fully briefed and is now ripe for disposition. Having considered the Motion to Dismiss together with Defendants' Memorandum in Support (Dkt. 9), Plaintiff Oatlands, Inc.'s Opposition (Dkt. 12), and Defendants' Reply (Dkt. 13), this Court GRANTS the Motion to Dismiss for the reasons that follow.

I. BACKGROUND[1]

A. Factual Background

The instant case is a contract dispute between two non-profit corporations, Oatlands, Inc. ("Oatlands") and the National Trust for Historic Preservation in the United States (the "National

---

[1] For purposes of considering Defendants' Motion to Dismiss, the Court accepts all facts contained within the Complaint as true, as it must at the motion-to-dismiss stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Trust"), concerning the preservation of a historic mansion and estate in Leesburg, Virginia, known as the Oatlands Historic House & Gardens (the "Oatlands House" or the "Property").

### 1. Congress' Creation of the National Trust

In 1949, Congress created the National Trust as "a charitable, educational, and nonprofit corporation" charged with acquiring and preserving historic American lands, buildings, objects, and antiquities of national significance. 54 U.S.C. § 312102(a). Congress vested control of the National Trust in a board of directors, referred to as the Board of Trustees. 54 U.S.C. § 312104(a). The Board consists of: (1) the U.S. Attorney General, the U.S. Secretary of the Interior, and the Director of the National Art Gallery as *ex officio* members, and (2) not fewer than six general Board Members who are citizens of the United States. *Id.* Each Board Member serves a term of up to five years and receives no compensation. *Id.* § 312104(c)(2), (e). Congress granted the National Trust the power and authority: (1) to sue and be sued in its own name; (2) to adopt a corporate seal; (3) to create a constitution, bylaws, and regulations; and, as relevant here, (4) to contract and to execute cooperative agreements under terms and conditions that the National Trust deems advisable. *Id.* § 312105(c)-(e) & (h)-(i).

### 2. The National Trust's Endowment Funds for the Oatlands House

The Oatlands House is listed on the National Register of Historic Places as a National Historic Landmark. Dkt. 1-1 (Complaint) at 4. Construction on the main mansion began in 1804, and the building is recognized as one of the finest federal-period country estate houses in the nation. *Id.* The 396-acre Property consists of two components: (1) a large tract containing a two hundred year-old mansion, with formal gardens and ancillary structures (the "Historic Core"), *id.*,

Ex. 5 (Amended and Restated Cooperative Agreement) ¶ 1(A);[2] and (2) "an adjacent fifty-four (54) acre parcel known as 'Oatlands Hamlet[,]'" *id.*, Ex. 5 at Preamble.

The National Trust acquired the Historic Core in 1965 by gift from Margaret Eustis Finley and her husband and sister. *Id.* ¶ 25. Afterward, Ms. Finley donated a $500,000 "endowment fund" to the National Trust, on the condition that the National Trust use the income generated from it for the Property's maintenance and preservation (the "Finley Fund"). *Id.* The National Trust's endowment funds specifically earmarked for the Property consist of the Finley Fund and another fund established in 2004 by a $1.25 million gift to the National Trust from Valerie Symington (the "Symington Fund") to be used exclusively for the "Oatlands" historic estate. *Id.* ¶¶ 29-31.

### 3. The Parties' Co-Stewardship Agreements

Congress authorized the National Trust to hold and manage historic properties either directly or by contracting with local property managers through "cooperative agreements . . . under terms and conditions that the National Trust considers advisable . . . ." 54 U.S.C. § 312105(h). Oatlands serves as the National Trust's local property manager for the Oatlands House under the terms of a cooperative agreement, which was originally executed in 1984 and later amended in 2019. Dkt. 1-1 ¶¶ 37, 41.

In April 2014, Oatlands acquired the Oatlands Hamlet parcel to generate income to support its maintenance of the larger historic site. *Id.* ¶ 38. Later, in 2019, Oatlands decided to convey the

---

[2] Although the general rule is that documents outside of the complaint may not be considered in the context of a motion to dismiss, the Court may consider documents that are either attached to or referenced in the complaint. *See Shooting Point, LLC v. Cumming*, 238 F. Supp. 3d 729, 736 (E.D. Va. 2002) (collecting cases). Here, there are several agreements that are both attached to and referenced in the Complaint. *See* Dkt. 1-1, Ex. 5 (Amended and Restated Cooperative Agreement); *id.*, Ex. 6 (Amended and Restated Loan Agreement); *id.*, Ex. 7 (Amended and Restated Lease). Thus, each of these documents may be considered when deciding the instant Motion to Dismiss.

Oatlands Hamlet parcel to the National Trust, and the National Trust agreed to withdraw approximately $1.3 million from the Symington Fund to pay off Oatlands' mortgage debt on the tract (the "Oatlands Hamlet Transaction").  *Id.*, Ex. 5 ¶ 6(B).  In connection with this transaction, the parties also agreed to use their "best efforts" to pursue a "mutually-acceptable conservation easement [the "Conservation Easement"] on the Historic Core using the Virginia Land Preservation Tax Credit program, with any net funds received to be held by the National Trust in a board-designated endowment for the Property, subject to approval of the terms by the National Trust Board and the Oatlands Board."  *Id.*, Ex. 5 ¶ 13.  To memorialize their agreements with respect to the Oatlands Hamlet Transaction, the parties executed a series of contracts consisting of (1) the Amended and Restated Cooperative Agreement, *id.*, Ex. 5; (2) the Amended and Restated Loan Agreement (the "Loan"), *id.*, Ex. 6; and (3) the Amended and Restated Lease (the "Lease"), *id.*, Ex. 7, (collectively, the "Co-Stewardship Agreements").

The Co-Stewardship Agreements contain several other provisions relevant to the instant dispute.  Specifically, they provide that, for the nominal sum of only $10 per year, Oatlands would lease the Oatlands House from the National Trust.  *Id.*, Ex. 7 ¶¶ 1, 3.  In return for its essentially rent-free lease of the Oatlands House, Oatlands agreed to be financially responsible for all costs of maintaining, operating, and preserving the Property:

> [Oatlands] covenants, agrees and undertakes to pay, in addition to the Rent, each, all and every expense of maintaining, operating and administering the Property in a clean and sightly condition for the purposes specified in Paragraph 1 and in the Co-Stewardship Agreements, including without limitation, the following costs: water/sewer, gas, electric, real estate taxes and assessments, preservation, and restoration costs, for and during the Term of this Lease.

*Id.*, Ex. 7 ¶ 4.

To help cover some of Oatlands' costs for maintaining the Oatlands House, the Co-Stewardship Agreements require that the National Trust make quarterly payments to Oatlands from the National Trust's endowment funds:

> Quarterly Payments. Each fiscal year during the Term of this Agreement, the National Trust will pay to Oatlands, in four (4) equal quarterly installments during the first week of each quarter (July 1, October 1, January 1, April 1), the annual withdrawal from the Oatlands Fund #50016 and any other board-designated [sic] endowments established for the benefit of the Property (such as the board-designated endowment created with proceeds from the conservation easement . . .), as applicable, permitted in accordance with the payout authorized by the National Trust Board, with administrative costs applied on the same basis as for other National Trust endowments . . . .

*Id.*, Ex. 5 ¶ 6(B)(i). The Co-Stewardship Agreements further provide that the endowment funds from which the quarterly payments are drawn

> will continue to be invested and managed by the National Trust in accordance with the policies established by the National Trust Board of Trustees (the "National Trust Board"), in its sole discretion but in accordance with all applicable legal requirements that may affect such management and discretion.

*Id.*, Ex. 5 ¶ 6(B).

At bottom, the Co-Stewardship Agreements contemplated that Oatlands would "continue to use its best efforts to operate a financially sustainable business model for the Property that aims at achieving self-sufficiency, taking into account both funds provided by or through the National Trust and those raised by Oatlands." *Id.* ¶ 6(A).

### 4. The Instant Lawsuit

Oatlands now brings suit in this Court against the National Trust and its trustees, alleging that the National Trust has failed to meet its obligations under the Co-Stewardship Agreements. Dkt. 1-1 ¶ 43. First, Oatlands alleges that the National Trust has refused to work with Oatlands to secure the Conservation Easement. *Id.* ¶ 49. Oatlands explains that, while the National Trust has represented that it would be willing to approach potential donors who could provide the funds

5

necessary to secure the easement, the National Trust has not yet presented Oatlands with a commitment from any donor to contribute at least $2 million to the National Trust's endowment funds under the Virginia Land Preservation Tax Credit Program. *Id.* ¶ 50. Second, Oatlands asserts that the National Trust has wrongfully reduced the endowment draw paid to Oatlands, thus depriving Oatlands of the funding necessary to maintain the Oatlands House and pay its operational expenses. *Id.* ¶ 60. Oatlands alleges that, at the time that the Co-Stewardship Agreements were signed, the payout authorized by the National Trust Board was 5% of the balance of the National Trust Oatlands Endowment. *Id.* ¶ 63. But after the parties signed the Co-Stewardship Agreements, the National Trust enacted a Spending Policy in June 2020, pursuant to which it has been making quarterly payments to Oatlands that are as low as 3.5% of the National Trust Oatlands Endowment. *Id.* ¶¶ 64, 70.

## B. Procedural Background

Plaintiff Oatlands ("Plaintiff") initially filed suit against the National Trust and its Trustees (collectively, "Defendants") in the Circuit Court of Loudoun County, Virginia on February 2, 2023. Dkt. 1 (Notice of Removal) ¶¶ 1, 6. Defendants then removed the instant action to this Court on March 15, 2023. Dkt. 1.

On March 20, 2023, the parties filed a Joint Motion Requesting Order Setting Briefing Schedule for Defendants' Motion to Dismiss ("Joint Motion"), Dkt. 3, and this Court granted the Joint Motion the next day, Dkt. 7. Subsequently, on March 23, 2023, Defendants filed their Motion to Dismiss, Dkt. 8, along with a Memorandum in Support thereof, Dkt. 9. On April 12, 2023, Plaintiff filed an Opposition to Defendants' Motion, Dkt. 12, and on April 27, 2023, Defendants filed a Reply in support of their Motion, Dkt. 13.

6

II. STANDARD OF REVIEW

To survive a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), a complaint must set forth "a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556); *see also Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015) ("[T]he reviewing court must determine whether the complaint alleges sufficient facts 'to raise a right to relief above the speculative level.'" (quoting *Twombly*, 550 U.S. at 555)).

In reviewing a Rule 12(b)(6) motion, the Court "must accept as true all of the factual allegations contained in the complaint," drawing "all reasonable inferences" in the plaintiff's favor. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted). To be sure, "the [C]ourt 'need not accept the [plaintiff's] legal conclusions drawn from the facts,' nor need it 'accept as true unwarranted inferences, unreasonable conclusions, or arguments.'" *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 616 n.26 (4th Cir. 2009) (quoting *Kloth v. Microsoft Corp.*, 444 F.3d 312, 319 (4th Cir. 2006)). In general, the Court may not look beyond the four corners of the complaint in evaluating a Rule 12(b)(6) motion. *See Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015).

III. ANALYSIS

In its Complaint, Plaintiff brings seven counts against Defendants—the first five sounding in breach of contract and the latter two sounding in breach of trust. The first five counts request the following relief for Defendants' alleged breaches of the Co-Stewardship Agreements:

> Count I: Specific performance requiring the National Trust to use its best efforts to work with Oatlands to obtain the Conservation Easement.

> Count II: In the alternative to Count I, money damages "of at least $2.5 million" for the National Trust's failure to use its best efforts to work with Oatlands to obtain the Conservation Easement.
>
> Count III: In the alternative to Counts I and II, partial rescission of the Amended and Restated Cooperative Agreement, requiring the National Trust to return the Oatlands Hamlet property to Oatlands due to its failure to use its best efforts to work with Oatlands to obtain the Conservation Easement.
>
> Count IV: "[A]t least $500,000" in money damages for the National Trust's failure to pay Oatlands the full endowment draws that it was entitled to.
>
> Count V: A declaratory judgment that the National Trust may not rely on its Spending Policy in paying Oatlands inadequate endowment draws.

Dkt. 1-1 ¶¶ 144-76.

Based on these same grievances, Plaintiff also brings two claims against Defendants for breach of trust. *Id.* ¶¶ 177-99. Count VI of the Complaint seeks $3 million in damages and the return of the Oatlands Hamlet parcel, *id.* ¶ 188, and Count VII asks the Court to remove each of the National Trust's Board Members, to appoint a "special fiduciary" in their place, and to award Plaintiff attorneys' fees, *id.* ¶ 199. Defendants move the Court to dismiss this action in its entirety. The Court will address the merits of the breach of contract and breach of trust counts in turn.

## A. The Breach of Contract Counts

Defendants first argue that all five of Plaintiff's breach of contract claims should be dismissed because they are premised on alleged rights that are inconsistent with the actual terms of the parties' Co-Stewardship Agreements. "To survive a motion to dismiss for failure to state a breach of contract claim, the complaint must state sufficient facts showing: '(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation.'" *Wenzel*

8

*v. Knight*, No. 3:14-CV-432, 2015 WL 3466863, at *4 (E.D. Va. June 1, 2015) (quoting *Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004)).

1. Counts I Through III

Counts I through III of Plaintiff's Complaint seek alternative remedies (specific performance, damages, and rescission) for Defendants' alleged refusal to work with Plaintiff to secure a tax-qualified conservation easement on the Historic Core. Dkt. 1-1 ¶¶ 144-67. Defendants assert that all three counts fail as a matter of law because the terms of Paragraph 13 are too indefinite to constitute an enforceable obligation. Dkt. 9 at 16. In response, Plaintiff counters that the requirements related to the conservation easement are clear from the contract language. Dkt. 12 at 13. Specifically, Plaintiff posits that "best efforts" must require sufficient action on the National Trust's part, such as completing the necessary documentation and developing a transaction structure to enable a submission to the Virginia Land Preservation Tax Credit Program. *Id.*

"It is well settled under Virginia law that agreements to negotiate at some point in the future are unenforceable." *Beazer Homes Corp. v. VMIF/Anden Southbridge Venture*, 235 F. Supp. 2d 485, 490-91 (E.D. Va. 2002) (citations omitted) (holding that the parties' agreement "to 'negotiate in good faith to reach a mutually acceptable Contract,'" was an unenforceable "agreement[] to agree in the future"). Such provisions are known as "agreements to agree," and are unenforceable because they are simply "too vague and too indefinite to be enforced." *Id.* at 490 (internal quotation omitted).

In *Beazer Homes Corp.*, a court in this District granted a motion to dismiss based on an alleged breach of terms in an agreement requiring the parties to "negotiate in good faith to [r]each a mutually acceptable Contract based on the terms and conditions outlined herein," reasoning that

9

the contractual language amounted to an unenforceable agreement to agree. *Id.* at 488, 491, 494-95. Defendants in the instant case liken Paragraph 13 of the Amended and Restated Cooperative Agreement to the terms that the *Beazer Homes Corp.* court found unenforceable.

This Court finds *Beazer Homes Corp.* to be instructive here. Paragraph 13 of the Amended and Restated Cooperative Agreement provides, in pertinent part: "the Parties agree to use their best efforts to secure the placement of a mutually-acceptable conservation easement on the Historic Core." Dkt. 1-1, Ex. 5 ¶ 13. Critically, as in *Beazer Homes Corp.*, the plain language of this provision envisions that the parties would still have to negotiate and agree on "mutually acceptable" terms for a conservation easement. In fact, the terms at issue in the case at bar are even less defined than the unenforceable agreement to agree in *Beazer Homes Corp.* There, the instrument at issue at least contained "terms and conditions outlined" in the contract upon which the parties' to-be-negotiated agreement was to be based. *Beazer Homes Corp.*, 235 F. Supp. 2d at 488. By contrast, the Agreement in the instant case is devoid of any terms or conditions for the conservation easement, other than that it would have to pass muster with state tax authorities under the Virginia Land Preservation Tax Program.

Plaintiff's arguments fail to overcome this agreement-to-agree problem. In its Opposition, Plaintiff maintains that Virginia law enforces a party's agreement to use its best efforts as a matter of contract law. Dkt. 12 at 12. But in focusing on the "best efforts" language in Paragraph 13, Plaintiff entirely ignores that the parties here agreed to use their "best efforts" to secure a "*mutually-acceptable*" conservation easement, Dkt. 1-1, Ex. 5 ¶ 13 (emphasis added), meaning that the parties still could—and ultimately did—disagree about what they might later find to be "mutually acceptable" to them. And nowhere in its Complaint or Opposition does Plaintiff assert that the parties had already agreed on what a "mutually-acceptable" conservation easement would

10

look like.  The Court thus concludes that the National Trust's promise to obtain a conservation easement is not legally enforceable.  Accordingly, Plaintiff's breach of contract claims concerning the conservation easement (Counts I through III) cannot proceed past the motion to dismiss stage.

### 2. Counts IV and V

Counts IV and V of the Complaint are based on Plaintiff's allegation that the National Trust has failed to pay Plaintiff the full endowment draws that it is owed under the Co-Stewardship Agreements.  Dkt. 1-1 ¶¶ 168-76.  In particular, Plaintiff submits that Defendants breached the Agreements when the National Trust unilaterally enacted a Spending Policy that reduced the draw payment to Oatlands from the historical 5% draw.  *Id.* ¶ 70.  Plaintiff explains that the Spending Policy results in a different calculation of the endowment draws because it (1) applies a reduction in the spending rate for fiscal years 2020-2024; (2) applies the spending rate to the average endowment fund balance over three-years; and (3) applies a 2% cap and floor on year-over-year increases to the endowment draws.  *Id.* ¶ 71.  Plaintiff further asserts that the endowment draws have been inconsistent with the Spending Policy in that the draws have been less than the draw percentage authorized by the Board, and the Board has failed to properly apply the spending floor, which was designed to protect against large year-over-year changes in the payments.  *Id.* ¶¶ 81-94.  Defendants, in turn, move the Court to dismiss Counts IV and V, arguing, first, that the Co-Stewardship Agreements give the National Trust sole discretion to determine how much of its endowment funds to provide Plaintiff with each quarter and, second, that the National Trust correctly applied the Spending Policy each fiscal year.  Dkt. 9 at 14.

Paragraph 6(B)(i) of the Amended and Restated Cooperative Agreement requires that the National Trust make quarterly payments to Plaintiff from the National Trust's endowment funds. Dkt. 1-1, Ex. 5 ¶ 6(B)(i).  That Paragraph, however, contains no language specifying a particular

amount to be paid out each quarter.  Importantly, if the parties had intended to fix the endowment draw rate, they could have said so in the Agreement.  The lack of any such provision thus suggests that the National Trust was not locked into any particular payout percentage.

Nevertheless, Plaintiff theorizes that the National Trust is obligated to continue paying Plaintiff the spending rate authorized by the National Trust Board at the time that the Co-Stewardship Agreements were signed.  Dkt. 1-1 ¶ 70.  But such a conclusion contradicts the plain language of Paragraph 6(b) of the Agreement, which provides that "the National Trust Oatlands Endowment will continue to be invested and managed by the National Trust in accordance with the policies established by the [National Trust Board] . . ., *in its sole discretion* but in accordance with all applicable legal requirements that may affect such management and discretion."  *Id.*, Ex. 5 ¶ 6(B) (emphasis added).  From the face of the Agreement, the National Trust appears to retain "sole discretion" to decide what percentage of its endowment funds to provide Oatlands each fiscal year, *id.*, Ex. 5 ¶ 6(B), and the only limit on its discretion is that the "payout" be "authorized by the National Trust Board, with administrative costs applied on the same basis as for other National Trust endowments."  *Id.*, Ex. 5 ¶ 6(B)(i).

Seeking to avoid this conclusion, Plaintiff asserts that the "sole discretion" language in Paragraph 6(B) of the Amended and Restated Cooperative Agreement applies only to fund management and investment composition, not endowment draws.  Dkt. 12 at 19-20 (quoting Dkt. 1-1, Ex. 5 ¶ 6(B)).  This Court is unpersuaded.  Paragraph 6(B) provides that "the National Trust Oatlands Endowment will continue to be invested and managed by the National Trust . . . , in its sole discretion . . . ."  The ordinary meaning of "manag[ing]" is consistent with the National Trust having the right to exercise authority over how its endowment funds are used, including what percentage of them go towards quarterly payments to Plaintiff under Paragraph 6(B)(i) of the

Agreement. *See* "*Manage*," Merriam-Webster Dictionary Online, https://perma.cc/JM8C-ZVPX (last visited October 11, 2023) (defining the verb manage as "to exercise executive, administrative, and supervisory direction of"). Moreover, Plaintiff's grievances about the National Trust's financial support are further undermined by the plain language in the Co-Stewardship Agreements that contemplates Plaintiff operating and maintaining the Property on a financially self-sufficient basis. *See* Dkt. 1-1, Ex. 5 ¶ 6(A) ("Financially Sustainable Business Model. Oatlands will continue to use its best efforts to operate a financially sustainable business model for the Property that aims at achieving self-sufficiency . . . ."). For these reasons, the Court rejects Plaintiff's argument that the National Trust may not unilaterally change the spending rate from the rate in place when the Co-Stewardship Agreements were executed.

The Court next turns to Plaintiff's contention that, even if the National Trust has discretion to change the spending rate, it has exercised that discretion in a manner that is inconsistent with its own Spending Policy. In support of its position, Plaintiff claims that the National Trust Board authorized endowment draw rates for 2019 through 2022 of 5.0%, 4.95%, 4.90%, and 4.85%, respectively. Dkt. 1-1 ¶¶ 81-85. According to Plaintiff, the National Trust Board should have applied these draw percentages to the following respective prior-year balances of the endowment: "$6,614,449.49," "$7,439,716.15," "$8,168,904.14," and "9,535,405.07." *Id.* ¶¶ 82-85. Plaintiff asserts that, each fiscal year, however, the National Trust's payments to Plaintiff fell short of what the total payouts should have been based on this calculation. *Id.* Plaintiff also avers that the National Trust Board failed to apply the 2% floor to the endowment draws for 2019. *Id.* ¶ 93. Specifically, Plaintiff alleges that, for the fiscal year prior to the Oatlands Hamlet Transaction, the National Trust made four quarterly draw payments to Oatlands of $103,714.00 (totaling $414,856.00). *Id.* ¶ 92. However, Plaintiff asserts that, after the Transaction, rather than applying

13

the 2% floor to the full endowment draw, the National Trust Board calculated the endowment draw for the year to total $316,264, which amounted to a 23.77% year-over-year reduction. *Id.* ¶ 93. Defendants, on the other hand, argue that Plaintiff's calculations are based on an incorrect reading of the Amended and Restated Cooperative Agreement.

Pursuant to the Agreement, the National Trust's endowment funds for the Oatlands House consist of (1) the balance of the fund established by Ms. Finley's $500,000 gift in 1965, Dkt. 1-1 ¶ 25, and (2) the balance of the fund created by Ms. Symington's $1.25 million gift in 2004, *id.*, ¶¶ 29, 31. Plaintiff alleges that the National Trust had traditionally paid annual endowment draws to Plaintiff based on a percentage of the balance of these two funds. *Id.* ¶ 43. However, the parties contracted to change this arrangement in the Agreement, which took effect on April 15, 2019. *Id.*, Ex. 5 at Preamble. Specifically, under Paragraph 6 of the Agreement, the parties agreed to bifurcate the two endowment funds for the Property. *Id.*, Ex. 5 ¶ 6(B), (B)(i). The original endowment fund established by the Finley gift (the "Oatlands Fund #50016" or the "General Fund") would remain as the sole existing endowment fund available for making annual endowment draw payments to Oatlands, *id.*, while the remaining proceeds of the Symington Fund (referred to in the Agreement as "Oatlands Symington Fund 50141")—after about $1.3 million of it was spent in accordance with the parties' agreement on the Oatlands Hamlet Transaction—would be used to create a dedicated $500,000 "Maintenance Fund" for the Property, *id.*, Ex. 5 ¶ 6(B). This "Maintenance Fund" would exist separately from the General Fund; Plaintiff could use the Maintenance Fund only by "apply[ing] to the National Trust" for the sole purpose of "fund[ing] capital repairs and cyclical maintenance," with any such application to be "funded by the mutual agreement of the Parties." *Id.*, Ex. 5 ¶ 6(C). Reading the Agreement as a whole, it is plain that the Maintenance Fund, with its specific use and purpose restrictions, is entirely separate from the

14

General Fund, which serves as the sole source for Plaintiff's regular annual endowment payments by the National Trust under Paragraph 6(B)(i) of the Cooperative Agreement.

In calculating the higher annual payout amounts that it claims it should have been provided, however, Plaintiff combines the balance of the General Fund and the Maintenance Fund. But such a reading of the Agreement would render the specific, agreed-to restrictions imposed on the Maintenance Fund utterly meaningless. *See TM Delmarva Power v. NCP of Va.*, 557 S.E.2d 199, 200 (Va. 2002) ("[N]o word or clause in a contract will be treated as meaningless if a reasonable meaning can be given to it, and parties are presumed not to have included needless words in the contract."). Accordingly, Plaintiff's argument concerning the National Trust's alleged underpayment of endowment draws fails because it is based on a flawed interpretation of the Cooperative Agreement.

Plaintiff's contention that the National Trust failed to apply the Spending Policy's 2% floor for fiscal year 2019 fares no better. The Court finds that the Spending Policy's 2% floor did not apply to the National Trust's 2019 endowment payout because the Spending Policy was not yet in effect at that time. Plaintiff claims that it received $414,856 in endowment payments "for the fiscal year prior to the Oatlands Hamlet [T]ransaction," *id.* ¶ 92, which would have been fiscal year 2018 since the Transaction closed in April 2019, *id.* ¶ 39. For fiscal year 2019, Plaintiff received $316,264 in endowment draw payments, which it claims should have been about $100,00 higher based on the purportedly applicable 2% floor in the Spending Policy (*i.e.*, 98% of the prior year's $414,856 payout). *Id.* ¶¶ 81, 92-94. But the Complaint alleges that the Spending Policy, which introduced the 2% floor, did not take effect until June 19, 2020—near the end of fiscal year 2020. *Id.* ¶¶ 70-71, 81. Therefore, as a matter of law, Defendants could not have violated the Spending Policy's 2% floor in 2019 because, as the Complaint itself alleges, the Policy was not

15

adopted until the following year. For these reasons, the alleged endowment shortfalls cannot form the basis of a breach of contract claim and Counts IV and V of the Complaint will be dismissed.

The Court further finds that Count V of the Complaint fails for a separate, independent reason—that Plaintiff's request for declaratory relief is duplicative of its breach of contract claim. In Count V of the Complaint, Plaintiff asks this Court to declare that the National Trust violated the Co-Stewardship Agreements by reducing the amount of its endowment draw payments to Plaintiff. Dkt. 1 ¶¶ 173-176. At the same time, Plaintiff asserts a breach of contract claim in Count IV of the Complaint, claiming that it has suffered "at least $500,000" in damages as a result of that reduction in endowment draws. *Id.* ¶¶ 168-172. "[T]he same conduct" thus "underlies [Plaintiff's] claims for declaratory judgment and breach of contract." *Metra Indus., Inc. v. Rivanna Water & Sewer Auth.*, No. 3:12CV00049, 2014 WL 652253, at *2 (W.D. Va. Feb. 19, 2014). This Court finds that "'[b]ecause the declaratory judgment claim 'seeks the resolution of legal issues that will, of necessity, be resolved in the course of the litigation of the other causes of action,' the claim for declaratory relief is duplicative, and permitting it to proceed will not serve a useful purpose." *Hardnett v. M&T Bank*, 204 F. Supp. 3d 851, 863 (E.D. Va. 2016) (quoting *Metra Indus., Inc.*, 2014 WL 652253, at *2); *see also Sharma v. OneWest Bank, FSB*, No. CIV.A. DKC 11-0834, 2011 WL 5167762, at *6 (D. Md. Oct. 28, 2011) ("When declaratory relief would be duplicative of claims already alleged, dismissal is warranted." (citing *Harte–Hanks Direct Mktg./Balt., Inc. v. Varilease Tech. Fin. Grp., Inc.*, 299 F.Supp.2d 505, 528 (D.Md.2004))). Accordingly, Count V will be dismissed for this additional reason.

## B. The Breach of Trust Counts

Turning to Plaintiff's breach of trust claims, Defendants argue that Plaintiff has improperly tried to shoehorn the parties' contractual dispute into an ill-fitting trust law mold under the Virginia

16

Uniform Trust Code. Dkt. 9 at 3. According to Defendants, this attempt falls flat for several reasons. First, Defendants assert that there is no trust relationship between the parties. *Id.* at 19. Rather, there is merely a contractual relationship between two nonprofit corporations, governed by the Co-Stewardship Agreements. *Id.* Second, Defendants contend that, at the very least, Plaintiff's breach of trust claims against the National Trust's individual Board Members fail as a matter of law because the Board Members are entitled to immunity under Virginia's charitable immunity statute. *Id.* at 20. In response, Plaintiff maintains that Congress created the National Trust to hold the Oatlands House in trust, Dkt. 12 at 22-23, and further argues that Virginia's charitable immunity statute does not apply to the National Trust's Board Members because the National Trust's federal charter provides the relevant statutory scheme, *id.* at 29-30.

As an initial matter, the Court finds that no beneficiary-trustee relationship exists between Plaintiff and the National Trust and its Board. In making this determination, this Court is guided by the Supreme Court of Virginia's decision in *Dodge v. Trustees of Randolph-Macon Woman's College*, where the court recognized that the actions and decisions made by nonprofit corporations and their directors are governed by the principles of corporation law, not the Virginia Uniform Trust Code ("VUTC"). 661 S.E.2d 805, 808-09 (Va. 2008).

In *Dodge*, the plaintiffs were alumni and supporters of Randolph-Macon Women's College who donated funds for the purpose of supporting the College as a single-sex institution for women. *Id.* at 806. Because of these and other similarly restricted gifts to the College, the plaintiffs claimed that "the College is a charitable trust and that the plaintiffs are beneficiaries within the intendment of the Uniform Trust Code." *Id.* at 807. They sued the College—which existed as a non-stock corporation—claiming a breach of trust when its governing Board of Trustees voted to accept male students, alleging that "the College's actions are contrary to the plaintiffs' interests as trust

17

beneficiaries and contrary to the charitable purposes of the corporation." *Id.* The Supreme Court of Virginia affirmed the trial court's holding that "the Uniform Trust Code is not applicable to the College," and that the actions of the College's Board were governed solely by "the provisions of the Virginia Nonstock Corporation Act . . . ." *Id.* The *Dodge* court observed that the Uniform Trust Code applies only to "an express inter vivos trust, charitable trust, or noncharitable trust created pursuant to a statute, judgment, or decree," and that no such express trust is created simply because a nonprofit corporation has received "real property" and "funds donated" by benefactors for particular charitable purposes. *Id.* at 806, 809 (citing former Va. Code § 55-541.02(A)). The Supreme Court of Virginia found that the claimed charitable purposes of the College and the restricted charitable gifts that it received did not create an express trust. *Id.* at 809. In so doing, the court opined that a different result would improperly "transform every nonstock charitable corporation in Virginia, or that does business in Virginia, into a trust that is subject to the Uniform Trust Code." *Id.*

*Dodge* serves as a useful analog here. Like the plaintiffs in *Dodge*, Plaintiff merely avers that some sort of trust arose from conditions imposed by the donors of the Finley Fund and Symington Fund. Dkt. 1-1 ¶¶ 178-185. But those gifts are no different from the restricted gifts made by the plaintiffs in *Dodge*, which did not create an express trust subject to the VUTC. 661 S.E.2d at 809.

Furthermore, that the National Trust's Board Members have the title "general trustees" does not change the National Trust's corporate status, as Plaintiff argues. Dkt. 112 at 29. "Even the members of the managing board of a charitable corporation, whether called directors or trustees, are not 'trustees' in the strict sense because they do not hold title to the property of the corporation." Restatement (Third) Trusts § 5, Comment G. Indeed, the name of the governing

body of the College in *Dodge* was "the *Trustees* of Randolph-Macon Woman's College," but the Supreme Court of Virginia still considered the College to be a corporation, not a trust. 661 S.E.2d at 806, 809 (emphasis added). Plaintiff's argument that Congress intended to establish the National Trust as a trust because it granted the National Trust the authority to accept personal or real property "absolutely or *in trust*" is similarly unavailing. Dkt. 12 at 22 (emphasis added) (quoting 54 U.S.C. § 312105(f), (g)). As the *Dodge* Court explained, nonprofit corporations can hold property in trust, but that does not necessarily convert a nonprofit corporation into a trust and require "the application of trust law, rather than corporate law." 661 S.E.2d at 808.

For these reasons, the Court finds that Plaintiff has not plausibly alleged a trust relationship between the parties. Accordingly, Plaintiff's breach of trust claims (Counts VI and VII of the Complaint) will be dismissed.

Finally, Plaintiff's breach of trust claims against the National Trust's individual Board Members (Count VI and VII of the Complaint) will be dismissed for the additional reason that the Board Members are statutorily immune from suit or liability. Va. Code §§ 8.01-220.1:1(A) (providing that directors and officers of tax-exempt entities who serve without compensation are statutorily immune from all liability for actions taken by them in their official capacity). It is uncontroverted here that the National Trust is a nonprofit corporation exempted from taxation under Section 501(c)(3) of the Internal Revenue Code, and that, by law, the National Trust's Board members are required to serve without compensation. 54 U.S.C. § 312104(e). And while Plaintiff asserts that Virginia's charitable immunity statute does not apply to the National Trust's Board Members because of the National Trust's federal charter, Dkt. 12 at 29-30, that immunity specifically applies to the uncompensated "[d]irectors, partners, members, managers, trustees and officers" of *all* tax-exempt corporations like the National Trust, not just Virginia nonprofit

19

corporations. Va. Code § 8.01-220.1:1(A). As such, Plaintiff's claims against the individual Board Members will be dismissed from the instant action for this reason as well.

                  \*     \*     \*

In sum, none of Plaintiff's breach of contract or breach of trust claims can proceed beyond the motion to dismiss stage. Counts I through V of the Complaint fail as a matter of law because they rely on claimed rights that are inconsistent with the Co-Stewardship Agreements. Count V will also be dismissed for the separate reason that Plaintiff's request for declaratory relief is duplicative of the breach of contract claim Plaintiff asserts in Count IV. Furthermore, Counts VI and VII fail in their entirety because Plaintiff cannot plausibly allege the existence of an express trust such that the National Trust and its Board Members are governed by the VUTC. And Plaintiff's breach of trust claims against the Board Members in Counts VI and VII will be dismissed for the additional reason that the National Trust's Board Members are entitled to immunity under Virginia's charitable immunity statute.

## IV. CONCLUSION

For the foregoing reasons, it is hereby ORDERED that Defendants' Motion to Dismiss (Dkt. 8) is GRANTED; Counts I through VII of the Complaint are DISMISSED WITH PREJUDICE because amendment would be futile.

The Clerk is directed to forward copies of this Memorandum Opinion and Order to counsel of record and to close this civil action.

It is SO ORDERED.

Alexandria, Virginia
November 6, 2023

/s/
Rossie D. Alston, Jr.
United States District Judge